ERIC P. JORGENSEN (AK Bar # 894010)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
(907) 586-2751
(907) 463-5891 [fax]
ejorgensen@earthjustice.org

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF POINT HOPE, CITY OF POINT HOPE, INUPIAT COMMUNITY OF THE ARCTIC SLOPE, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATIONAL AUDUBON SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, OCEANA, PACIFIC ENVIRONMENT, RESISTING ENVIRONMENTAL DESTRUCTION ON INDIGENOUS LANDS, a Project of the INDIGENOUS ENVIRONMENTAL NETWORK (REDOIL), SIERRA CLUB, and THE WILDERNESS SOCIETY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. _____ |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DIRK KEMPTHORNE, Secretary of the Interior, RANDALL B. LUTHI, Director of Minerals Management Service, and MINERALS MANAGEMENT SERVICE and UNITED STATES FISH AND WILDLIFE SERVICE, United States Department of the Interior, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(5 U.S.C. §§ 702-706; 42 U.S.C. § 4332; 16 U.S.C. § 1536)

**INTRODUCTION**

1.      This action challenges Defendants' decision to offer approximately 29.4 million acres of public lands on the outer continental shelf of the Chukchi Sea for oil and gas leasing. The decision, together with the Chukchi Sea Planning Area Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea Final Environmental Impact Statement (FEIS), violates the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA).

2.      The Chukchi Sea provides habitat for a great variety of marine life, including polar bears, endangered bowhead whales, walrus, threatened spectacled and Steller's eiders, seals, beluga whales, gray whales, and many species of fish and birds. Native Alaskan communities along the Chukchi Sea, including Point Hope, rely on the sea and its wildlife for their nutrition and their culture. Members of these communities practice a traditional subsistence lifestyle, engaging in subsistence activities in the Chukchi Sea passed down from generation to generation for millennia. Subsistence is an integral part of the identity, culture, spirituality, social structure, and physical sustenance of these communities. In Defendant Minerals Management Service's (MMS) FEIS, which purports to analyze the potential impacts of lease sale 193 on the Chukchi Sea natural and human environment, MMS acknowledges that there could be substantial impacts from the proposed lease sale to the wildlife of the Chukchi Sea and the communities that depend upon it for their subsistence.

3.      The Chukchi Sea environment is undergoing dramatic changes. In the summer of 2007, the surface temperature of parts of the Chukchi Sea was reported to be five degrees (Centigrade) above average. The extent of summer sea-ice set a new record low. Some of the federal government's own scientists heralded the record low sea-ice conditions in the Arctic this

summer as a evidence that diminishing sea-ice cover may have passed the point of no return. In the summer of 2007, walrus were observed hauled out on land in unusual numbers and in places they had not used as haulouts for a century. Humpback and fin whales were reported in the Chukchi Sea, hundreds of miles north of their usual range. MMS acknowledges in the FEIS that wildlife, such as polar bears and walrus which depend upon sea-ice, are vulnerable to the effects of climate change, but it does not address these recent dramatic changes.

4. MMS acknowledges there are many unknowns about the wildlife that inhabits the Chukchi Sea, how that wildlife is being affected by climate change, and how oil and gas activities will affect the sea, its wildlife, and subsistence activities. As a result of these critical information gaps, the FEIS does not describe the full potential effects of the lease sale on the Chukchi Sea environment or the wildlife that inhabits the sea and upon which Native Alaskan communities along the sea depend for their cultural and physical well-being.

5. The FEIS does not adequately analyze and present the impacts to the environment and human communities of lease sale 193. It fails to adequately analyze the impact of the lease sale in the context of a warming climate. It understates the potential impacts of oil and gas development pursuant to the leases by analyzing a limited development scenario. It understates the risks of an oil spill. Its analysis of the effects of seismic surveying is misleading. It fails to fully analyze the cumulative impacts to threatened eiders of the lease sale and on-shore oil and gas development. In addition, in reaching its biological opinion under the ESA that the lease sale is not likely to jeopardize the continued existence of the threatened spectacled or Steller's eider, Fish and Wildlife Service (FWS) omits analysis of future federal oil and gas activities in the National Petroleum Reserve – Alaska and the Beaufort Sea.

6. Defendants MMS, Dirk Kempthorne, and Randall B. Luthi have violated NEPA because the FEIS does not constitute an adequate detailed statement addressing the impacts from oil and gas leasing in the Chukchi Sea, as required by NEPA. 42 U.S.C. § 4332(C); 40 C.F.R. § 1500 *et seq.*

7. Defendant FWS has failed to comply with the requirements of the ESA, 16 U.S.C. § 1536, in reaching its biological opinion on the lease sale's effects on threatened Steller's and spectacled eiders because it failed to fully consider the potential effects on threatened eiders of federal activities in the National Petroleum Reserve – Alaska and Beaufort Sea OCS upon which FWS has already consulted pursuant to the ESA.

## JURISDICTION

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, and 5 U.S.C. §§ 702-706. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

9. Plaintiff Native Village of Point Hope is a federally recognized tribal government under the 1934 Indian Reorganization Act, as amended in 1936 for Alaska Natives. It is responsible for the well-being of its 800-900 members. The Chukchi Sea is of vital importance to the Native Village of Point Hope. Members of the Native Village of Point Hope have depended for millennia on bowhead whales, walrus, seals, polar bears, beluga whales, fish such as salmon, trout, and tom cod, and birds, for their subsistence. These resources are critical to both the health and culture of the members. The Native Village of Point Hope and its members have a strong interest in the sea's resources and the well-being of the wildlife that inhabits the sea.

10.     Plaintiff City of Point Hope is a municipality incorporated in 1966.  It is responsible for the well-being of the approximately 950 residents of the City of Point Hope.  The majority of Point Hope residents engage in subsistence activities.  The City of Point Hope is actively involved in preserving and supporting the subsistence traditions of its residents.  The Chukchi Sea is vitally important to the City and its residents, and the City and its residents have a strong interest in protecting the sea's resources and wildlife.

11.     Plaintiff Inupiat Community of the Arctic Slope (ICAS) is a federally recognized regional tribal government.  ICAS represents tribal members across eight North Slope communities:  Anaktuvuk Pass, Atqasuk, Barrow, Kaktovik, Nuiqsut, Point Hope, Point Lay, and Wainwright.  ICAS's mission is to represent and protect the interests of its members, including promoting and protecting their subsistence way of life.  Members of ICAS depend on subsistence and the integrity of the environment for their health, culture, social structure, and community well-being, and have engaged in subsistence activities in the Arctic Ocean, including the Chukchi Sea, for millennia.  ICAS and its members have a strong interest in the sea and the health of the wildlife that inhabits it.

12.     Plaintiff Alaska Wilderness League is a non-profit organization with approximately 10,000 members and activists.  Alaska Wilderness League was founded in 1993 to advocate for protection of Alaska's public lands that are threatened with environmental degradation.  Since its inception, it has taken an active role on issues related to oil and gas development in Alaska.  Its Alaska office has three full-time employees and houses its Arctic Environmental Justice Program.  Through advocacy and education, the League's Arctic Environmental Justice Program works closely with communities in the Arctic affected by development.  Alaska Wilderness League is committed to honoring the human rights and

traditional values of the people of the Arctic, and the shared interest in protecting critical areas for future generations.

13. Plaintiff Center for Biological Diversity is a non-profit organization with offices in San Francisco, Joshua Tree and San Diego, California; Phoenix and Tucson, Arizona; Silver City, New Mexico; Portland, Oregon; and Washington, D.C. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of Arctic wildlife in general and the polar bear and Pacific walrus in particular. These efforts include petitioning FWS to list the polar bear under the ESA.

14. Plaintiff National Audubon Society, founded in 1905, is a not-for-profit corporation organized under the laws of the State of New York, with its headquarters office in New York, New York. Audubon has offices in 23 states, including a state office in Anchorage, Alaska. The Alaska State office has six chapters. Audubon's mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity. Audubon has more than one million members and supporters, including approximately 2,400 members in Alaska. Audubon has been actively involved in advocating for protection of the biological resources in the Western Arctic, including the Chukchi Sea.

15. Plaintiff Natural Resources Defense Council is a non-profit environmental membership organization with more than 550,000 members throughout the United States. It has had a longstanding and active interest in the protection of the environment in Alaska's Arctic, including the Chukchi Sea. With its nationwide membership and a staff of lawyers, scientists,

and other environmental specialists, it plays a leading role in a diverse range of land and wildlife management and resource development issues.

16. Plaintiff Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with approximately 1,400 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways-of-life, transportation and infrastructure alternatives that minimize impacts on wild lands, and clean water and wild rivers to protect health, fish, and recreational opportunities. It has been actively involved in efforts to protect the key values of public lands in the Arctic, including in the Chukchi Sea, from the threats of oil and gas development.

17. Plaintiff Oceana, Inc. is a non-profit, international advocacy organization dedicated to protecting the world's oceans, including the Chukchi Sea. Oceana's mission includes seeking protection and conservation for Arctic marine ecosystems and wildlife, including marine mammals. Oceana's headquarters are located in Washington, D.C., and it has offices or staff in Alaska, California, Connecticut, Florida, Maryland, and New Jersey. Oceana has more than 260,000 members and supporters in the United States and world-wide.

18. Plaintiff Pacific Environment is a non-profit organization based in San Francisco, California. Pacific Environment protects the living environment of the Pacific Rim by promoting grassroots activism, strengthening communities and reforming international policies. It has an office in Alaska with employees who travel throughout the state, working with native communities in the Arctic and elsewhere to protect the resources on which they depend. Pacific Environment actively advocates for greater protection of the Arctic environment and its inhabitants from the harms caused by oil and gas exploration, development and production.

19. Plaintiff Resisting Environmental Destruction on Indigenous Lands, or REDOIL, is a network of grassroots Alaska Natives of the Inupiat, Yupik, Aleut, Tlingit, Gwich'in, Eyak and Denaiana Athabascan tribes, including residents of Arctic Ocean coastal communities. REDOIL takes an active role in addressing the human and ecological health impacts of the unsustainable development practices of the fossil fuel industry in Alaska. It advocates for the preservation of subsistence rights for Native Alaskans, self-determination rights of tribes in Alaska, a just transition from fossil fuel development, and the implementation of tribal options for sustainable development. REDOIL is a project of the Indigenous Environmental Network, a network of grassroots Indigenous organizations, groups, communities and traditional societies from throughout North America working together to address environmental and economic justice issues impacting Indigenous peoples and territories.

20. Plaintiff Sierra Club is a national non-profit organization having approximately 750,000 members dedicated to the exploration, enjoyment, and preservation of the scenic and natural resources of the United States, including Alaska. The Sierra Club works towards educating and enlisting the public to protect and restore the quality of the natural environment. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water and clean air. The Sierra Club has long been active in issues relating to the impacts of oil and gas leasing and development in America's Arctic.

21. Plaintiff The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 310,000 members and activists nationwide, including in Alaska, and has had a

longstanding involvement with the issues surrounding the impacts of oil and gas development on public lands, including in Alaska's Arctic.

22. Members of the Plaintiff groups reside near, visit, or otherwise use and enjoy the Chukchi Sea for subsistence, recreation, wildlife viewing, education, research and other scientific uses, photography, or aesthetic and spiritual enjoyment, or enjoy or otherwise use migratory wildlife from the Chukchi Sea. Lease sale 193 will directly and irreparably injure these interests.

23. Each of the Plaintiff groups monitors uses of the Chukchi Sea, the outer continental shelf, and the marine life that inhabits the Chukchi Sea. Each Plaintiff group monitors compliance with the law respecting these resources, educates its members and the public concerning the management of these resources, and advocates policies and practices that protect the natural value and sustainable resources of these areas. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for management of these public resources. The interests and organizational purposes of the Plaintiffs will be directly and irreparably injured by Defendants' violations of the law as described in this complaint.

## DEFENDANTS

24. Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the Department of the Interior.

25. Defendant Randall B. Luthi is sued in his official capacity as Director of the Minerals Management Service.

26.     Defendant Minerals Management Service is an agency of the United States Department of the Interior entrusted with management of the mineral resources of the Chukchi Sea outer continental shelf.

27.     Defendant United States Fish and Wildlife Service is an agency of the United States Department of the Interior charged with implementing the ESA for threatened Steller's and spectacled eiders.

## FACTS

### *The Chukchi Sea*

28.     The Chukchi Sea is a shallow continental shelf sea in the Arctic Ocean north of the Bering Strait and west of the Beaufort Sea.  It provides habitat and rich feeding grounds for a great variety of marine life and provides important subsistence resources upon which many residents of the Chukchi Sea coast depend for their cultural and nutritional well-being.  Native Alaskan communities, such as Point Hope, have been vitally connected to the Chukchi Sea and its resources for thousands of years.  These communities depend upon bowhead whales, walrus, seals, beluga whales, polar bears, birds, and fish for subsistence.  Subsistence hunting and fishing is central to the cultural traditions of these communities.  Food is shared among members of the community and among different communities.  Oil and gas development in the Chukchi Sea has the potential to threaten the subsistence way of life communities on the North Slope have practiced for thousands of years.

29.     A number of species protected by the ESA inhabit the Chukchi Sea, including endangered bowhead, humpback, fin, and right whales, and threatened Steller's and spectacled eiders.  Spectacled eiders molt in Ledyard Bay in the Chukchi Sea from late June though October, and the area has been designated as critical habitat for the species.  Polar bears from the

Beaufort Sea stock and the Chukchi/Bering seas stock inhabit the Chukchi Sea.  The lead system, polynyas, and ice edge in the Chukchi Sea provide important feeding habitat for polar bears. Pacific walrus, particularly females, calves and sub-adults, use the Chukchi Sea as their primary feeding grounds in summer and autumn.  Seals, gray, beluga and killer whales, terrestrial mammals, and an abundance of fish and bird species also inhabit the sea and its coastal areas.

30.     The Chukchi Sea is a dynamic Arctic marine environment.  Portions of the sea seasonally fluctuate between solid, contiguous sea-ice, liquid sea water, and various intermittent stages.  Many of the species that inhabit the Chukchi Sea depend on seasonal sea-ice.  Sea-ice comprises polar bears' primary habitat, which they use for hunting, feeding, and mating.  Polar bears preferentially hunt and kill seals at breathing holes, haul-outs, and lairs on the ice and only seldom kill seals in open water.  During time spent ashore, polar bears generally survive on reserves of body fat accumulated while on the sea-ice.  Walrus specialize in using summer sea-ice as a platform from which to dive to the sea floor to forage for the benthic species on which they feed.  During their spring migration through the Chukchi Sea, bowhead whales follow leads between the shore-fast ice and offshore pack ice.  Similarly, threatened spectacled  and perhaps Steller's, eiders are thought to use spring leads in the sea-ice during their spring migration to their breeding grounds on the North Slope.  Seals are also heavily dependent on sea-ice in the Chukchi Sea.

31.     During recent decades, the Arctic has warmed more rapidly than any other region on earth.  In Alaska, winter temperatures have increased by as much as three to four degrees (Centigrade) during the past fifty years.  The Arctic is expected to continue to warm at a faster rate than the rest of the earth.  Changes in average ambient temperatures affect the extent, concentration and seasonal duration of sea-ice in the Chukchi Sea and throughout the Arctic.  In

2007, the surface temperature of parts of the Chukchi Sea was reported to be up to five degrees (Centigrade) warmer than average. Recent studies have observed perennial sea-ice disappearing at a rate of 9.2 percent per decade during the past 25 years. New record lows for summer sea-ice extent were set in 2002, 2005, and again in 2007. Sea-ice in September 2007 was reported to be 39 percent below the long-term average from 1979 through 2000. This event has been heralded by the federal government's own climate researchers as evidence that the Arctic ice cap has reached a tipping point and that the Arctic may be ice free by 2030. A recent study concludes that observed summer sea-ice extent from 1953-2006 is larger than any of the simulations in the models participating in the Intergovernmental Panel on Climate Change Fourth Assessment Report, and that current summer sea-ice minima are approximately 30 years ahead of the mean model forecast. Throughout the Arctic, the length of the sea-ice season is shortening. Studies indicate that across the Arctic, sea-ice has retreated during an average of 13.1 additional days each decade.

32. The changes to sea-ice in the Chukchi Sea and Arctic in general have profound effects on ice-dependent species. Recent studies have demonstrated a statistically significant relationship between the timing of sea-ice break-up and the quality of polar bears' condition when they reach the shore in the late spring or early summer. Earlier break-up of sea-ice has shortened polar bears' seal hunting season. As a consequence, polar bears have diminished fat stores during the open water period. This has resulted in declining reproductive rates, body mass, cub survival, and subadult survival in the polar bear population that inhabits Western Hudson Bay. The reduced extent of sea-ice forces bears to travel greater distances when migrating and to swim greater distances to reach the shore. The increases in energy expenditure involved in migration further contributes to individual bears' physical deterioration. Recent

studies published by the U.S. Geological Survey confirm that nutritional limitations caused by the diminished extent of consolidated sea-ice, greater duration of the open water period, and the increased distance between polar bears' sea-ice hunting grounds and terrestrial denning areas have and will increasingly result in declining physical condition and reduced cub survival. Researchers have documented declines in the physical stature of adult male polar bears and the survival rate of cubs of the year in the Southern Beaufort Sea polar bear population, attributable to reductions in sea-ice wrought by climate change. Researchers from the U.S. Geological Survey state that studies of the Southern Beaufort Sea polar bear population are relevant to the much less studied Chukchi Bering Sea polar bear population because both stocks inhabit the same divergent-ice eco-region. The ranges of the two populations also overlap in the Chukchi Sea.

33. Walrus, which feed on the sea floor, generally utilize sea-ice as a platform from which to effectively forage, but cannot do so if the ice recedes over water more than 80-115 meters deep. As sea-ice retreats beyond the continental shelf, walrus must abandon the ice, losing access to traditional feeding grounds. During the low summer sea-ice conditions of 2007, several thousand walrus were observed hauled out on the Alaskan Chukchi Sea coast between Barrow and Cape Lisbourne. According to a government scientist, the walrus appeared a month earlier than usual and in higher numbers than in the past. Large aggregations of walrus were also observed at Point Shmidt, a spot that had not been used as a walrus haulout for centuries. Walrus hauled out on shore are vulnerable to disturbance from noise, vulnerable to predation, and subject to injury and death from stampedes. In 2007, about 3000 to 4000 walrus, two or three times the usual number, reportedly died on shore, many from injuries sustained during stampedes.

34.     Climate change is also affecting the feeding ranges of wildlife in the Chukchi Sea. Gray whales may increasingly use the sea as a primary summer feeding ground. Endangered humpback and fin whales were sighted in the Chukchi Sea in 2007, well north of their previously observed ranges.

### Oil And Gas Activities In And Around The Chukchi Sea

35.     There has not been a lease sale in the Chukchi Sea since 1991. During the intervening years, the Chukchi Sea environment has seen dramatic changes due to climate change. There has been no recent drilling in the Sea, and there are currently no active leases in the sea.

36.     Although the Chukchi Sea has seen little recent oil and gas activity, there has been substantial oil and gas activity in the neighboring Beaufort Sea and National Petroleum Reserve – Alaska. Many species – such as endangered bowhead whales, threatened spectacled eiders, and polar bears – use habitat in both the Chukchi Sea and those areas. These species will experience cumulative effects from the proposed oil and gas activity in the Chukchi Sea, including effects from a potential shore base and a potential overland pipeline from the Chukchi Sea through the reserve to the Trans Alaska Pipeline System, and oil and gas activity in the National Petroleum Reserve – Alaska and the Beaufort Sea.

### Lease Sale 193

37.     Lease sale 193 is the first of three lease sales planned in the Chukchi Sea under MMS's Outer Continental Shelf Oil and Gas Leasing Program 2007-2012 (Five-year Plan), approved by the Secretary of the Interior on June 29, 2007 and effective July 1, 2007. The Five-year Plan identifies a Chukchi Sea OCS planning area of nearly 40 million acres. The Five-year Plan defers from leasing a 25-mile wide buffer zone along the Chukchi Sea coast.

38.     MMS states that its purpose in holding lease sale 193 is to offer to qualified bidders areas in the Chukchi Sea that might contain economically recoverable oil and gas resources for development.  MMS states that an increase in domestic energy supplies will reduce foreign imports, and provide jobs within the United States.

### *The FEIS*

39.     On June 14, 2007, MMS published a Notice of Availability of a Final Environmental Impact Statement (FEIS) for lease sale 193 in the Federal Register.  72 Fed. Reg. 32,860 (June 14, 2007).

40.     Data on bowhead whale population structure, fall migration through the Chukchi Sea, amount of feeding in the Chukchi Sea in fall, summer use of the northern Chukchi Sea, and general location in the lead system during spring migration are limited or missing.  Data gaps exist concerning the dynamics of gray whales and offshore Chukchi Sea habitat relationships, quality, quantity dynamics, and distribution of prey resources.  Beluga whale feeding areas, late summer distribution, and fall migration patterns are poorly understood.  No reliable population estimate exists for the Alaska Pacific walrus stock.  Little is known about the biology or population dynamics of ice-dependent seals that use the Chukchi Sea.  No reliable population estimates exist for ringed seals, spotted seals, ribbon seals, or bearded seals.  No reliable population estimate exists for the Chukchi/Bering Sea population of polar bears.  Information on the distribution, abundance, age structure, population trends, and use of habitat is not available for fish populations in the lease sale area.  Studies reporting distribution and abundance of fish in the Chukchi Sea are twenty to thirty years old.  Several fish species are known only from a single specimen of each, while others are known only from a handful of specimens collected years to decades ago.  The current status of many marine and coastal bird species that use the Chukchi

Sea is unknown or poorly understood, including that of the Kittlitz's Murrelet, tufted and horned puffin, black-legged kittiwake, northern fulmar, short-tailed shearwater, several species of auklets, black guillemot, ivory gull, three species of jaegers, glaucous gull, yellow-billed loon, common eider, brant, greater white-fronted goose, and bar-tailed godwit. MMS acknowledges these gaps in knowledge about the wildlife that inhabits the Chukchi Sea in the FEIS.

41.     MMS acknowledges in the FEIS that gaps exist in knowledge about the effects of oil and gas activities on the wildlife that inhabits the Chukchi Sea. MMS admits that oil and gas activity could have adverse impacts on endangered bowhead whales, threatened eider, marine mammals, marine and coastal birds, fish, and terrestrial mammals. MMS states that it is unable to fully describe or evaluate the impacts of oil and gas development on species that inhabit the Chukchi Sea because data is missing. MMS states that it is unable to conclude that significant impacts would not occur to marine mammal populations in the project area as a result of the lease sale because of the paucity of information available on marine mammal ecology in the Chukchi Sea. Data gaps also exist concerning the impacts of noise and oil spills on marine mammals, including bowhead, beluga, gray, humpback and fin whales, walrus, seals, and polar bears. Potential population-level impacts from oil spills on Chukchi Sea fish populations cannot be dismissed because of the lack of empirical data. Although MMS states that there is a high risk that several regional bird species could experience significant adverse impacts from activities conducted pursuant to the lease sale, recent data is lacking for most Chukchi Sea bird species, making a projection of the full potential impacts difficult.

**A.      *Combined Impacts Of Climate Change And The Lease Sale***

42.     MMS concludes that unavoidable adverse effects on wildlife inhabiting the Chukchi Sea would likely occur if the lease sale is held. MMS states that it is certain that some

polar bears will be harassed or killed as a result of industrial activities in their habitat. It states that, due to the magnitude of polar bear mortality that could result in the event of an oil spill, the lease sale could have significant adverse impacts on polar bears. MMS states that noise and disturbance associated with lease sale activities could interfere with walrus' health and ability to function normally and could result in potentially fatal stampedes. An oil spill could have a significant impact on the walrus population, according to MMS. The agency acknowledges that several species of coastal and marine birds have a high probability of experiencing substantial negative impacts in the event of an oil spill. It states that certain populations of fish, particularly discreet runs of salmon, could be eliminated in the event of an oil spill. MMS states that bowhead whales could experience significant effects from seismic surveying noise and oil spills. It concludes that threatened eiders could experience a level of mortality that would jeopardize the continued existence of the species in the event of an oil spill.

43. MMS acknowledges that climate change is affecting the Chukchi Sea environment. It acknowledges that ice-dependent species such as walrus and polar bears are particularly vulnerable to changes in their habitat as the climate warms. It acknowledges that reduction in sea-ice will almost certainly have negative effects on the population of polar bears and ringed seals. It acknowledges that retreating summer sea-ice may force walrus, including mothers and pups, to abandon ice and haul out on shore, where they are vulnerable to disturbance and predation. It also acknowledges that the unavailability of prey species as a result of retreating ice could have a substantial effect on the walrus population. The FEIS also acknowledges that climate change may negatively affect other species, such as seals, important prey fish species such as the arctic cod, and whales subject to increased noise and disturbance from shipping traffic.

44.     The effects of oil and gas activity and the effects of climate change can combine to affect polar bears and other species in the Chukchi Sea.  If polar bears are in poor condition due to climate change and reduced availability of prey, they may become increasingly vulnerable to the effects of contaminants and disturbance from oil and gas operations.

**B.     *Development And Production Scenario***

45.     MMS analyzes the impacts of development and production of oil from lease sale 193 in the FEIS.  MMS bases its analysis of the environmental impacts of the lease sale on a hypothetical development and production scenario projecting the type of development that will occur as a result of the lease sale.

46.     MMS assumes that a field of at least one billion barrels of oil would have to be discovered for development in the Chukchi Sea lease sale area to occur, because lower volumes are unlikely to be economic.

47.     MMS estimates that the lease sale area contains 15.4 billion barrels of technically recoverable oil.  It estimates that, at an oil price of 60 dollars per barrel, 8.4 billion barrels of oil could be economic to develop, if discovered.  It states that the development of smaller oil fields is more likely to follow development of the first field in the area.

48.     In the FEIS, MMS analyzes only the environmental impacts of the discovery, development, and production of a single offshore field in the Chukchi Sea lease area.  It analyzes the production from that single field of only one billion barrels of oil, the minimum amount of oil that must be discovered, according to MMS, to make development of oil in the Chukchi Sea economically feasible.  MMS analyzes the environmental impacts of a development and production scenario that contains one central bottom-founded platform and sub-sea wells located within about 15 miles of and connected by pipeline to the central platform.  Oil produced from

the field would flow via sub-sea pipeline ranging from 30-150 miles long from the central offshore platform to a shore base.  It would then flow via overland pipeline of up to 300 miles long through the National Petroleum Reserve – Alaska to the Trans-Alaska Pipeline System.

49.     The EIS does not analyze the impacts of development and production of fields other than the first developed field or the development and production of more than one billion barrels of oil.

50.     MMS only analyzes the impacts of an overland oil pipeline transporting oil to the Trans Alaska Pipeline System.  MMS does not analyze tankering oil from the Chukchi Sea region to market.

51.     MMS estimates that the Chukchi Sea contains 76.8 trillion cubic feet of technically recoverable natural gas.  MMS omits analysis of natural gas development and production in the FEIS on the ground that there is no transportation infrastructure to move produced gas from northern Alaska to market.  In the FEIS, MMS does not analyze the development and production of natural gas using non-pipeline transportation to market, such as liquefied natural gas (LNG) facilities and tankering.

52.     During the process of MMS's preparation of the FEIS, at least one oil and gas production company with operations in the Alaskan Arctic, Shell Exploration & Production Company, commented to MMS that MMS should analyze transporting gas to market via LNG ports from the southern Chukchi Sea as well as transporting gas via pipeline.  Since the completion of the FEIS, MMS itself has presented development and production scenarios for the Chukchi Sea that include LNG facilities and tankering gas and oil to market.

### C. *Oil Spills*

53. A large oil spill could significantly adversely affect subsistence activities of Alaska Natives on the North Slope. A spill might have long lasting effects on subsistence because of food tainting. Concerns about food tainting could seriously curtail practices for harvest sharing and processing, because all communities would be concerned about the safety of subsistence resources.

54. A large oil spill could significantly adversely affect wildlife and their habitat in the Chukchi Sea.

55. MMS estimates that a field of at least one billion barrels of oil would have to be discovered for development and production to occur as a result of the lease sale. In evaluating the environmental impacts of development and production from the lease sale, MMS evaluates the impacts of the production and development of one billion barrels of oil. In evaluating oil spill risk of the lease sale, MMS assumes that oil will be developed and produced.

56. MMS derives the chance of one or more large spills occurring from the spill rate and the resource volume estimates. MMS defines a large oil spill as a spill of greater than or equal to one thousand barrels of oil.

57. MMS uses a mean spill rate of .51 large spills per billion barrels of oil produced. The spill rate is constant for all alternatives. MMS takes the spill rate it utilizes from a study conducted by Bercha Group entitled Alternative Oil Spill Occurrence Estimators and their Variability for the Chukchi Sea – Fault Tree Method  pursuant to a contract with MMS.

58. MMS uses different resource volume estimates for each alternative for purposes of calculating the oil spill risk. It uses a resource volume estimate of one billion barrels for Alternative I. For Alternatives III and IV, however, MMS uses a resource volume estimate of

less than the one billion barrels of oil it states is necessary for any development and production to occur in the Chukchi Sea.  It uses a resource estimate of .64 billion barrels for Alternative III and .85 billion barrels for Alternative IV.

59.	As a result of using resource volume estimates of less than one billion barrels of oil for Alternatives III and IV, MMS states that the risk of one or more oil spills occurring from these alternatives is less than that for Alternative I.  MMS states the chance of one or more large oil spills occurring is 40 percent for Alternative I; 28 percent for Alternative III; and 35 percent for Alternative IV.

60.	Oil spill response methods, including mechanical techniques, in situ burning, and chemical dispersal to clean up or treat spilled oil may be significantly limited in the Arctic environment.

61.	MMS relies on non-mechanical means of oil spill remediation, such as in situ burning or chemical dispersal of spilled oil.  MMS does not analyze the environmental impacts of these methods of oil spill remediation.

**D.	*On-lease Seismic Surveying***

62.	The oil and gas industry typically relies upon the use of airguns to conduct geological and geophysical seismic surveys of the sea bed structures.  Air guns are submersible devices that are towed behind boats singly or in long arrays, firing shots of compressed air into the water about every ten seconds.  A large seismic array can produce effective peak pressures of sound of over 250 decibels.  Seismic surveying airgun arrays ranged from 560 cubic inches to 1,500 cubic inches in 1996 through 1998.  In 2006, airgun arrays were as large as 3,100 cubic inches.

63. A substantial body of scientific evidence demonstrates that airgun pulses from seismic surveying activities can have a wide range of impacts on marine animals, including marine mammals, fish, and invertebrates such as squid.

64. The FEIS purports to provide the environmental analysis of seismic activities, including on-lease seismic activities, in the Chukchi Sea. MMS acknowledges that seismic surveying may have adverse effects on bowhead whales, walrus, beluga whales, gray whales, seals, fish and other wildlife in the Chukchi Sea.

65. MMS acknowledges that seismic noise and associated vessel traffic could affect whaling, sealing, bird hunting, and fishing in the open-water season on the Chukchi Sea. Access to subsistence resources could also be affected by a reduction in subsistence resources and changes in the distribution of subsistence resources.

66. The FEIS assumes that on-lease seismic surveying will be subject to some mitigation measures contained in prior seismic surveying permits issued by MMS to operators conducting off-lease seismic surveying. The FEIS also assumes that on-lease seismic surveying will be subject to some mitigation measures previously imposed by FWS or NMFS to protect marine mammals.

67. The FEIS's analysis of the environmental impacts of seismic surveying states that the effects of seismic surveying activities will be mitigated by these mitigation measures.

68. MMS does not specify the mitigation measures that will be applied to on-lease seismic surveying. The leases to be issued pursuant to the lease sale contain no binding provisions requiring lessees to employ mitigation measures MMS assumes in the FEIS will apply to on-lease seismic activities.

69. The FEIS does not analyze the efficacy of seismic mitigation measures it assumes will apply to on-lease seismic surveying activity.

**E.      *Cumulative Impacts On Threatened Eiders***

70. Lease sale 193 will have adverse effects on ESA-listed spectacled and Steller's eiders.

71. Federal oil and gas development in the Beaufort Sea OCS and in the National Petroleum Reserve – Alaska is reasonably foreseeable. That development will have adverse effects on ESA-listed spectacled and Steller's eiders.

72. MMS relies entirely upon the biological evaluation prepared in connection with its consultation with FWS pursuant to the ESA to analyze the effects of foreseeable federal oil and gas development in the Beaufort Sea OCS and in the National Petroleum Reserve – Alaska. Future federal actions, including federal oil and gas activities, however, are explicitly outside the scope of the biological evaluation and are not considered therein.

*FWS's Eider Biological Opinion*

73. Pursuant to the ESA, MMS consulted with FWS to determine whether the oil and gas activities contemplated by the lease sale were likely to jeopardize the continued existence of threatened Steller's and spectacled eiders.

74. On or about March 28, 2007, FWS issued to MMS its biological opinion that (a) the effects of the oil and gas activity during the lease sale and exploration phases of lease sale 193 were not likely to jeopardize the continued existence of threatened spectacled and Steller's eiders or result in the destruction or adverse modification of designated critical habitat and (b) the oil and gas activity during the development and production phases of lease sale 193 were reasonably likely not to do so.

75.     FWS has already consulted with the Bureau of Land Management on oil and gas leasing and development in the National Petroleum Reserve – Alaska and issued incidental take statements permitting the taking of over one hundred listed eiders in connection with those activities.  FWS does not analyze how these onshore activities, when added to the oil and gas activities contemplated by lease sale 193, will affect listed eiders.

### *The Decision to Hold Lease Sale 193*

76.     On or about December 12, 2007, Defendant Randall B. Luthi transmitted to the Assistant Secretary – Land and Minerals Management, Department of the Interior, a document setting forth MMS's recommendation to hold lease sale 193 and to offer for lease an area identified as Alternative IV in the FEIS, reduced by six additional blocks as a result of the adoption of the 25-mile wide coastal deferral zone in the Five-year plan.  The area recommended for lease comprises approximately 29.4 million acres.

77.     On or about December 18, 2007, the Assistant Secretary – Land and Minerals Management, Department of the Interior, signed the document, indicating that he agreed with the recommendation.

78.     On January 2, 2008, MMS published a Final Notice of Sale for lease sale 193 in the Federal Register.  73 Fed. Reg. 209 (Jan. 2, 2008).  The notice states that the lease sale is scheduled to be held on February 6, 2008 in Anchorage, Alaska.

### STATUTORY FRAMEWORK

**Administrative Procedure Act**

79.     The APA authorizes courts to review agency actions and "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The FEIS and

FWS's biological opinion are both reviewed under this provision of the APA and for compliance with NEPA and the ESA, respectively.

**National Environmental Policy Act**

80.     Congress enacted NEPA in order to require federal agencies to incorporate environmental concerns into the decision-making process.  42 U.S.C. § 4331(a).  In furtherance of this goal, NEPA compels federal agencies prospectively to evaluate the environmental impacts of proposed actions that they carry out, fund or authorize and ensures that the public participates in the decision making process.

81.     NEPA requires federal agencies to prepare an environmental impact statement (EIS) for any major federal action that may significantly affect the quality of the human environment.  42 U.S.C. § 4332.  The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  It "is more than a disclosure document" and "shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions."  *Id.*

82.     An EIS must include (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided, if the proposed action proceeds; (3) alternatives to the proposed action; (4) the relationship between local short-term use of the human environment and the maintenance and enhancement of long term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action, if implemented.  40 C.F.R. § 1502.16.

83.     An EIS must analyze the direct, indirect, and cumulative effects of the proposed action and any identified alternatives thereto. *Id.* Direct effects are those effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." 40 C.F.R. § 1508.8. Cumulative impacts are those impacts that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7.

**Endangered Species Act**

84.     The ESA requires federal agencies, through consultation with FWS to insure that any action authorized, funded or carried out by the agency is not likely to jeopardize the continued existence of listed species, including listed eiders. 16 U.S.C. § 1536(a)(2). The ESA and its implementing regulations set out a detailed consultation process for determining the biological impact of a proposed activity. 16 U.S.C. § 1536(b); 50 C.F.R. §§ 402.10 - .16. That consultation process results in the issuance of a biological opinion by FWS, in which it states whether the activity is likely to jeopardize the continued existence of a particular threatened or endangered species or result in the destruction or adverse modification of the species' designated critical habitat. 16 U.S.C. § 1536(b)(3).

85.     FWS must evaluate the effects of the action and the cumulative effects on the threatened or endangered species in reaching its biological opinion.  50 C.F.R. § 402.14(g). Effects of the action are the aggregate of the direct and indirect effects of the proposed action, interrelated actions, interdependent actions, and the environmental baseline.  50 C.F.R. §402.02. The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  Indirect effects "are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur."  *Id.*  Interrelated actions "are those that are part of a larger action and depend on the larger action for their justification."  *Id.* Interdependent actions "are those that have no independent utility apart from the action under consideration."  *Id.*  Cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  *Id.*

86.     If FWS concludes that the action is not likely to cause jeopardy, but is likely to take individual members of the listed species, the agency provides a written statement, known as an incidental take statement, which authorizes the take of a certain quantum of the species incidental to the activity and requires the acting agency to re-initiate consultation if that amount of take is exceeded.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.16(a).

87.     FWS's ESA consultation regulations permit it to engage in "incremental step" consultations if the action that is the subject of the consultation is authorized by a statute, such as the Outer Continental Shelf Lands Act (OCSLA), that allows the acting agency to "take

incremental steps toward the completion of the action," and the acting agency requests such incremental consultation. 50 C.F.R. § 402.14 (k). In an "incremental step" consultation, the service issues a biological opinion as to whether the incremental step contemplated by the acting agency is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat. It also opines as the whether the entire action is reasonably likely to do so. The acting agency may proceed with the incremental step only if the incremental step is not likely, and the entire action is reasonably likely not to, jeopardize the continued existence of the listed species or destroy or adversely modify designated critical habitat. *Id.*

**Outer Continental Shelf Lands Act**

88. In 1953, Congress enacted the Outer Continental Shelf Lands Act (OCSLA) to authorize federal leasing of the outer continental shelf (OCS) for oil and gas development in federal waters. In 1978, Congress amended OCSLA (Pub. L. No. 95-372, 92 Stat. 632 *et seq*.) to provide, in part, for the development of resources on the OCS "subject to environmental safeguards." 43 U.S.C. § 1332(3).

89. OCSLA provides that "[t]he Secretary shall conduct a study of any area or region included in any oil and gas lease sale or other lease in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the Outer Continental Shelf and the coastal areas which may be affected by oil and gas or other mineral development in such area or region." 43 U.S.C. § 1346(a). The Secretary of the Interior is directed to "consider available relevant environmental information in making decisions." 43 U.S.C. § 1346(d).

90.     OCSLA, as amended, establishes four distinct stages for oil and gas development activities on the OCS:  (1) the development of a five-year leasing plan; (2) issuance of oil and gas leases; (3) approval of lessee's exploration plans; and (4) approval of lessee's development and production plans.  43 U.S.C. § 1331 *et seq.*

91.     A lease under OCSLA entitles its holder to "explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the development and production plan."  43 U.S.C. § 1337(b)(4).  A leaseholder may conduct ancillary activities on its lease without any further federal approval.  30 C.F.R. § 250.105, .207-209.  These activities include geological and geophysical exploration, such as seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease.  30 C.F.R. § 250.207; 30 C.F.R. § 250.105.

92.     The Secretary of the Interior may cancel a validly issued lease only if he "determines, after a hearing, that (i) continued activity pursuant to the lease or permit would probably cause serious harm or damage . . . to the marine, coastal, or human environment; (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and  (iii) the advantages of cancellation outweigh the advantages of continuing such lease or permit in force."  43 U.S.C. § 1334(a)(2)(A).  The Secretary of the Interior must first suspend operations under the lease before canceling the lease.  If the Secretary cancels a lease on the basis of these factors, the lessee is entitled to compensation.  43 U.S.C. § 1334(a)(2)(B)-(C); 30 CFR 250.181.

## COUNT I

93. Paragraphs 1 through 92 are re-alleged and incorporated by reference.

94. NEPA requires the preparation of an environmental impact statement (EIS) for all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). An EIS must include "a detailed statement" that analyzes the direct, indirect and cumulative impacts to the environment of the proposed action along with reasonable alternatives to the proposed action. 42 U.S.C. § 4332(C); 40 C.F.R. § 1500 *et seq.*

95. MMS acknowledges in its FEIS that climate change is affecting the Chukchi Sea lease sale 193 area and the wildlife that inhabits the sea.

96. MMS acknowledges in its FEIS that the oil and gas activities contemplated by the action will affect the Chukchi Sea lease sale 193 area, the wildlife that inhabits the sea, and subsistence activities dependent on that wildlife.

97. Despite acknowledging that the lease sale will affect polar bears, walrus, and other species in the Chukchi Sea and dependent subsistence activities, and separately acknowledging that climate change will affect these species, the FEIS does not adequately addresses the combined impacts on these species and subsistence activities of oil and gas activity in the Chukchi Sea when added to the impacts of climate change, including the most recent and best available information about climate change and its impacts.

98. Defendants' decision to proceed with lease sale 193 in the Chukchi Sea in the absence of an adequate analysis of the direct and cumulative potential impacts to the environment and to communities of the Arctic Slope engaged in a subsistence way of life was arbitrary, capricious and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(C), and APA, 5 U.S.C. §§ 702, 706.

## COUNT II

99.     Paragraphs 1 through 98 are re-alleged and incorporated by reference.

100.     NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).

101.     The presentation of incomplete or misleading information in an EIS violates NEPA.

102.     The FEIS analyzes the environmental impacts of the production of only one billion barrels of oil.  The FEIS recognizes that much more than one billion barrels of oil could be economic to develop, depending on the price of oil.  It states that at a price of 60 dollars per barrel, 8.4 billion barrels of oil could be economic to develop, if discovered, in the Chukchi Sea.

103.     The FEIS analyzes the impacts of transporting oil through an overland pipeline to the Trans Alaska Pipeline System.  It does not analyze tankering oil to market.

104.     The FEIS recognizes that the Chukchi Sea contains 76.8 trillion cubic feet of technically recoverable natural gas.  It does not analyze production of this gas.  The FEIS does not analyze transporting gas to market using LNG facilities and tankering.

105.     MMS's limitation of the development scenario it analyzes in the FEIS understates the potential impacts of the lease sale to the environment and wildlife of the Chukchi Sea and to communities of the Arctic Slope engaged in a subsistence way of life.  The FEIS is thus misleading or incomplete.

106.     Defendants' decision to proceed with lease sale 193 in the Chukchi Sea in the absence of an adequate analysis of the potential impacts of development under the leases was arbitrary, capricious and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(C), and APA, 5 U.S.C. §§ 702, 706.

## COUNT III

107.    Paragraphs 1 through 106 are re-alleged and incorporated by reference.

108.    NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).

109.    The presentation of incomplete or misleading information in an EIS violates NEPA.

110.    The FEIS predicates its analysis of the environmental impacts of development under the lease sale on the assumption that one billion barrels of oil will be produced.

111.    For its analysis of oil spill risks, however, it assumes that less than one billion barrels of oil will be produced under Alternatives III and IV.

112.    The FEIS relies on in situ burning and chemical dispersal as means of cleaning up oil spills in the Chukchi Sea.  The FEIS fails to discuss the impacts of these clean-up methods.

113.    The FEIS acknowledges that oil spills may adversely affect wildlife in the Chukchi Sea, but it fails to analyze adequately the impacts of oil spills on important wildlife species, such as gray whales and their prey species.

114.    Defendants' decision to proceed with lease sale 193 in the Chukchi Sea in the absence of an adequate analysis of the potential impacts of oil spills to the environment and to communities of the Arctic Slope engaged in a subsistence way of life was arbitrary, capricious and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(C), and APA, 5 U.S.C. §§ 702, 706.

115.     Paragraphs 1 through 114 are re-alleged and incorporated by reference.

116.     NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).

117.     The presentation of incomplete or misleading information in an EIS violates NEPA.

118.     The FEIS analysis of the environmental impacts of seismic surveying incorporates mitigation measures.

119.     The types of mitigation that will apply to on-lease seismic surveying are not specified.  The efficacy of those mitigation measures is not analyzed.  The leases that will issue pursuant to the lease sale do not impose seismic mitigation measures.

120.     The FEIS fails to discuss adequately the impacts of the seismic activity authorized by the lease sale on walrus, beluga whales, gray whales, seals, fish and other wildlife.  The FEIS also fails, therefore, to discuss adequately the impacts of seismic activity on subsistence activities dependent on these species.  The FEIS's analysis of seismic surveying is incomplete and misleading and violates NEPA.

121.     Defendants' decision to proceed with lease sale 193 in the Chukchi Sea in the absence of an adequate analysis of the potential impacts of seismic surveying to the environment and to communities of the Arctic Slope engaged in a subsistence way of life was arbitrary, capricious and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(C), and APA, 5 U.S.C. §§ 702, 706.

**COUNT V**

122.    Paragraphs 1 through 121 are re-alleged and incorporated by reference.

123.    NEPA requires that an EIS include an assessment of the cumulative impacts of the proposed action when added to other past, present, and reasonably foreseeable actions. 40 C.F.R. § 1508.7.

124.    The FEIS fails to analyze the incremental impact of the oil and gas activity contemplated by the lease sale when added to the impacts of other past, present, and reasonably foreseeable future actions to threatened eiders, such as federal oil and gas development in the Beaufort Sea OCS and the National Petroleum Reserve – Alaska.

125.    Defendant's decision to proceed with lease sale 193 in the Chukchi Sea in the absence of an adequate analysis of cumulative impacts to the environment was arbitrary, capricious and not in accordance with law and violated NEPA, 42 U.S.C. § 4332(C), and APA, 5 U.S.C. §§ 702, 706.

**COUNT VI (against FWS only)**

126.    Paragraphs 1 through 125 are re-alleged and incorporated by reference.

127.    Pursuant to Section 7 of the ESA, 16 U.S.C. § 1536, each federal agency undertaking an action which might adversely affect threatened Steller's or spectacled eiders must consult with FWS to insure that its action is not likely to jeopardize the continued existence of that species.

128.    The decision to hold the lease sale may affect Steller's and spectacled eiders, which are listed as threatened under the ESA. FWS administers the ESA with respect to threatened eiders. Accordingly, MMS was required to consult with FWS.

129.    Consultations under the ESA result in biological opinions, in which FWS must adequately address whether jeopardy to the species is likely.  16 U.S.C. § 1536(b).

130.    In assessing the potential for jeopardy to the species, including from incidental take of the species, FWS's biological opinion fails to consider the potential effects on threatened eiders of federal oil and gas leasing and development in the National Petroleum Reserve – Alaska and Beaufort Sea OCS that has already been consulted upon by FWS.

131.    The FWS's biological opinion on the Steller's and spectacled eiders is arbitrary and capricious in violation of the ESA, 16 U.S.C. § 1536(b) and APA, 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that the Court:

1.   Declare that Defendants MMS, Dirk Kempthorne and Randall B. Luthi have violated NEPA and that Defendant FWS has violated the ESA and that the actions as set forth above are arbitrary, capricious and not in accordance with law;

2.   Enter appropriate injunctive relief to ensure that the Defendants comply with NEPA and the ESA and to prevent irreparable harm to the Plaintiffs and to the environment until such compliance occurs, including by requiring Defendants to rescind any leases issued pursuant to lease sale 193;

3.   Award Plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4.   Grant such other relief as the Court deems just and proper.

Dated this 31st day of January, 2008.

Respectfully submitted,

*s/ Eric P. Jorgensen*
ERIC P. JORGENSEN (AK Bar # 894010)
Earthjustice
325 Fourth Street
Juneau, AK 99801
(907) 586-2751
(907) 463-5891 [fax]
ejorgensen@earthjustice.org

*Attorney for Plaintiffs Native Village of Point Hope,*
*City of Point Hope, Inupiat Community of the Arctic Slope*
*Alaska Wilderness League, Center for Biological Diversity,*
*National Audubon Society, Natural Resources Defense*
*Council, Northern Alaska Environmental Center, Oceana,*
*Pacific Environment, Resisting Environmental Destruction*
*on Indigenous Lands, a Project of the Indigenous*
*Environmental Network (REDOIL), Sierra Club, and The*
*Wilderness Society*

**CERTIFICATE OF SERVICE**

I, Eric P. Jorgensen, certify that on January 31, 2008, a true and correct copy of the foregoing COMPLAINT was served by first-class mail, certified, and return-receipt requested on the following:

| | |
|---|---|
| DIRK KEMPTHORNE,<br>Secretary of the Interior<br>U.S. Department of the Interior<br>1849 C. Street, NW<br>Washington, DC 20240 | RANDALL B. LUTHI,<br>Director<br>Minerals Management Service<br>1849 C. Street, NW<br>Washington, DC 20240 |
| MINERALS MANAGEMENT SERVICE<br>1849 C. Street, NW<br> Washington, DC 20240 | U.S. FISH AND WILDLIFE SERVICE<br>1849 C. Street, NW<br>Washington, DC 20240 |
| MICHAEL B. MUKASEY<br>Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | CIVIL PROCESS CLERK<br>Executive Office for U.S. Attorneys<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW, Rm 2242<br>Washington, DC 20530-0001 |
| U.S. DEPARTMENT OF THE INTERIOR<br>1849 C. Street, NW<br>Washington, DC 20240 | |

*s/ Eric P. Jorgensen*
ERIC P. JORGENSEN (AK Bar # 894010)
Earthjustice
325 Fourth Street
Juneau, AK 99801
(907) 586-2751
(907) 463-5891 [fax]
ejorgensen@earthjustice.org