ERIK GRAFE (AK Bar # 0804010)
ERIC P. JORGENSEN (AK Bar # 8904010)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
(907) 586-2751
(907) 463-5891 [fax]
egrafe@earthjustice.org
ejorgensen@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF POINT HOPE, *et al.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>DIRK KEMPTHORNE, Secretary of the Interior, *et al.,* )<br><br>Defendants, )<br><br>and )<br><br>SHELL GULF OF MEXICO, INC., and CONOCOPHILLIPS COMPANY, )<br><br>Intervenor-Defendants. ) | Case No. 1:08-cv-00004-RRB |

**PLAINTIFFS' OPENING BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    I.     THE BIOLOGICAL RICHNESS, SUBSISTENCE SIGNIFICANCE,
          AND RAPIDLY CHANGING ENVIRONMENT OF THE CHUKCHI
          SEA ..............................................................................................................2

    II.    CHUKCHI SEA LEASE SALE 193 ................................................................6

        A.   Missing information about the Chukchi Sea and the potential impacts
            of the lease sale .......................................................................................7

        B.   The analysis of the lease sale and climate change over time..........................10

        C.   The development scenario as a basis for assessing impacts ...........................10

        D.   The analysis of seismic surveying ...............................................................13

        E.   The analysis of impacts to threatened spectacled and Steller's eiders ...........19

        F.   The Endangered Species Act listing of the polar bear....................................21

ARGUMENT.........................................................................................................22

    I.     THE DEPARTMENT OF THE INTERIOR VIOLATED NEPA IN
          DECIDING TO HOLD THE LEASE SALE.........................................................23

        A.   MMS failed to obtain missing information needed to assess the
            impacts of the lease sale or justify a conclusion that it could not obtain
            such information .....................................................................................23

        B.   The EIS failed to analyze the lease sale's effects in the context of
            climate change .......................................................................................28

        C.   The EIS failed to assess the full impacts of the lease sale by omitting
            development of natural gas from its analysis and understating the
            amount of oil that could be developed.......................................................32

            1.    MMS omitted natural gas development from its scenario......................33

            2.    MMS limited its scenario to one billion barrels of oil............................37

        D.   The EIS's analysis of seismic surveying failed to disclose potentially
            significant impacts.................................................................................42

        E.   The EIS failed to analyze the cumulative impacts of the lease sale to
            threatened spectacled and Steller's eiders in the context of other
            activities in eiders' Arctic habitat................................................................46

II.    THE DEPARTMENT OF THE INTERIOR VIOLATED SECTION 7 OF
       THE ESA BY FAILING TO ASSESS THE AGGREGATE IMPACTS
       OF ALL ACTIVITIES PLANNED IN THREATENED EIDERS'
       NORTH SLOPE HABITAT AND BY FAILING TO CONSULT ON
       THE LEASE SALE'S IMPACTS TO THREATENED POLAR BEARS............48

    A.   FWS failed to analyze the lease sale in the context of other federal
         activities occurring in eiders' Arctic habitat in reaching its biological
         opinion ...........................................................................................49

    B.   MMS failed to consult with FWS on the lease sale's potential to
         jeopardize the continued existence of the threatened polar bear ....................50

III.   BECAUSE THE DECISION TO HOLD THE LEASE SALE WAS
       ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA,
       NEPA AND THE ESA, THE COURT SHOULD VACATE THE SALE
       AND ISSUANCE OF LEASES...........................................................................52

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alaska v. Andrus,*
  580 F.2d 465 (D.C. Cir. 1978) ............................................................52

*Alaska Wilderness League v. Kempthorne,*
  548 F.3d 815 (9th Cir. 2008) ...........................................................43, 44

*Alpine Lakes Prot. Society v. Schlapfer,*
  518 F.2d 1089 (9th Cir. 1975) ...........................................................54

*American Biosci., Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ..........................................................52

*American Motorcyclist Association v. Watt,*
  714 F.2d 962 (9th Cir. 1983) ............................................................54

*American Rivers v. F.E.R.C.,*
  201 F.3d 1186 (9th Cir. 2000) ...........................................................24

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ..................................................................53, 54

*Andrus v. Sierra Club,*
  442 U.S. 347 (1979) .......................................................................24

*Animal Defense Council v. Hodel,*
  840 F.2d 1432 (9th Cir. 1988) ...........................................................16

*Cabinet Resource Group v. U.S. Fish and Wildlife Service,*
  465 F. Supp. 2d 1067 (D. Mt. 2006) .....................................................24

*Cady v. Morton,*
  527 F.2d 786 (9th Cir. 1975) ............................................................54

*Center for Biological Diversity v. Bureau of Land Management,*
  422 F. Supp. 2d 1115 (N.D. Cal. 2006) .............................................24, 27, 29

*Center for Biological Diversity v. National Highway Traffic Safety Administration,*
  538 F.3d 1172 (9th Cir. 2008) ...........................................................32

*Center for Biological Diversity v. U.S. Forest Service,*
  349 F.3d 1157 (9th Cir. 2003) .........................................................43, 45

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 4 of 78

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971)......................................................................................22

*City of Davis v. Coleman,*
   521 F.2d 661 (9th Cir.1975) .............................................................32, 35, 36

*City of Sausalito v. O'Neill,*
   386 F.3d 1186 (9th Cir. 2004) .................................................................43

*Connor v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .................................................................53

*Defenders of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2001) ....................................................49, 50

*Defenders of Wildlife v. Norton, Number Civ. A. 99-927 (ESH),*
   2003 WL 24122459 (D.D.C. Jan. 7, 2003)..............................................50

*Earth Island Institute v. U.S. Forest Service,*
   442 F.3d 1147 (9th Cir. 2006) ..............................................15, 29, 30, 42, 44

*Forest Conservation Council v. U.S. Forest Service,*
   66 F.3d 1489 (9th Cir. 1995) ...................................................................54

*Foundation for North American Wild Sheep v. U.S. Department of Agricultural,*
   681 F.2d 1172 (9th Cir. 1982) ............................................................23, 24

*Friends of the Earth v. Laidlaw Environmental Services,*
   528 U.S. 167 (2000)..................................................................................23

*Fund for Animals v. Hall,*
   448 F. Supp. 2d 127 (D.D.C. 2006) .........................................................47

*Gifford Pinchot Task Force v. U. S. Fish & Wildlife Service,*
   378 F.3d 1059 (9th Cir. 2004) .................................................................22

*Greenpeace v. National Marine Fisheries Service,*
   80 F. Supp. 2d 1137 (W.D. Wash. 2000).................................................50

*Half Moon Bay Fishermans' Marketing Association v. Carlucci,*
   857 F.2d 505 (9th Cir. 1988) ...................................................................23

*Idaho Sporting Cong. v. Rittenhouse,*
   305 F.3d 957 (9th Cir. 2002) ..............................................................29, 30

Case 1:08-cv-00004-RRB   Document 82   Filed 02/05/09   Page 5 of 78

*Izaak Walton League of America v. Marsh*,
    655 F.2d 346 (D.C. Cir. 1981) ................................................................................43

*Kern v. U.S. Bureau of Land Management*,
    284 F.3d 1062 (9th Cir. 2002) ..................................................................31, 32, 33

*Kessler v. Associate Finance Service Corporation*,
    573 F.2d 577 (9th Cir. 1977) ....................................................................................30

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*,
    387 F.3d 989 (9th Cir. 2004) .....................................................................22, 29, 42

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)..................................................................................................32

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .....................................................................43, 44, 45

*Marsh v. Or. Natural Resource Council*,
    490 U.S. 360 (1989)..................................................................................................22

*Mass v. Watt*,
    716 F.2d 946 (1st Cir. 1983)..............................................................................33, 53

*Methow Valley Citizens Council v. Regional Forester*,
    833 F.2d 810 (9th Cir. 1987) ....................................................................................27

*National Audubon Society v. U.S. Forest Service*,
    46 F.3d 1437 (9th Cir. 1994) ....................................................................................16

*National Audubon Society v. Kempthorne*,
    1:05-cv-00008 (JKS) (D. Alaska Sept. 25, 2006)....................................................30

*National Wildlife Federation v. National Marine Fisheries Service*,
    524 F.3d 917 (9th Cir. 2008) ...............................................................................49, 50

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ....................................................................................46

*Native Village of Point Hope v. Minerals Management Service*,
    564 F. Supp. 2d 1077 (D. Alaska 2008...................................................................44

*Natural Resource Defense Council v. Houston*,
    146 F.3d 1118 (9th Cir. 1998) ...............................................................................51, 53

*Natural Resource Defense Council v. U. S. Forest Service,*
421 F.3d 797 (9th Cir. 2005) ...................................................................................42

*North Slope Borough v. Andrus,*
642 F.2d 589 (D.C. Cir. 1980) ............................................................................46, 51

*Oregon Environmental Council v. Kunzman,*
817 F.2d 484 (9th Cir. 1987) ....................................................................24, 25, 27, 28

*Oregon Natural Resource Council v. Lowe,*
109 F.3d 521 (9th Cir. 1997) ..............................................................................43, 45

*Pacific Rivers Council v. Thomas,*
30 F.3d 1050 (9th Cir. 1994) ....................................................................................51

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989).................................................................................................25

*Save Our Ecosystems v. Clark,*
747 F.2d 1240 (9th Cir. 1984) ...................................................................24, 25, 27, 28

*Save the Yaak Committee v. Block,*
840 F.2d 714 (9th Cir. 1988) ....................................................................................54

*Selkirk Conservation Alliance v. Forsgren,*
336 F.3d 944 (9th Cir. 2003) ....................................................................................43

*Sierra Club v. Marsh,*
816 F.2d 1376 (9th Cir. 1987) ..................................................................................53

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs,*
486 F.3d 638 (9th Cir. 2007) ....................................................................................52

*State of California v. Watt,*
683 F.2d 1253 (9th Cir. 1982)..............................................................................33, 42

*Steamboaters v. Federal Energy Regulatory Commission,*
777 F.2d 1384 (9th Cir. 1985) ..................................................................................54

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1978).............................................................................................48, 53

*Thomas v. Peterson,*
753 F.2d 754 (9th Cir. 1985) ........................................................................32, 51, 53, 54

*Tribal Village of Akutan v. Hodel,*
869 F.2d 1185 (9th Cir. 1988) ...................................................................33, 42

*Turtle Island Restoration Network v. National Marine Fisheries Service,*
340 F.3d 969 (9th Cir. 2003) ....................................................................22, 51

*Village of False Pass v. Watt,*
565 F. Supp. 1123 (D. Alaska 1983) ................................................................ 26

*Village of False Pass v. Clark,*
733 F.2d 605 (9th Cir. 1984) .......................................................26, 33, 42, 55

*Washington Toxics Coalition v. Environmental Protection Agency,*
413 F.3d 1024 (9th Cir. 2005) .................................................................51, 53

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)...............................................................................................53

*Winter v. Natural Resource Defense Council,*
128 S. Ct. 365, 555 U.S. ___ (2008)................................................................53

## FEDERAL STATUTES

Administrative Procedure Act, 5 U.S.C. § 706.....................................................22, 52

Marine Mammal Protection Act, 16 U.S.C. § 1361, *et seq* ....................................45

Endangered Species Act, 16 U.S.C. § 1531, *et seq* ..................................................2

16 U.S.C. § 1536(a)(2)..................................................................21, 22, 49, 51

National Environmental Policy Act, 42 U.S.C. § 4332(C)......................................32, 33

Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq*...................................33

43 U.S.C. § 1332(3) .............................................................................................55

43 U.S.C. § 1334(a)(1)..........................................................................................51

43 U.S.C. § 1334(a)(2).............................................................................................51

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 8 of 78

**FEDERAL REGULATIONS**

30 C.F.R. § 250.106 ................................................................................................51

30 C.F.R. § 250.172(d) ...........................................................................................51

30 C.F.R. § 256.47(b) .............................................................................................51

30 C.F.R. § 256.47(e)(1) .........................................................................................51

40 C.F.R. § 1500.3 ..................................................................................................24

40 C.F.R. § 1501.1 ..................................................................................................32

40 C.F.R. § 1502.1 .............................................................................................29, 42

40 C.F.R. §§ 1502.9(a),(b) ................................................................................43, 45

40 C.F.R. § 1502.22 .....................................................................................24, 25, 27

40 C.F.R. § 1506.1(c) ..............................................................................................44

40 C.F.R. § 1508.7 ...............................................................................30, 32, 46, 47

50 C.F.R. § 402.02 ...........................................................................47, 49, 50, 51

50 C.F.R. § 402.03 ..................................................................................................49

50 C.F.R. § 402.14(a) ...................................................................................22, 49, 51

50 C.F.R. § 402.14(g) ..............................................................................................49

50 C.F.R. § 402.14(k) ..............................................................................................21

50 C.F.R. § 402.16 .............................................................................................49, 51

**FEDERAL REGISTER NOTICES**

51 Fed. Reg. 15,618 (Apr. 25, 1986) .....................................................................25

67 Fed. Reg. 46,712 (July 16, 2002) .......................................................................14

70 Fed. Reg. 54,406 (Sept. 14, 2005) ...................................................................6, 11

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 9 of 78

71 Fed. Reg. 43,112 (July 31, 2006).......................................................................................15, 16

71 Fed. Reg. 60,751 (Oct. 16, 2006)..............................................................................................7

71 Fed. Reg. 66,912 (Nov. 17, 2006)...........................................................................................17

72 Fed. Reg. 32,860 (June 14, 2007) .............................................................................................7

72 Fed. Reg. 56,979 (Oct. 5, 2007)..............................................................................................31

73 Fed. Reg. 209 (Jan. 2, 2008) .....................................................................................................7

73 Fed. Reg. 28,212 (May 15, 2008) ............................................................................................21

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 10 of 78

# INTRODUCTION

This case challenges the Secretary of Interior's decision to offer offshore oil and gas leases in approximately 29.4 million acres of the Chukchi Sea off the northern coast of Alaska. The Chukchi Sea, already stressed by changes resulting from global climate change, provides habitat for hundreds of species of fish, birds, and marine mammals, including endangered and threatened polar bears, bowhead whales and spectacled and Steller's eiders. The sea is at the heart of the subsistence culture practiced by Inupiat communities along its coast for millennia. The government offered the oil and gas leases at issue in this case without completing an adequate review of their potential impacts to wildlife and the unique indigenous subsistence way of life sustained by the sea.

The Minerals Management Service violated the National Environmental Policy Act (NEPA) by preparing an environmental impact statement that failed to analyze adequately the potential impacts of the sale. The agency conducted its analysis in an informational vacuum without first assessing whether it could obtain missing information. It failed to analyze the lease sale's potential impacts in the context of global climate change and the resultant rapidly changing Chukchi Sea environment. Its analysis ignored natural gas production altogether and examined only the impacts of the development of a fraction of the oil resources it estimated could be developed. Its analysis of seismic surveying misleadingly diminished the impacts of the activity to marine mammals and failed to fully analyze effects on endangered bowhead whales. The Minerals Management Service and Fish and Wildlife Service also violated NEPA and the Endangered Species Act (ESA) by failing to analyze the lease sale's impacts to threatened eiders in the context of all other activities affecting the species across their Arctic habitat. The Secretary of Interior further violated the ESA by failing to consult on the lease sale's potential to jeopardize the continued existence of threatened polar bears.

For all these reasons, the Court should vacate the leases pending the agencies' compliance with the law.

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*
Case No. 1:08-cv-00004-RRB

1

I.     THE BIOLOGICAL RICHNESS, SUBSISTENCE SIGNIFICANCE, AND RAPIDLY
       CHANGING ENVIRONMENT OF THE CHUKCHI SEA

The Chukchi Sea, a portion of the Arctic Ocean north of the Bering Strait and west of the Beaufort Sea, provides habitat and rich feeding grounds for a great variety of marine life and irreplaceable subsistence resources upon which Inupiat communities along its coast have depended for thousands of years.  Doc. No. 65 at 7, ¶ 31 (filed Nov. 13, 2008); Ex. 49 at 34, 83-96, 186.  Sensitive populations of bowhead whales, humpback whales, fin whales, polar bears, and spectacled and Steller's eiders, all protected by the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* (ESA), inhabit the sea.  Ex. 49 at 45-47, 61, 77-81; Ex. 23 at 2.  Every spring, nearly the entire Western Arctic stock of bowhead whales, including mothers and calves, migrates north and east through the Chukchi Sea on its way to summer feeding grounds, and every autumn it returns south and west through the sea to its wintering grounds.  Ex. 49 at 49-51. The lead system, polynyas, ice edge and coastal areas of the sea provide vital feeding and denning habitat for polar bears.  Doc. No. 65 at 7 ¶ 32 (filed Nov. 13, 2008); Ex. 49 at 79. Pacific walrus, particularly females, calves and sub-adults, use the sea as their primary feeding grounds in summer and autumn.  Doc. No. 65 at 7, ¶ 32 (filed Nov. 13, 2008); Ex. 49 at 74. Ringed, spotted, ribbon and bearded seals, beluga whales, killer whales, minke whales, gray whales, and harbor porpoises, as well as least 98 species of fish, including Pacific salmon and Arctic cod, and over 40 species of marine and coastal birds, also inhabit the sea.  Ex. 49 at 70, 39, 61-70.

The Chukchi Sea is the center of the culture, identity, and subsistence way of life of Inupiat Eskimo communities along its coast.  Ex. 49 at 83; Ex. 103 at 2-3,5; Ex. 96 at 2; Ex. 100 at 2-3; Ex. 102 at 3; Ex. 95 at 2-4, 6; Ex. 99 at 1-3; Ex. 98 at 2-3, 7; Ex. 101 at 2, 3-4; Ex. 97 at 2-3, 4.  The sea provides these communities with food, clothing, and materials for traditional arts.  For example, over 71 percent of the households of Point Hope obtain half or more of their food from harvesting local subsistence resources.  Ex. 49 at 447a.  The nutritional benefits of subsistence foods to Inupiats cannot easily be substituted with store-bought foods.  *Id.* at 190a-b. Barrow, Point Hope, and Wainwright engage in subsistence hunting of bowhead whales each spring and, in the case of Barrow, fall.  *Id.* at 86.  These communities and others, such as Point Lay and Atquasuk, engage in extensive food sharing and bartering, which is an integral part of

traditional Inupiat family organization.  *Id.* at 83.  Thus, all across the North Slope, in communities that engage directly in whaling as well as in communities that do not, the bowhead is of unique spiritual importance, a focal point of sharing, cooperation and the preservation of cultural traditions.  *Id.* at 86; Ex. 96 at 2-3; Ex. 97 at 2, 3; Ex. 95 at 2, 3-4; Ex. 99 at 1-3, 4; Ex. 98 at 2; Ex. 19 at 4; Ex. 102 at 3-4; Ex. 100 at 3, 4; Ex. 103 at 5.  Aside from the bowhead, Chukchi Sea communities engage in subsistence hunting of walrus, seals, beluga whales, polar bears, birds, and fish, all of which depend upon the health of the Chukchi Sea ecosystem.  Doc. No. 65 at 7, ¶ 31 (filed Nov. 13, 2008); Ex. 49 at 97-98, 459, 460-63, 464-67, 468.  The importance of these subsistence activities can hardly be overstated – they are at the core of Inupiat identity.  Ex. 49 at 83; Ex. 96 at 2; Ex. 100 at 2-4; Ex. 103 at 2, 5; Ex. 102 at 5, 6-7; Ex. 99 at 3; Ex. 98 at 2-3; Ex. 97 at 2-3.

Despite the cultural and biological significance of the Chukchi Sea, there is a profound lack of basic knowledge about the sea and the wildlife that inhabits it.  The last Minerals Management Service (MMS)-funded surveys of bowhead whales in the Chukchi Sea occurred in 1991.  Ex. 49 at 50-51.  Data on bowhead whale population structure, fall migration through the Chukchi Sea, amount of feeding in the Chukchi Sea in autumn, summer use of the northern Chukchi Sea, and general location in the lead system during spring migration are limited or missing.  *Id.* at 45, 50-51, 139, 140.  Data gaps exist concerning the gray whale distribution in and use of the Chukchi Sea.  *Id.* at 423.  Beluga whale feeding areas, late summer distribution, and fall migration patterns are poorly understood.  *Id.* at 163.  No reliable population estimate exists for the Alaska Pacific walrus stock.  *Id.* at 74.  Little is known about the biology or population dynamics of ice-dependent seals that use the Chukchi Sea.  *Id.*  No reliable population estimates exist for ringed seals, spotted seals, ribbon seals, or bearded seals.  *Id.* at 71-74.  No reliable population estimate exists for the Chukchi/Bering Sea population of polar bears.  *Id.* at 84.  Information on the distribution, abundance, age structure, population trends, and use of habitat is not available for fish populations in the lease sale area.  *Id.* at 32-33; *see also id.* (noting that fish studies in the Chukchi Sea are twenty to thirty years old and that several fish species are known only from a single specimen).  The current status of many marine and coastal bird species that use the Chukchi Sea is unknown or poorly understood, including that of the Kittlitz's Murrelet, tufted and horned puffin, black-legged kittiwake, northern fulmar, short-tailed shearwater, several species of auklets, black guillemot, ivory gull, three species of jaegers,

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*                                                                3
Case No. 1:08-cv-00004-RRB
Case No. 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 13 of 78

glaucous gull, yellow-billed loon, common eider, brant, greater white-fronted goose, and bar-tailed godwit. *Id.* at 62-65, 68-69.

The lack of baseline data about the sea is compounded by the rapid changes to the ecosystem caused by global climate change. The Chukchi Sea is one of the "principle bellwethers to climate change in North America and the Arctic Ocean." Ex. 49 at 42. During recent decades, the Arctic has warmed more quickly than any other region on earth; Doc. No. 65 at 7-8, ¶ 34 (filed Nov. 13, 2008); Ex. 81 at 2. Winter temperatures have increased by as much as three to four degrees (Centigrade) during the past fifty years. Doc. No. 65 at 7-8 ¶ 34 (filed Nov. 13, 2008); Ex. 81 at 3. And the Arctic is expected to continue to warm at a faster rate than the rest of the earth. Doc. No. 65 at 7-8, ¶ 34 (filed Nov. 13, 2008); Ex. 81 at 3.

These increases in average temperatures are changing the ecosystem dramatically, beginning with their effects on the extent, concentration and seasonal duration of sea-ice in the Chukchi Sea and throughout the Arctic. Doc. No. 65 at 7-8, ¶ 34 (filed Nov. 13, 2008). Perennial sea-ice cover is disappearing at a rate of about 9 percent per decade. Ex. 80 at 2. Summer sea-ice has retreated an average of 13.1 additional days each decade. Ex. 81 at 5. Winter sea-ice extent was at a record low in 2005 and 2006. Ex. 49 at 35. Summer sea-ice extent retreated to record lows in 2002, 2005, and again in 2007, and extreme minima were observed in 2003, 2004, and 2006. Doc. No. 65 at 7-8, ¶ 34 (filed Nov. 13, 2008); Ex. 49 at 35. Moreover, the evidence is mounting that these changes are accelerating. *See* Ex. 61 at 3 (citing scientific articles)). Sea-ice extent of September 2007 was 39 percent below the long-term average from 1979 through 2000. Doc. No. 65 at 7-8, ¶ 34 (filed Nov. 13, 2008). This dramatic retreat has been heralded by the government's own climate researchers as evidence that the Arctic ice cap has reached a tipping point and that the Arctic may be ice free in summer by 2030. Ex. 61 at 3-4. The observed rate of sea-ice loss is faster than what models have predicted. *Id.* at 3.

Many of the species that inhabit the Chukchi Sea depend on seasonal sea-ice. Doc. No. 65 at 7, ¶ 33 (filed Nov. 13, 2008). Sea-ice comprises polar bears' primary habitat, which they use for hunting, feeding, and mating. *Id.* Polar bears preferentially hunt and kill seals at breathing holes, haul-outs, and lairs on the ice and only seldom kill seals in open water. *Id.* During time spent ashore, polar bears generally survive on reserves of body fat accumulated while on the sea-ice. *Id.* Walrus specialize in using summer sea-ice as a platform from which to

dive to the sea floor to forage for the benthic species on which they feed. *Id.* Seals are also heavily dependent on sea-ice in the Chukchi Sea for birthing and rearing their pups. *Id.*

The changes to sea-ice in the Chukchi Sea and Arctic in general have profound effects on ice-dependent species. Earlier break-up of sea-ice has shortened polar bears' seal hunting season, and forced bears to travel greater distances when migrating and to swim greater distances to reach the shore. Doc. No. 65 at ¶ 35. This has resulted in declining reproductive rates, body mass, cub survival, and subadult survival. *Id.*; *see also* Ex. 73 at 12-13. Receding sea-ice also threatens walrus. As the ice recedes over deep water, walrus can no longer use it as a platform from which to forage from the sea bottom. Doc. No. 65 at 9, ¶ 36 (filed Nov. 13, 2008). They must abandon the ice, losing access to traditional feeding grounds, and head to coastal haulouts, where they are vulnerable to disturbance from noise, vulnerable to predation, and are subject to injury and death from stampedes. *Id.* During the low summer sea-ice conditions of 2007, for example, several thousand walrus were observed hauled out on the Alaskan Chukchi Sea coast between Barrow and Cape Lisbourne, *id.*, appearing a month earlier than usual and in higher numbers than in the past. Ex. 61 at 5. In the summer of 2007, unusual sightings of humpback and fin whales in the Arctic Ocean, hundreds of miles north of their usual range, were reported. *Id.* at 5-6.

Climate change in the Chukchi Sea has the potential to adversely affect subsistence practices, and human health, of Inupiat communities across the North Slope. Ex. 49 at 241-42, 236-37. The subsistence way of life depends on healthy wildlife populations in the Chukchi Sea. Diminished health of Chukchi wildlife, such as ice-dependent walrus, threatens communities' ability to rely on these species for subsistence. Sea-ice change may "threaten[] subsistence livelihoods," Ex. 49 at 237, by diminishing the health of and changing the timing of migration and distribution of important subsistence species, including bowhead whales and walrus, *Id.* at 236, and increasing the dangers inherent in hunting on the sea-ice. *Id.* at 240. Changes to the permafrost are also of major concern to Inupiat communities, both because of changes to wildlife and wildlife habitat and because of changes to traditional food storage mechanisms, such as ice cellars. *Id.* at 239.

## II.     CHUKCHI SEA LEASE SALE 193

Lease sale 193 opened approximately 29.4 million acres of the Chukchi Sea – an area almost the size of the state of Connecticut – to oil and gas activity, Ex. 57 at 2, with potentially dramatic impacts to wildlife and subsistence in the changing sea.  As MMS acknowledged, the sale is expected to result in unavoidable adverse effects to fish, marine and coastal birds, including threatened eider, and marine mammals in the Chukchi Sea, and could result in unavoidable adverse effects to endangered bowhead whales and subsistence activities.  Ex. 49 at 191a-191d.  A large oil spill could have population-level adverse impacts on threatened polar bears, endangered bowhead whales, walrus, beluga whales, birds, and fish, and could cause multi-year suspensions of the subsistence activities that are central to Inupiat communities along the Chukchi Sea coast.  *Id.* at 20-23.

Prior to lease sale 193, there had been no lease sales and no drilling in the Chukchi Sea since 1991.  Ex. 49 at 9, 109.  The only active leases in the sea are those that were issued pursuant to lease sale 193.  Doc. No. 65 at 10, ¶ 38 (filed Nov. 13, 2008).  Originally contemplated as a limited "special interest" sale, MMS expanded lease sale 193 to an area-wide sale, and initiated preparation of an environmental impact statement (EIS) to analyze the effects of this large project.  Ex. 49 at 5; Ex. 1 at 1; 70 Fed. Reg. 54,406, 54,407 (Sept. 14, 2005).

MMS imposed a tight timeline on preparation of the EIS for lease sale 193.  *See* Ex. 30 at 2 (MMS Alaska regional director John Goll noting that the schedule leaves "no breathing room"); Ex. 39 at 3 (noting that a slip in the schedule "would effectively shut down all remaining pre-leasing seismic next summer").  To complete the "NEPA work within the available timeframes, many processes were shortened and/or combined."  Ex. 39 at 2-3 (noting "very tight time schedules for preparation of the Sale 193 NEPA work" and that "[t]here is absolutely no slack time in the current schedule"); Ex. 40 at 2.  Indeed, even the agency's public hearings for lease sale 193 in communities along the Chukchi Sea coast were sometimes confusingly compressed to encompass multiple projects.  Ex. 49 at 249 (Point Hope public hearing, covering both the Five Year Program and lease sale 193); *Id.* at 252 (Barrow public hearing, same).

The tight timeline raised concerns, both within and outside the agency, about the adequacy of the environmental analysis of the lease sale.  Interior personnel complained that they could not adequately complete their work in the short time allowed.  Ex. 1 at 2 (noting difficulties of preparing lease sale 193 EIS because of limited MMS resources; "the next five

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 16 of 78

year plan being so late in starting will require extreme efforts and long hours for the staff to accommodate the compressed time frame"; "MMS has only so much human resource and because of the time constraint of the next five year plan, this resource will be stretched to the limit"); Ex. 32 at 1 (email from MMS biologist James Wilder stating "[n]ot to beat a dead horse, but MMS needs to be aware that given the short time frame for my work on 193, my analysis will be a *cursory* look, at best. I don't think anyone will consider it a 'good, hard look' … my analysis will not be robust and I doubt it will stand up to any sort of critical scrutiny."); Ex. 29 at 1-2; Ex. 66 at 1 (noting that Fish and Wildlife Service (FWS) personnel were "Pearl Harbored by short deadlines"); Ex. 32 at 1. The Environmental Protection Agency (EPA) expressed concern over "the overlapping schedules of the different NEPA documents, and the relatively short timelines assigned to developing and finalizing the documents," because the rush "will make it very difficult for the sponsor agencies to obtain, evaluate and incorporate the most up-to-date information in each document." Ex. 43 at 3, 5 (noting also environmental justice concerns regarding "the effects of multiple, overlapping and fast-tracked planning processes that have occurred over the past several months").

Nonetheless, MMS pushed ahead. In October 2006, it published a notice of availability of a draft EIS for lease sale 193 for comment. 71 Fed. Reg. 60,751 (Oct. 16, 2006). In June 2007, MMS published the final EIS. 72 Fed. Reg. 32,860 (June 14, 2007). Plaintiff groups submitted comments to the draft and final EIS. *See, e.g.,* Ex. 49 at 358-405. In December, 2007, Plaintiffs also submitted a letter to MMS urging the agency to supplement its EIS to incorporate new information that had come to light since the publication of the EIS. Ex. 61. Shortly after the decision of the Secretary of Interior to proceed and the issuance of the final notice of sale, 73 Fed. Reg. 209 (Jan. 2, 2008), Plaintiffs initiated this lawsuit. Doc. No. 1 (filed Jan. 31, 2008). MMS held lease sale 193 on February 6, 2008. Ex. 58 at 1.

> A. <u>Missing information about the Chukchi Sea and the potential impacts of the lease sale</u>

MMS's ability to analyze adequately the impacts of lease sale 193 fundamentally was constrained by a basic lack of data about the Chukchi Sea and the dramatic shifts occurring there due to climate change, and the self-imposed tight time frame led to the lease sale proceeding in the absence of this data. *See supra* at 3-4. The EIS is replete with statements that information is missing about the Chukchi Sea environment and the potential effects of the lease sale on wildlife

and subsistence. The EIS's acknowledgments of missing data, too numerous to describe here, are set forth in a compendium exhibited hereto, reflecting literally hundreds of such admissions throughout the EIS. *See* Ex. 129. That compendium shows that, for example, in addition to major gaps for fish, about which so little is known that the EIS was largely confined to analyzing broad categories rather than individual species, *see id.* at 7, the EIS admitted to important data gaps for 13 of the 14 marine mammal species and at least 23 of the 30 categories of birds it analyzed. *See id.* at 10-15, 16-22.

During the administrative process, the National Marine Fisheries Service (NMFS), EPA and FWS expressed concern over the lack of baseline data available to MMS. NMFS stated that "[d]ata to describe marine mammals within the sale area and their habitat use of the sale area are lacking or inadequate to support impact assessment and mitigation planning" and "acquisition of [audiometric data] must precede leasing, where acoustic effects on marine mammal species have not been adequately researched." Ex. 54 at 3. EPA stated that it "is concerned that, overall, the depth and diversity of uncertainties presented in the document resulted in the lack of adequate support for many of the document's conclusions" and that data on bowhead, humpback, and fin whales was lacking. Ex. 43 at 2, 4.[1] FWS noted that "additional information concerning walrus habitat use patterns and subsistence hunting patterns in the Chukchi Sea are needed to adequately evaluate potential impacts of oil activities and formulate effective mitigation strategies" and asked MMS to specifically identify these information gaps and proceed using a cautionary approach. Ex. 49 at 441e; *see also id.* (noting need for continued studies to fill data gaps).

The lack of information rendered MMS unable to determine the potential impacts of the lease sale on subsistence and many of the wildlife species that inhabit the Chukchi Sea. MMS admitted that "[l]imited monitoring data prevent effective assessment of cumulative subsistence-resource damage; resource displacement; changes in hunter access to resources; increased competition; contamination levels in subsistence resources; harvest reductions; or increased

---

[1] Later in the administrative process, EPA submitted another comment letter to MMS stating, without specifically addressing missing information, that the agency had adequately addressed the "majority" of the concerns it raised in its comment letter, such as more fully addressing health impacts, correcting a portion of its oil spill risk analysis, and working with FWS to address concerns about eiders and polar bears. Ex. 53 at 1-2. The many data gaps identified in the draft EIS had not, however, been filled in the final EIS. *Compare, e.g.,* Ex. 41 at 6 (unable to assess impacts on marine mammals due to data gaps) *with* Ex. 49 at 150 (same).

effort, risk and cost to hunters … [or] the effectiveness of mitigation measures."  Ex. 49 at 229. It admitted that it did not have enough information to assess the lease sale's impacts to marine mammals.  *Id.* at 26 ("because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas"); *id.* at 29, 191 (same);  *id.* at 150-51 ("Because of lack of data on which to base informed decisions, it is unknown if noise introduced into the environment from industrial activities, including drilling and seismic operations, will have an adverse impact on nonendangered and nonthreatened marine mammals in the Proposed Action areas."); *see also id.* at 157 ("Unfortunately, it has not been possible to predict the type and magnitude of marine mammal responses to the variety of disturbances caused by oil and gas operations and industrial developments in the Arctic.  More importantly, it has not been possible to evaluate the potential effects on populations."); *id.* at 161 ("[w]ithout historical data on distribution and abundance, it is not possible to measure the impacts of an oil spill on marine mammals"); *id.* at 218 ("Because very little is known about the distributions, population sizes or habitat use of marine mammals in the Chukchi Sea, it is difficult to determine if significant impacts will or will not occur to marine mammals as a result of the proposed action.").  Even the analysis of potential impacts to the endangered bowhead whale, a species of central social and cultural importance to Inupiat communities along the Chukchi Sea coast, was limited by glaring gaps in information.  *See id.* at 151 ("Variability in the distribution of bowhead whales in the Beaufort Sea over time and among years, and lack of recent data on bowhead seasonal distribution and abundance in the Chukchi Sea makes attempts to quantitatively model the numbers of whales that might be contacted by oil problematic."); *id.* at 212 ("while it is clear there have been multiple noise and disturbance sources in the Beaufort Sea over the past 30 years, because of the incompleteness of data, even for the 1990's, for many types of activities, we cannot evaluate the cumulative effects on bowhead whales resulting from multiple noise and disturbance sources ….  Because data also are incomplete for the Chukchi Sea, we reach the same general conclusions.").  Similarly, the analysis of the lease sale's potential impacts to fish, *id.* at 127-28, and marine birds, *id.* at 150, was limited by lack of information.

B.     The analysis of the lease sale and climate change over time

The EIS acknowledged that the climate in the Arctic is getting warmer, and the Chukchi Sea is in a state of dramatic change, with many significant and negative impacts to the ecosystem, its wildlife, and subsistence.  Ex. 49 at 42, 58, 71, 75, 77-80, 99-100; *see also supra* at 4-5.  The EIS also stated that these climate changes are "apparently accelerating."  Ex. 49 at 42.  Instead of analyzing the potential impacts in light of this changing environmental baseline, the EIS assessed project impacts against a static snapshot of the Chukchi Sea environment as it exists today.  *Id.* at 336.  The EIS attempted to address climate change instead in the cumulative impacts section.  *Id.* at 210, 219-222.  That section described present changes in the Chukchi Sea environment and some effects on species, *id.* at 219-225, but did not attempt to project the impacts of climate change into the future.  Instead, it stated that "[d]ue to the ongoing effects of climate change in the Arctic, continued close attention and effective mitigation practices … are warranted."  *Id.* at 221-22 (nonendangered marine mammals); *see also id.* at 226, 235 (same, polar bears); *id.* at 217 (same, ringed seals); *id.* at 233 (same, beluga whales); *see generally id.* at 210, 217-226, 233.  The EIS thus did not analyze the potential impacts of the lease sale in the context of the future changes in the Chukchi Sea caused by climate change.

C.     The development scenario as a basis for assessing impacts

MMS developed a "scenario" to analyze the potential impacts of lease sale 193.  The scenario projected the type and amount of exploration, development, and production that could result from the lease sale.  The entire analysis of impacts in the EIS is predicated on the projected levels of activity in the scenario.  Ex. 49 at 197-107-26, 448, 449.  MMS limited the scenario to the development of oil only, excluding any analysis of the exploration, development and production of natural gas.  Ex. 44 at 2; Ex. 49 at 108.  It further constrained its scenario, and therefore the entire impact analysis in the EIS, to the discovery, development and production of the first 1 billion barrels of oil from the first discovered oil field.  Ex. 49 at 49.  The EIS described this as the minimum level of oil necessary to justify an initial development project in the Chukchi Sea.  *Id.* at 49.

Elsewhere in the record and EIS, by contrast, MMS described a range of economically recoverable oil resources in the Chukchi Sea depending on oil price, ranging between 2.37 billion barrels of oil at a price of 46 dollars per barrel and 12 billion barrels of oil at a price of 80

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*                                          10
Case No. 1:08-cv-00004-RRB

dollars per barrel of oil, Ex. 21 at 4c-5, and the EIS disclosed a middle estimate of 8.4 billion barrels of oil at 60 dollars per barrel. Ex. 49 at 108-109. It also described a range of economically recoverable natural gas reserves, ranging from 7.91 trillion cubic feet of gas at a price of 6.96 dollars per thousand cubic feet to 54.44 trillion cubic feet of natural gas at a price of 12.10 dollars per thousand cubic feet of gas. Ex. 21 at 4c-5.

MMS developed its scenario for the lease sale early in the EIS process, largely before its publication of a notice of intent to prepare an EIS. 70 Fed. Reg. 54,406, 54,407 (Sept. 14, 2005) (second col.); Ex. 4 at 1-2; Ex. 5 at 1-2; Ex. 11 at 1-3. Like many aspects of MMS's analysis of lease sale 193, the scenario seems to have been motivated by the need for speed. Ex. 4 at 2 (email from James Craig, the analyst who drafted the scenario, to supervisor Deborah Cranswick, noting the need for "a scenario ASAP" and that "we won't have the 2005 resource assessment numbers until Sept, so we must base the scenario on the 'first development' not the total economic potential"). MMS appears to have reached its decision to analyze the production of 1 billion barrels of oil and omit natural gas from its scenario quickly, over the course of a few days at the beginning of the administrative process, prior to any public input. *See id.*; Ex. 5 at 1-2; Ex. 6 at 1-2. Although the scenario underwent some changes over the next few months, these basic decisions appear to have been finalized by mid-September, 2005. Ex. 8 at 1-3; Ex. 11 at 1; Ex. 12 at 1.

In December 2005, however, Shell Exploration and Production Company (Shell), a company with extensive investments and operations in the Alaskan Arctic and a major bidder on lease sale 193 leases, submitted a comment letter to MMS that included natural gas production in its development plans and stated that "LNG [liquefied natural gas] from ports in the southern Chukchi Sea should also be analyzed" in the EIS. Ex. 13 at 2. MMS analysts determined that "Shell's scenario for future exploration and development activities in the Chukchi Sea is valid from an engineering standpoint," and "the opportunity to discover and develop natural gas pools in the Chukchi area will factor into leasing and exploration strategies for some (but not all) companies." Ex. 17 at 5, 4.

Analysts raised questions about revising the scenario the scenario to reflect Shell's interest in developing natural gas in the Chukchi Sea. Ex. 17 at 1; Ex. 20 at 1-4; Ex. 19 at 4 (asking rhetorically "Is Shell not an expert on the issue of development of oil and gas fields?"); Ex. 18 at 1 ("Do we have these facilities (gas pipeline and LNG plant) that Shell recommends be

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 21 of 78

in the EIS … as part of the scenario of activities we will analyze in the EIS?  If not, let's discuss ASAP.").  Indeed, even prior to the Shell letter, an MMS analyst expressed disagreement with the decision not to analyze natural gas production.  Ex. 9 at 1 ("I disagree with the gas production as being 'speculative'"; "I am not sure after a careful reading of the E&D scenario that we can dismiss gas production as a reasonably foreseeable activity over the life of the project").  MMS, however, continued to exclude natural gas from its analysis to avoid delay.  Ex. 17 at 4-5 ("Modifying the MMS scenario to upgrade natural gas production/export from 'speculative' (beyond 20 years) to 'reasonably foreseeable' would be very disruptive to on-going EIS work and tight leasing schedules without providing more realism in our analyses."); Ex. 14 at 1 ("we need to solve this fast"); Ex. 15 at 1 (noting potential for delay if scenario were changed).

Later in the administrative process, as the date of the lease sale approached, MMS recognized that "[p]erhaps some companies are more interested in gas than oil" in the Chukchi Sea.  Ex. 44 at 3 (internal email dated March 19, 2007).  Consequently, MMS concluded that "[r]estricting the [lease incentives] to oil only could cost millions (perhaps tens of millions$) in bonus bids from companies interested in gas exploration [and] [i]f marginal gas projects were not developed, billions of dollars could be lost in royalties and taxes." *Id.*  Responding to this demand, MMS provided lease incentives for natural gas as well as for oil production.  Ex. 55 at 3-4 (explaining that the lease incentive is denominated in barrels of oil equivalent (BOE) to encompass both natural gas and oil); Ex. 57 at 8-9.  This was a significant departure from prior lease sales.  Ex. 55 at 4.  However, neither the draft EIS nor its analyses were amended or supplemented to reflect this significant change.

In addition to providing economic incentives for lessees to produce natural gas on their leases, MMS also promoted the benefits of natural gas production from the lease sale to the state of Alaska.  MMS's Alaska regional director, John Goll, sent to Governor Palin's staff an email attaching a briefing memorandum on lease sale 193 that explains the inducements for natural gas production from Chukchi Sea leases and asserts "gas production from the Chukchi could be exported via LNG as an alternative strategy if a gas pipeline project does not occur."  Ex. 55 at 5.  MMS also incorporated natural gas production in a presentation to the North Slope Borough entitled "Scenarios and Benefits from Development in the Chukchi OCS," which presents three different development scenarios and the likely revenues Chukchi Sea oil and gas development

would provide the North Slope Borough. Ex. 2 at 1, 7-13. Each development scenario includes the development of natural gas. *Id.* at 7, 8, 11. The first scenario envisions that large amounts of oil and gas are developed and are both transported by overland pipelines from the Chukchi Sea to the Trans-Alaska Pipeline System (TAPS) and a new gas pipeline. *Id.* at 7. The second scenario envisions that only gas is developed, that a LNG facility is developed near Point Lay or Kivalina, and that gas is transported to market via LNG tankers. *Id.* at 8-9. The third scenario envisions that moderate amounts of oil and gas are developed and that they are both transported to market via "offshore storage and loading." *Id.* at 11-12. None of these scenarios was analyzed or addressed in the EIS.

With respect to oil, there were some within the agency who questioned MMS's 1 billion barrel assumption. MMS analyst Dee Williams emailed Deborah Cranswick, MMS's Chief of Environmental Assessment, asking: "If it becomes economical to build one platform to produce an estimated 1 billion barrels, and there is between 12 and 29 billion barrels that are recoverable, why is the scenario not compelled to imagine more than one platform (i.e. is a single platform *always* the initial scenario, in which case maybe we should just explain that)?" Ex. 7 at 2. James Craig, the analyst primarily responsible for developing the scenario, candidly admitted that the choice to model 1 billion barrels of oil "means far lower resource recovery and associated activities than the full economic potential,"(Ex. 4 at 1) and "is not tied to a resource assessment or oil price range. It is simply the approximate size of the first, standalone offshore oil field in the Chukchi province." Ex. 22 at 1.

       D.      <u>The analysis of seismic surveying</u>

"One of the greatest concerns associated with the impacts of oil and gas exploration and development on marine mammals has to do with potential impacts of noise on their ability to function normally and on their health." Ex. 49 at 134. Marine mammals rely on sound for virtually every aspect of their life – to communicate, to find mates, to navigate, to orient, to detect predators, and to gain other information about their environment. *Id.* at 135. Oil and gas activities associated with lease sale 193 will introduce industrial noise into the marine environment through a variety of means, including seismic surveying, drilling, the use of icebreakers and other vessels, and construction. *Id.* Seismic surveying, a process by which oil and gas companies use extremely loud sound pulses from airguns to collect data about offshore

subsurface geology to depths in excess of 10 km, is the loudest of these activities.  Ex. 78 at 4; Ex. 49 at 110-112; 67 Fed. Reg. 46,712, 46,718 (July 16, 2002) ("Aside from explosions, the loudest human noise in the oceans is from airgun arrays used in oil and gas exploration.").  The loudest types of seismic surveying, 2D and 3D seismic surveys, are conducted "day and night," firing airgun pulses every 10-15 seconds regardless of weather, sea state or visibility, and may continue for months, covering areas of "thousands of square miles . . . ."  Ex. 49 at 109-11; Ex. 27 at 3.

The noise generated by seismic surveying activities associated with leasing can disrupt and injure marine mammals, such as bowhead and other whales, seals, and walrus, in numerous ways, "ranging from subtle behavioral and physiological impacts to fatal."  Ex. 49 at 136; *id.* at 153-58 (whales); *id.* at 151-52 (seals); *id.* at 152-53 (walrus).  The impacts of seismic surveys on whales, particularly on the endangered bowhead whale that is the lynchpin of Inupiat subsistence culture, is of particular concern.  *Id.* at 17.  Seismic surveys can "interfere with communication among whales … mask natural sounds important to whales … physiologically damage whales … and alter normal whale behavior, such as [causing whales to] avoid[] important areas (such as feeding areas) or displacing a migration route farther from shore."  *Id.* at 136.  This displacement may also cause subsistence whalers to have to travel further to hunt whales, subjecting them to dangerous open ocean conditions and increasing the risk that meat will spoil before it can be processed.  *Id.* at 182, 185, 189.  The potential effects of noise on female bowhead whales and calves "merit[s] special consideration" because of the vulnerability and sensitivity of this portion of the bowhead whale population.  *Id.* at 131.  Any reduction in the health of marine mammal populations would also adversely affect Chukchi communities' ability to engage in the subsistence way of life that depends upon these animals.

Seismic surveys have also been reported to disrupt subsistence harvesting activities by altering the migration pathways and distribution of wildlife important to subsistence.  For example, a former Chairman of the Alaska Eskimo Whaling Commission noted that during seismic surveys in 1979-81, whalers, who traveled up to 75 miles into the ocean from Barrow, saw only a single bowhead whale, and no gray or beluga whales or bearded seals.  Ex. 49 at 181; *see also id.* at 181-86.  The EIS acknowledges that "the greatest disruption of the subsistence whale hunt would be expected in the traditional fall bowhead whale-hunting areas for Barrow, where multiple seismic-survey operations could deflect whales away from traditional hunting

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 24 of 78

areas," and "any disruption of the Barrow bowhead whale harvest could have significant effects on regional subsistence resources and harvest practices." *Id.* at 189.

In 2006, MMS permitted three seismic surveys in the Chukchi Sea. These were the first 3D seismic surveys ever conducted in the Chukchi Sea, and the first seismic surveys of any sort conducted in the sea since 1991. *See* Ex. 91 at 7. Recognizing the potential impacts to marine mammals from seismic surveying, MMS and NMFS imposed a set of mitigation measures in their respective permits to seismic operators intended to reduce impacts of seismic noise on marine mammals, including bowhead whales. Ex. 49 at 12-17; Ex. 27 at 19-23; 71 Fed. Reg. 43,112, 43,127-130 (July 31, 2006). These mitigation measures included a requirement that operators establish and monitor a 180 dB[2] safety zone to protect cetaceans and walrus and a 190 dB safety zone to protect pinnipeds other than walrus from potential injury from seismic survey noise. Ex. 27 at 21; Ex. 91 at 6; Ex. 49 at 13; 71 Fed. Reg. at 43,117, 43,127-29.

During the 2006 seismic season, NMFS and MMS required operators to report data on marine mammals encountered during their seismic surveying. 71 Fed. Reg. at 43,131; Ex. 27 at 21. These 2006 monitoring reports raise serious questions about the efficacy of the 180 dB and 190 dB safety zones.[3] They establish that, despite implementation of the safety zones, scores of

---

[2] NMFS and MMS use the unit decibels (dB) to measure the intensity of underwater sound for purposes of determining potentially injurious exposure to noise. *See,* Ex. 49 at 135; Ex. 27 at 8, 11-12.

[3] The draft EIS for lease sale 193 stated that MMS would review the monitoring reports from 2006 with respect to mitigation measures designed to protect endangered bowhead whale mother and calf pairs. Ex. 41 at 4; *see also* Ex. 49 at 270a-b. MMS and NMFS also discussed preliminary results of the 2006 seismic monitoring reports in the draft Programmatic Seismic EIS, published several months prior to the EIS and included in the lease sale EIS bibliography. Ex. 91 at 10 (discussing preliminary results and noting that "a review of [the] final reports … will be instrumental in helping MMS and NMFS to further assess the feasibility and effectiveness of mitigation and monitoring measures"); Ex. 49 at 486. Despite these statements, the administrative record does not contain the monitoring reports. The court should nevertheless consider these reports under the well-established rule permitting consideration of extra-record documents to demonstrate that an agency failed to consider relevant factors. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1162 (9th Cir. 2006) ("We allow extra-record materials if necessary to 'determine whether the agency has considered all relevant factors and has explained its decision.'") (quoting *S.W. Ctr. For Biological Diversity v. U. S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)). This exception is particularly important in the NEPA context where "a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes

---

marine mammals were exposed to seismic pulses loud enough to potentially cause permanent hearing loss. *See* Ex. 88 at 2-3 (identifying 42 instances where a total of 50 marine mammals, including an endangered bowhead whale, gray whales, and multiple seal species, were seen within the safety zone and "likely" or "very likely" exposed to potentially injurious airgun pulses before the array was powered down); Ex. 89 at 2-3 (identifying 24 such instances involving various seal species); *see also* Ex. 90 at 2-3 (GXT Monitoring Report at 7-9-10) (identifying one shut down in which three walrus, including one juvenile, were possibly exposed to potentially injurious levels of sound). Even when marine mammals were spotted and the airguns were powered down, the animals nonetheless "likely" or "very likely" suffered exposure to potentially injurious noise levels more than 70 percent of the time. *See* Ex. 89 at 3 (Table 6.8); Ex. 88 at 3 (Table 5-8) (66 out of 93 total power-downs or shut downs failed to prevent potentially injurious exposure). Moreover, the reported numbers "are likely underestimates of the actual numbers of animals exposed to the specific sound levels," because "[s]ome animals probably moved away before coming within visual range, and not all of those that remained would have been detected by observers." Ex. 94 at 2.

The EIS's description of impacts from seismic surveying to marine mammals assumed that the 180 dB and 190 dB safety zones would apply and would mitigate the impacts of the activity to marine mammals. Ex. 49 at 15, 142-43, 152-53, 155. It did not disclose the serious shortcomings the 2006 data revealed.

During the 2006 seismic surveying season, MMS and NMFS also required seismic operators to aerially monitor the area where received sound levels from the seismic vessels reached 120 dB or greater and to suspend surveying activity any time that 4 or more bowhead whale cow-calf pairs were observed within that area. Ex. 27 at 22; 71 Fed. Reg. at 43,123-24.

---

(…footnote continued)

be determined only by looking outside the administrative record to see what the agency may have ignored." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988) (opinion amended by 867 F.2d 1244 (9th Cir. 1989) (citing and quoting *Suffolk County v. Sec'y of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064 (1978)); *see Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447-48 (9th Cir. 1994) (applying exception to allow scientific testimony outside the administrative record where agency had "neglected to mention a serious environmental consequence").

This mitigation measure was adopted because the science showed that noise at 120-dB can cause a response in bowhead whales, females with their young have a heightened sensitivity to noise and disturbance, and the ability of mother bowhead whales to provide adequate care to their young during the first year of life is particularly critical. Ex. 27 at 5, 15-18. MMS and NMFS were concerned that seismic noise could have biologically significant effects on the health of females and young calves and to the following year's reproductive potential of adult females by, for example, displacing them from important feeding, nursing, resting and calving areas. *Id.* at 15, 18; Ex. 49 at 143; Ex. 28 at 3-4. The 120–dB mitigation measure was essential to allow NMFS to conclude that the 2006 surveying activity would not have a significant impact on bowhead whale populations. 71 Fed. Reg. 66,912, 66,913 (Nov. 17, 2006).

Consistent with the agencies' conclusions with respect to the 2006 seismic surveying, an early draft of the EIS, which was prepared by a biologist in the MMS's environmental division, appears to have included the 120 dB safety zone as one of the "mitigation measures deemed necessary and required to reduce potential adverse impacts to below a 'significance' threshold." Ex. 24 at 2-3. Several months later, some MMS personnel in the petroleum resource evaluation division contested the use of and basis for a 120 dB safety zone for bowhead whales. Ex. 33 at 3-4; Ex. 34 at 1; Ex. 35 at 1; Ex. 36 at 1-2 (raising issue to level of Alaska regional director John Goll). In the end, the draft EIS included language noting that the agency imposed 120 dB safety zones for seismic surveys in 2006 and that the measure had been challenged by ConocoPhillips. Ex. 41 at 4 (identifying this as an "Unresolved (or Controversial or Outstanding) Issue[]"). The draft EIS promised that the outcome of this challenge and new information gleaned from monitoring in 2006 would "inform future MMS NEPA analyses and determine the fate of the subject seismic survey-related stipulations and mitigation measures." *Id.*; *see also* Ex. 37 at 1-2.

Shortly after MMS released the draft EIS for lease sale 193, NMFS and MMS decided to assess the entire program of seismic surveys throughout the Beaufort and Chukchi seas, and they published notice of their intent to prepare a programmatic EIS (PEIS) for this purpose. 71 Fed. Reg. at 66,913. One of the reasons the agencies concluded it was necessary to prepare a full EIS, rather than a more limited environmental analysis as they had done in 2006, was "to reanalyze the range of practical mitigation measures for protecting marine mammals in more detail . . . ." *Id.* The 120 dB safety zone is one of the mitigation measures the agencies needed to examine in greater detail. *Id.* (noting that the safety zone had been "essential" to NMFS concluding that

seismic activities in 2006 would not have a significant impact, and increased seismic permitting "may lead to an increased impact on marine mammals"); *see also* Ex. 49 at 270a. This programmatic analysis is not complete.

During the comment period for the draft sale 193 EIS, subsistence whalers, the North Slope Borough, conservation groups, and industry all submitted comments about the issue of whether bowhead whale mothers and calves needed to be protected from exposure to sounds above 120 dB. *See* Ex. 49 at 253-54 (whaling crew member Gordon Brower), *id.* at 265 (citizen at Anchorage public hearing), *id.* at 269a, 269b (North Slope Borough), *id.* at 278-96 (ConocoPhillips), *id.* at 314 (American Petroleum Institute), *id.* at 365 (Alaska Coalition). In response to some of these comments, MMS promised that the issue would be analyzed in the EIS. For example, MMS stated in response to the North Slope Borough's comments: "The specific requirements for the 120-dB and 160-dB restrictions are being evaluated by MMS and NMFS in an EIS on seismic surveying in U.S. Arctic waters *and in this EIS for proposed Sale 193.*" Ex. 49 at 270a-b (emphasis added).

As the date of publication of the final EIS for lease sale 193 neared MMS biologists continued to argue that the 120 dB safety zone should remain in place for all seismic surveys in the Chukchi Sea:

> [A] great deal of analysis and peer scientific review has resulted in what we have in terms of decisions and monitoring protocols. Until we have definitive reasons to change these and in light of the fact this issue is still being debated vigorously the current status quo should stand, and as justified by expert panels, scientists and meaningful disciplined discussion[,] . . . [when] further clarification of the issue[s] become available amend as appropriate—not before. . . . This is not a case of faulty science but one rather of lack of sufficient species specific data and dependence on basic principles of animal science to assist in decision making.

Ex. 50 at 1; Ex. 51 at 1 (another MMS scientist, agreeing with the need to maintain 2006 mitigation measures); *see also* Ex. 46 at 2-3. MMS's petroleum analysts continued to disagree. *See* Ex. 51 at 2.

The final EIS did not analyze the 120 dB issue. It did not require seismic surveys to employ a 120 dB safety zone or assume in its analysis of impacts that they would do so. Ex. 49 at 15-16, 133. It acknowledged that "[i]f seismic surveys were unmitigated, or are insufficiently mitigated to reduce impacts to the whales themselves, effects that are biologically significant could result if seismic surveys cause avoidance of feeding areas, resting (including nursing)

areas, or calving areas by large numbers of females with calves or females over a period of many weeks." *Id.* at 143; *see also id.* at 214. But, without discussing what mitigation is adequate, the EIS concluded that "[o]verall, bowhead whales exposed to noise-producing activities such as vessel and aircraft traffic, drilling operations, seismic surveys, and construction activities most likely would experience temporary, nonlethal effects." Ex. 49 at 144; *see also id.* at 214. The EIS did not disclose the serious questions surrounding the significance of exposing bowhead whale cows and calves to levels of sound above 120 dB. It simply listed the 120 dB safety zone as one of the mitigation measures that "may be selectively incorporated in Incidental Take Authorizations issued by either NMFS or FWS" and that "would function to provide further protection from the possibility for causing adverse environmental impacts in special situations." *Id.* at 16.

      E.      <u>The analysis of impacts to threatened spectacled and Steller's eiders</u>

North Slope breeding spectacled and Steller's eider populations have declined precipitously, leading to the range-wide listing of spectacled eiders as threatened under the ESA in 1993 and the listing of the Alaska-breeding population of Steller's eiders as threatened under the ESA in 1997. Ex. 72 at 10, 14. The Chukchi and Beaufort seas and North Slope provide vital habitat for the breeding populations of these eiders, with approximately 12,916 spectacled eiders and 500 Steller's eiders breeding in the region each summer. *Id.* at 17. Threatened eiders make wide use of the terrestrial and marine environment of the region from late April through November of each year for different stages of their lifecycle. *Id.* Both species are thought to use the Chukchi Sea spring lead system to migrate from their southern wintering range to their summer breeding grounds on the North Slope. *Id.* at 13, 16. Both species use the Chukchi Sea after breeding and on their southerly fall migration. *Id.* at 15 (Steller's eiders); *Id.* at 13 (spectacled eiders). Members of all three breeding populations of spectacled eiders, and a majority of the female North Slope-breeding population, use Ledyard Bay in the Chukchi Sea to molt, and the area has been designated critical habitat for the species. *Id.* at 20. Areas adjacent to the Chukchi Sea are also vitally important to threatened eiders. Steller's eiders nest on the North Slope from Wainwright to at least as far east as Prudhoe Bay, with highest concentration around Barrow. *Id.* at 14. Non-breeding females have been observed using the Beaufort Sea in late summer. *Id.* at 15. Spectacled eiders nest throughout the North Slope, from south-west of

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 29 of 78

Icy Cape to east of Prudhoe Bay, with higher concentrations on the western end of that range. *Id.* at 12 (fig. 3.3). Females rely extensively on the Beaufort Sea during post-nesting migration to Chukchi Sea molting grounds. *Id.*; Ex. 79 at 6 (fig. 3); Ex. 72 at 38. Some males also stage offshore in the Beaufort Sea. Ex. 79 at 7; Ex. 31 at 4.

Threatened eiders are facing increasing industrialization across their Arctic habitat. According to the EIS, thirty-one oil and gas fields have been developed on the North Slope, two of them offshore and two more accessing offshore pools from onshore locations; three developments are under construction, one of them offshore; and twenty-three discoveries may see development in the next 20 years, including several offshore discoveries in the Beaufort Sea. Ex. 49 at 198, 453-57 (Tables V-1 – V-5). Future lease sales are anticipated to occur in the Beaufort and Chukchi seas, state waters, and onshore in the National Petroleum Reserve – Alaska. Ex. 49 at 198-99, 453-57 (Tables V-1 – V-5). These activities have the potential to negatively affect eiders. *See, e.g.,* Ex. 64 at 8 (biological opinion for NPR-A noting that "[u]ltimately, habitat loss on the North Slope could eventually result in population-level effects" to threatened eiders); *id.* at 6 (noting that if development beyond that projected "occurs within/adjacent to areas of high concentration for either [eider] species, the potential for significant impacts is high").

Lease sale 193 presents potential additional sources of disturbance, collision hazards, and oil and toxic pollutants that could adversely affect threatened eiders. Ex. 49 at 21. For example, a large oil spill resulting from lease sale activities could kill the majority of the Steller's eider population if it occurred in the spring lead system or near-shore open-water areas and could kill thousands of spectacled eiders, appreciably affecting the likelihood of survival and recovery of the North Slope-breeding population, if it contacted Ledyard Bay Critical Habitat Unit while eiders were molting there. Ex. 72 at 28, 26.

Although the EIS acknowledged that "significant impacts are anticipated to occur" to threatened eiders from the cumulative impacts of the lease sale when added to all other activities occurring in their Arctic habitat, Ex. 49 at 195, 216, it relied entirely on a separate document, a biological evaluation, prepared by MMS in connection with its consultation with FWS under the ESA, to analyze the potential impacts of lease sale 193. *Id.* at 61, 145, 216. The biological evaluation, however, analyzed only the impacts of lease sale 193. It did not analyze the impacts

of the lease sale in the context of the myriad other federal activities occurring in threatened eiders' Arctic habitat.  Ex. 38 at 14.

Pursuant to Section 7 of the ESA, MMS initiated formal consultation with FWS to ensure that lease sale 193 is "not likely to jeopardize the continued existence" of threatened spectacled and Steller's eiders. 16 U.S.C. § 1536(a)(2); Ex. 49 at 242d.  FWS prepared a biological opinion pursuant to that consultation.  Ex. 72 at 8-9; 50 C.F.R. § 402.14(k).  This biological opinion, however, also examined only the impacts of lease sale 193.  *See, e.g.,* Ex. 72 at 23-24, 35-36 (examining only oil spill risk from lease sale 193).  Notwithstanding its narrow focus, FWS expressed particular concerned about the potential impacts to eiders of an oil spill from lease sale 193.  Ex. 72 at 30-31; Ex. 67 at 2 (noting that because of the high risk of oil spills, FWS gave MMS the "message that we are approaching [jeopardy] … loud and clear"); Ex. 68 at 1-2 (noting possible jeopardy because of oil spills); *see also* Ex. 26 at 3 (noting that, according to FWS personnel, "[c]onsultation will be extremely complicated and complex, nearest to 'j-word' [conclusion of jeopardy] in recent memory … 'gnarly'").

F.      The Endangered Species Act listing of the polar bear

The Chukchi Sea provides important habitat for the polar bear, a species in peril as a result of climate change shifts to the Arctic.  *See supra* at 4-5.  Lease sale 193 may negatively affect polar bears; as MMS concludes in the EIS, "[e]ven with the best mitigation measures in place, it is certain that some bears will be harassed or killed as a result of industrial activities in their habitat," and "any bears lost to oil and gas activities would be a portion of bears lost to all causes . . . and would likely exceed sustainable levels, potentially affecting both bear productivity and subsistence use, and potentially causing a decline in the bear population."  Ex. 49 at 164, 163.  MMS concludes lease sale 193 presents up to a 40 percent likelihood of one or more large oil spills in the Chukchi Sea.  *Id.* at 123.  Contact with oil is catastrophic for polar bears.  Oil can cause "acute inflammation of the nasal passages, marked epidermal responses, anemia, anorexia, stress, renal impairment, and death."  *Id.* at 165.  A large oil spill "could impact large numbers of polar bears," and "would likely result in significant impacts to polar bears."  *Id.* at 22; *see also id.* at 163-68.

On May 15, 2008, recognizing that the polar bear is in peril, the Secretary of the Interior listed it as a threatened species under the ESA.  73 Fed. Reg. 28,212 (May 15, 2008).  One of the

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 31 of 78

protections afforded the bear by this decision is the requirement that agencies engage in formal consultation pursuant to Section 7 of the ESA with the FWS before engaging in any activity that may affect the bear. *Id.* (first col.); 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). MMS has not, as of the date it produced the administrative record in this case, completed formal consultation with FWS to ensure that the lease sale is not likely to endanger the continued existence of the species.

## ARGUMENT

MMS has failed to adequately assess and disclose the potential impacts of lease sale 193 on wildlife and subsistence in the Chukchi Sea in violation of NEPA. It has failed to obtain missing information on the Chukchi Sea essential for such analysis or disclose why such information cannot be obtained. It has failed to analyze the impacts of the sale in the context of rapid shifts to the Chukchi Sea due to climate change. It has misrepresented the potential impacts of the sale, including the risk of an oil spill, by omitting analysis of the impacts of development and production of natural gas and analyzing only the minimum amount of anticipated oil development and production. Its analysis of seismic surveying failed to disclose potentially significant impacts. It has failed to analyze the cumulative impacts of the lease sale to threatened eiders. MMS and FWS have violated the ESA because the FWS biological opinion failed to consider the impact of lease sale 193 in the context of other activities in eiders' Arctic habitat. MMS has violated the ESA by failing to consult with FWS on the lease sale's potential to jeopardize threatened polar bears.

Judicial review of Plaintiffs' claims is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706. *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (NEPA); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003) (ESA). Under the APA, courts are to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The Court's review under the APA "is 'narrow' but 'searching and careful.'" *Gifford Pinchot Task Force v. U. S. Fish & Wildlife Serv.* 378 F.3d 1059, 1065 (9th Cir. 2004) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971))).

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*
Case No. 1:08-cv-00004-RRB

22

Plaintiffs are organizations representing Alaska Natives, each with a mission to protect Inupiat subsistence traditions, and conservation organizations, each with a mission to protect the environment, including wildlife populations and their natural habitats. *See* Ex. 103 at 2; Ex. 96 at 2; Ex. 100 at 2; Ex. 102 at 2; Ex. 110 at 1, 2; Ex. 106 at 1, 2; Ex. 121 at 2; Ex. 116 at 2; Ex. 111 at 2-3, 5-6; Ex. 108 at 2; Ex. 119 at 1, 2; Ex. 117 at 2; Ex. 115 at 1; Ex. 114 at 2; Ex. 123 at 2. Members of the Plaintiff organizations reside near, visit or otherwise use and enjoy the Chukchi Sea and coastal areas and the wildlife from the area for various purposes, including subsistence, recreation, wildlife viewing, education, research, photography, or aesthetic and spiritual enjoyment. *See, e.g.,* Ex. 95 at 1, 2-3; Ex. 98 at 1, 2-3, 4; Ex. 97 at 1, 2; Ex. 105 at 1, 2, 3, 5; Ex. 107 at 6, 7, 13; Ex. 113 at 1, 2-4, 5-6, 9. Plaintiffs' members are injured by the lease sale because the lease sale and related oil and gas activities threaten subsistence traditions, diminish the wilderness and natural qualities of the Chukchi Sea and coastal areas, and harm wildlife or habitat. *See, e.g,* Ex. 95 at 3, 4-5, 6, 7; Ex. 98 at 4-5; Ex. 97 at 1, 2-3, 4; Ex. 107 at 13-14; Ex. 113 at 7-8, 9. Plaintiffs have standing to bring this action because they, and their members, will suffer injuries in fact, those injuries are traceable to Defendants' actions, and they would be redressed by a favorable decision of this Court setting aside Defendants' arbitrary and unlawful actions. *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-84 (2000).

I.    THE DEPARTMENT OF THE INTERIOR VIOLATED NEPA IN DECIDING TO HOLD THE LEASE SALE

     A.    <u>MMS failed to obtain missing information needed to assess the impacts of the lease sale or justify a conclusion that it could not obtain such information</u>

"[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for [ ] speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982). The starting point of any analysis of an activity's impacts under NEPA is the collection and description of baseline data about the environment in which the activity is to occur, because, "without establishing … baseline conditions … there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 510 (9th Cir. 1988); *see also*

*Am. Rivers v. F.E.R.C.*, 201 F.3d 1186, 1195 n.15 (9th Cir. 2000); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1163 (N.D. Cal. 2006) (baseline is the "heart of the EIS" and must "be accurate and complete").

40 C.F.R. § 1502.22 sets out an agency's obligations when preparing an EIS in the face of incomplete or unavailable information.[4] An agency must first identify missing information that is relevant to reasonably foreseeable significant adverse impacts of the lease sale and is essential to a reasoned choice among alternatives. 40 C.F.R. § 1502.22(a); *see also Cabinet Res. Group v. U.S. Fish and Wildlife Serv.*, 465 F. Supp. 2d 1067, 1100 (D. Mt. 2006) (finding that failure "to attempt any assessment of the importance of the missing information calls into question the validity of the [agency's] conclusions about the impacts of the proposed action" and setting aside EIS). Having identified such missing information, the agency must then obtain the information and include it in the EIS. 40 C.F.R. § 1502.22(a); *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1249 (9th Cir. 1984) ("section 1502.22 clearly contemplates original research if necessary"). Only if the agency makes a finding that the incomplete information "cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," can it proceed to analyze potential impacts in the EIS in the face of incomplete information. 40 C.F.R. § 1502.22(b); *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 495-96 (9th Cir. 1987); *Ctr. for Biological Diversity*, 422 F. Supp. 2d at 1166 (Section 1502.22 requires an agency to "demonstrate" that the costs of obtaining missing, essential information are exorbitant). By its very nature, analysis under Section 1502.22(a) must be conducted at the outset of the NEPA process – identifying and obtaining missing information is a necessary first step to NEPA's requirement that information be "'gathered and analyzed prior to the implementation of a proposed action.'" *Save Our Ecosystems*, 747 F.2d at 1248 (quoting and citing *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d at 1179). Moreover, an agency must make this determination as part of the public NEPA process and disclose it in the EIS, *see, e.g., Kunzman*, 817 F.2d at 495, because without doing so, an agency deprives the public of "the assurance that [it] has indeed considered environmental concerns in its

---

[4]   The Council on Environmental Quality (CEQ) Regulations implementing NEPA are "mandatory regulations" binding on all federal agencies. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); 40 C.F.R. § 1500.3.

decisionmaking process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (citation and quotations omitted).[5] Thus, MMS was required to identify missing information, determine whether it knew the means of obtaining that information and whether it could do so without exorbitant expense, and, if so, obtain the information.

MMS failed to meet these duties in this EIS. As the public, NMFS, EPA, and FWS commented, and as MMS admitted throughout the EIS, fundamental information about the Chukchi Sea and the potential impacts of the lease sale is missing. *See supra* at 3-4, 7-8. The missing information is indisputably relevant to potentially significant impacts and essential to a reasoned choice among alternatives. 40 C.F.R. § 1502.22(a); *Save Our Ecosystems*, 747 F.2d at 1244 n.5 ("As long as information is 'important,' 'significant,' or 'essential,' it must be provided when the costs are not exorbitant in light of the size of the project and/or possible harm to the environment."); *Kunzman*, 817 F.2d at 495 (same). It rendered MMS unable to conduct the most basic of analyses, including determination of this lease sale's likely impacts on marine mammals, fish, and birds. *See supra* at 8-9; *see also* Ex. 129 at 21-40.

For instance, seismic surveys that cause avoidance of particular areas important to endangered bowhead whales for feeding, resting, nursing, or calving could have biologically significant effects to the bowhead population. Ex. 49 at 143. Yet, MMS admitted that it did not have the data to identify areas in the Chukchi Sea that are important to bowheads. *Id.* at 132 ("data are not available sufficiently to characterize the current seasonal and temporal use of the Chukchi Sea Planning Area by bowheads and other whales"). As this Court recognized two decades ago in the context of another OCS lease sale, "[i]n making an informed choice among the alternatives … consideration of the impacts of preliminary exploration and seismic activity

---

[5] Thus, when the CEQ amended 1502.22 to eliminate the requirement that an EIS "weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty"– stating that such analysis was more properly done after completion of the EIS – it expressly retained the requirement that an EIS analyze whether it was feasible to obtain missing information. 51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986); *see also id.* ("The evaluation of impacts under § 1502.22 is an integral part of an EIS and should be treated in the same manner as those impacts normally analyzed in an EIS. The information included in the EIS to fulfill the requirements of § 1502.22 is properly a part of the "Environmental Consequences" section of the EIS.").

on whales was essential." *Village of False Pass v. Watt*, 565 F. Supp. 1123, 1151-53 (D. Alaska 1983), *aff'd on other grounds Village of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984).

Similarly, for birds, the EIS acknowledged that "the risk that several regional bird populations could experience significant adverse impacts is high." Ex. 49 at 146; *see also id.* at 21. Yet, although there are "several areas historically documented to be important to marine and coastal birds in the proposed lease sale area" MMS lacked "site-specific data on habitat use patterns, routes and timing to assess impacts." *Id.* at 146.

For marine mammals the EIS acknowledged potentially significant effects from oil spills. *See* Ex. 49 at 150, 21 (significant impacts could occur to belugas and walrus and are likely to occur to polar bears if there is a large oil spill). Nevertheless, the EIS admitted that "because very little is known about the distributions, population sizes or habitat use of marine mammals in the Chukchi Sea, it is difficult to determine if significant impacts will or will not occur to marine mammals as the result of the proposed action." *Id.* at 218; *see also id.* at 157 (stating that MMS was unable to "predict the type and magnitude of marine mammal response to the variety of disturbances cause by oil and gas operations and industrial developments in the Arctic" or to "evaluate the potential effects on populations"); *id.* at 150-51 (discussing "paucity of information available on marine mammal ecology in the Chukchi Sea").

The "lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea" rendered MMS unable to distinguish potential effects on marine mammals offshore among lease sale alternatives. Ex. 49 at 26, 29. Missing information also constrained the range of alternatives considered. The EIS stated that "marine 'protected areas' … where whales concentrate their feeding activities … would greatly help to mitigate potential impacts to cetaceans from human activities." *Id.* at 161. Lack of data on whales' use of habitat in the Chukchi Sea, *id.* at 157, rendered MMS unable to evaluate alternative lease sale areas that might afford greater protection to whales.[6]

---

[6] When confronted with comments from the EPA recommending that MMS consider deferring sensitive wildlife areas until further baseline studies could bez conducted, MMS responded that, because the EPA had not identified any specific areas, the general coastal deferral alternatives already incorporated into the EIS adequately addressed the concern. Ex. 49 at 11-12. It did not assess whether obtaining information essential to a reasoned choice among alternative lease sale areas was feasible.

MMS can be excused from obtaining this sort of relevant and important information only if the agency determined that the cost of doing so was exorbitant or the means of obtaining it unknown. 40 C.F.R. § 1502.22(a). The EIS did not engage in analysis or explanation of either of these requirements. The EIS did not state that the means of obtaining missing information are unknown. Indeed, the EIS suggested that MMS is conducting ongoing studies to fill data gaps. Ex. 49 at 406 ("[W]hen information gaps are identified, MMS works to address them. For example, it is in the process of planning a new study of polar bears."); *id.* at 130 ("[i]n anticipation of potential new leasing in the Chukchi Sea, the MMS Environmental Studies Program has several Chukchi Sea studies ongoing or being procured."); *id.* at 195 ("To address many uncertainties in our current knowledge, MMS policy is to implement monitoring of actual activities to determine long-term cumulative effects that might result from oil and gas development in this region."). These ongoing studies strongly suggest that the means of obtaining missing information are not "unknown."[7]

Nor did the EIS evaluate whether obtaining basic information necessary to assess the impacts of the action was exorbitantly costly.[8] MMS's response to comments about missing baseline data asserted that the EIS complied with Section 1502.22 because it acknowledged missing information and evaluated the impacts in the face of that missing information by applying generally accepted theoretical approaches. *See* Ex. 49 at 255-57 *and* 260, 263 *and* 266, 269 *and* 270, 273 *and* 275. This approach, however, missed a crucial step in the analysis – assessing whether missing information could be obtained, and, if so, obtaining it. 40 C.F.R. § 1502.22(a); *Ctr. for Biological Diversity*, 422 F. Supp. 2d at 1165; *see also Save Our Ecosystems,* 747 F.2d at 1249. MMS simply rushed ahead in an informational vacuum.

_____

[7] These post-EIS studies "will not cure a deficient EIS." *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 817 (9th Cir. 1987), *rev'd on other grounds*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) (post-EIS studies do not cure NEPA violation in EIS). MMS was required to obtain information as part of the NEPA process, unless the means to do so were unknown or exorbitantly expensive.

[8] Unlike the EIS upheld by the Ninth Circuit in *Oregon Environmental Council v. Kunzman*, which justified its decision to forgo additional independent research by citing cost and time estimates for studies that would be required to fill information gaps, the EIS here did not contain *any* analysis of the costs of obtaining missing information. 817 F.2d at 495-96.

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*                                    27
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 37 of 78

The record confirms that MMS never grappled with the decision to obtain missing information.  Like the EIS, it is devoid of the required analysis.  Slides from a multi-day scientific meeting held in connection with preparation of the draft EIS identified that information was missing, *see, e.g.,* Ex. 10 at 6, 8, but did not discuss whether that information could be obtained for purposes of evaluating the impacts of the lease sale.  Later scientific meetings focused on obtaining information after the lease sale.  For example, at a November 2006 meeting, MMS's chief of environmental studies, Cleve Cowles, responded to a question about how the NEPA process could go forward in the face of missing baseline data by stating that NEPA "provides for making an environmental assessment based on the information that is available at the time … [h]ere, in this meeting, we are trying to look further ahead [than in an EIS] in terms of information that will be useful for managers as time moves on … [to] help us keep tabs on the environment as the industry activities may change."  Ex. 42 at 4-5.

MMS's failure to analyze whether information could be obtained without exorbitant cost is particularly glaring in light of the nature of the project under analysis in the EIS.  *Kunzman*, 817 F.2d at 495 (exorbitance of the costs of obtaining information must be evaluated "'in light of the size of the project and/or the possible harm to the environment.'") (citing *Save Our Ecosystems*, 747 F.2d at 1244 n. 5).  Here, the project's physical and financial scope is immense: lease sale 193 opened almost the entire Chukchi Sea to oil and gas development.  MMS expected to receive hundreds of millions of dollars in bids on the leases, and potentially billions of dollars in royalty payments from production on the leases.  *See, e.g.,* Ex. 49 at 202-03 (noting that prior lease sales in the Chukchi Sea in 1988 and 1991 yielded 512 million dollars in high bids); *see also* Ex. 44 at 3.  In the event, the sale garnered bids on the leases in excess of 2.5 billion dollars.  *See* http://www.mms.gov/alaska/cproject/Chukchi193/ 193Saleday/Sale193SaleDayStats.htm (last visited Dec. 8, 2008) (follow link to "Sale Day Statistics").  Rather than analyze the feasibility of obtaining basic information to assess the impacts of the lease sale on wildlife and subsistence in light of these factors, however, MMS violated NEPA by proceeding in an informational vacuum.

B.       The EIS failed to analyze the lease sale's effects in the context of climate change

The EIS failed to evaluate the potential impacts of the lease sale in the context of the Chukchi Sea environment undergoing dramatic changes due to global climate change.  Rather, it

analyzed the sale against a static baseline, deferring analysis of climate change to the cumulative impacts section. In the cumulative impacts section, in turn, it failed to follow its own mandate to analyze climate change over time based on an extrapolation of trends. Thus, the EIS never analyzed the potential impacts of the lease sale in the actual, changing Chukchi Sea environment in which activities under the lease sale will occur.

The EIS must take a "hard look" at the environmental consequences of the proposed action, *Klamath-Syskiyou Wildlands Ctr.*, 387 F. 3d at 993, which includes a "thorough analysis of the potential environmental impacts," *id.*, including "'all foreseeable direct and indirect impacts'". *Earth Island Inst.*, 442 F.3d at 1159 (quoting *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)). Fundamentally, the EIS must "provide a full and fair discussion of significant environmental impacts." 40 C.F. R. § 1502.1. MMS's approach to analyzing the impact of the lease sale in a changing environment was neither full nor fair because it failed to analyze, disclose, or discuss the likely future impacts of this further climate change or to assess the impacts of its proposed 40-year leases in the context of these likely climate changes over that period.

The EIS stated that the climate in the Chukchi Sea is changing and warming, with many significant and negative impacts to the Chukchi ecosystem and its wildlife, Ex. 49 at 42, 58, 71, 75, 77-80, 99-100. The EIS further stated that these climate changes are "apparently accelerating," *id.* at 42, thereby admitting that these climate changes will continue into the future and likely will be even more severe than those experienced so far. In response to comments, it stated that:

> The MMS realizes that the environment changes over time, but these changes occur in a way that cannot be assessed with certainty, so the cumulative analysis *must be based on an extrapolation of trends*.

*Id.* at 336 (emphasis added). Thus, by MMS's own statements, climate change is upon the Chukchi Sea, it is accelerating, and an adequate analysis of environmental changes over time, i.e., climate change, "must be based on an extrapolation of trends."

Nevertheless, MMS chose to analyze the proposed action against a static baseline, rather than the shifting environmental baseline it admits is the reality in the Chukchi Sea. "The baseline used in the EIS is defined by the existing environment at the time the Proposed Action is under consideration." Ex. 49 at 336. This is not an "accurate and complete," *Ctr. for Biological Diversity*, 422 F. Supp. 2d at 1163, description of the changing environment the EIS

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 39 of 78

itself acknowledged will exist over the life of the lease sale. Ex. 49 at 336, 42. Accordingly, the EIS failed to analyze the lease sale's effects against the environment as it will actually exist over the life of the sale. By ignoring change and analyzing the potential impacts of the lease sale against an artificially static baseline, the EIS thereby failed to examine the *actual* direct effects of the sale to wildlife and subsistence in the Chukchi Sea. *See Idaho Sporting Cong.*, 305 F. 3d at 973 (hard look must meaningfully address the actual impacts of the proposed project).[9]

The EIS purported to conduct an analysis of climate change together with the lease sale in the cumulative impacts section. Ex. 49 at 210 ("[T]he cumulative effects of the proposed Chukchi Sea lease sale are assessed in the context of climate change."); *id.* at 217 (noting that the discussion of cumulative impacts on marine mammals "will focus primarily on the effects of climate change"). Even assuming this would meet NEPA's requirements, this section of the EIS also failed to provide the requisite analysis. Despite the MMS's admission that the analysis of climate change "must" be based on an extrapolation of trends, the cumulative impacts section of the EIS contained no such analysis. *See id.* at 210, 217-26, 233. To the contrary, these sections essentially repeated or summarized the effects of climate change to the present, while avoiding entirely any analysis that extrapolated these trends into the future. They simply stated that "continued close attention" to climate change was warranted. *See id.* at 217, 222, 226, 233, 235. Thus, the EIS fell short of its own standard for analyzing climate change based on an extrapolation of trends. As such, the cumulative impacts section, too, failed to analyze the potential impacts of the lease sale when added to the potential impacts of climate change over time, and plainly fell short of NEPA's requirement that it take a hard look at "reasonably foreseeable" actions and impacts. 40 C.F.R. § 1508.7; *Earth Island*, 442 F. 3d at 1159.

---

[9] Several years ago, this Court considered an EIS's analysis of climate change and oil and gas activities in the onshore context. Ex. 86. The Court there referred with approval to the government's argument that the evaluation of climate change effects together with energy development should be conducted in the cumulative impact section of an EIS. *Id.* at 17. This issue, however, was not presented by the plaintiffs' arguments in that case, *see* Ex. 82 at 4-12; Ex. 83 at 3-7, and was not part of the holding of the case, Ex. 86 at 18-19. Even had the *National Audubon* Court decided that cumulative impacts are properly analyzed in the cumulative impact section of an EIS– which it did not – this Court is free to reconsider the issue here. *See Kessler v. Assoc. Fin. Serv. Co.*, 573 F.2d 577, 579 (9th Cir. 1977).

Moreover, the extrapolations of trends that MMS conceded are required for a proper analysis of climate change are feasible and already have been done by other federal agencies assessing climate change. An example is the analysis performed by the U.S. Geological Survey (USGS) incident to listing the polar bear as a threatened species, in which the USGS used extrapolations of climate change models to analyze and assess the effects of climate change on polar bears into the future. 72 Fed. Reg. 56,979 (Oct. 5, 2007). The "hard look" demanded under NEPA required that MMS perform similar analyses in this EIS. Where "it is reasonably possible to analyze the environmental consequences in an EIS…, the agency is required to perform that analysis." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F. 3d 1062, 1072 (9th Cir. 2002).

This Court's holding in *National Audubon Society*, that an agency was not required to conduct a "synergistic" analysis of climate change and the proposed action where its choice of a different methodology was reasonable in light of the evidence in the record, is not to the contrary. Ex. 86 at 19-20. This case does not turn on disputes over methodology, but, rather, on the agency's failure to apply the methodology of extrapolation of trends that it itself stated was a "must." *National Audubon Society* does not sanction an analysis that fails entirely to assess the future effects of the lease sale in a constantly changing environment.[10]

This failure to extrapolate the trends of climate change into the future led to incomplete analyses of the likely impacts of this lease sale to a host of rare and declining species, including polar bears, walruses, seals, and other marine mammals. Although the EIS recognized that climate change negatively affects "virtually every aspect of [polar bears'] existence," Ex. 49 at 223-25, and recognized that lease activities and, especially, oil spills could have very negative effects on bears, even under optimal conditions, *id.* at 163, 167-68, the EIS never attempted to assess these effects on the likely highly sub-optimal conditions the bears will face as climate change proceeds over the coming decades. Similarly, the EIS recognized that the lease sale could have adverse effects on walrus, *id.* at 152-53, 158, 162, and described at length the negative impacts of recent climate change on walrus, *id.* at 75, 219-20, but made no attempt to

---

[10]  Indeed, in another key distinction, MMS here admitted that climate change, oil and gas activities, and other human activities "likely will interact synergistically in a cumulative fashion" in their impacts on marine mammals and polar bears, Ex. 49 at 217, 222.

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 41 of 78

extrapolate these foreseeable continued impacts and trends so as to assess the impacts of the lease sale over its life. Likewise, although the EIS admitted that the lease sale could have adverse effects on subsistence, *id.* at 175, 179, 187-88, and stated that sea-ice and permafrost change "will threaten subsistence livelihoods", and that "synergistic cumulative effects" of climate change could cause "loss or dispersal of community", it did not assess these changes over the life of the lease sale. *Id.* at 237. The effect of these failures was to understate or obfuscate the likely actual effects of the action on wildlife and subsistence in violation of NEPA.

Because it failed to extrapolate, analyze, and disclose the impacts of climate change into the future, this EIS failed to provide an adequate analysis of the "actual environmental effects" of the action, *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Administration*, 538 F. 3d 1172, 1217 (9th Cir. 2008), and failed to provide an adequate analysis of the reasonably foreseeable cumulative impacts, 40 C.F.R. § 1508.7.

      C.      <u>The EIS failed to assess the full impacts of the lease sale by omitting development of natural gas from its analysis and understating the amount of oil that could be developed</u>

Although lease sale 193 leases permitted and encouraged the discovery, development and production of natural gas, the EIS did not analyze the potential impacts of these activities. MMS limited its analysis to oil. MMS further limited its analysis to only impacts from the development and production of the minimum amount of oil required for any development to occur as a result of the lease sale. These two assumptions—that the lease sale would not result in the development of natural gas or more than one billion barrels of oil—are unreasonable in light of the record, rendering the EIS's analysis of the lease sale's impacts misleading in violation of NEPA.

A central purpose of NEPA is to assure that federal decision-makers consider the environmental consequences of their actions before a decision to act is made. 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.1; *see Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976); *Thomas v. Peterson*, 753 F.2d 754, 760 (9th Cir. 1985). "[T]he purpose of an [EIS] is to evaluate the possibilities in light of current and contemplated plans and to produce an informed estimate of the environmental consequences." *Kern*, 284 F.3d at 1072 (quotation and citation omitted); *see also City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir.1975) ("[d]rafting an [EIS] necessarily involves some degree of forecasting"). A lease sale is the second of four stages of OCS oil and

gas activity governed by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, preceded by a five-year leasing program and followed by exploration and development and production. *See False Pass*, 733 F. 2d at 608-10. Because environmental review occurs at each of these stages, the Ninth Circuit evaluates MMS's compliance with NEPA in this context in light of the particular stage under analysis. *See id.* at 609-10, 613; *Tribal Village of Akutan v. Hodel*, 869 F. 2d 1185, 1192 (9th Cir. 1988); *see also State of Cal. v. Watt*, 683 F.2d 1253, 1268 (9th Cir. 1982), *rev'd on other grounds sub nom Sec. of Interior v. Cal.*, 463 U.S. 312 (1984). Recognizing the inherent difficulties of analyzing impacts from future oil and gas activities on leases, the court affords deference to the method an agency uses to do so. *See Akutan*, 869 F.2d at 1192. However, the analysis must be reasonable. *Id*. It must give the decision-maker a "clear idea how to visualize the environmental harms" of the proposed action. *Mass. v. Watt*, 716 F.2d 946, 949 (1st Cir. 1983). The misleadingly narrow scenario employed by MMS in the EIS does not meet this standard.

### 1. *MMS omitted natural gas development from its scenario*

Sale 193 leases are not "oil only leases." Ex. 44 at 2. MMS learned early in the administrative process that industry was interested in Chukchi Sea natural gas and, accordingly, it offered leases that permit and offer economic incentives for the production of natural gas. *See supra* at 11. MMS also promoted natural gas production during its interactions with the Governor and the North Slope Borough. *Id.* at 12-13; Ex. 2 at 7, 8-9, 10, 11-12. Nevertheless, MMS omitted analysis of natural gas development and production in the EIS. *See supra* at 10. This omission violates the fundamental NEPA requirement that, before an agency makes a decision to act, it must analyze the environmental consequences of the proposed action. 42 U.S.C. § 4332(C); *Kern*, 284 F.3d at 1072. Here, MMS made a decision to sell leases that permit and specifically promote the development and production of natural gas, but it failed to analyze the impacts of that action.

MMS's decision not to analyze natural gas production in the EIS is seriously undercut by its decision to provide royalty relief for natural gas production. *See supra* at 12. Royalty relief provides an incentive for lessees to develop their leases when the price of oil or gas is below a threshold that the lessee requires to make it economic to proceed with the development. Here, MMS set the royalty relief threshold price for natural gas at 6.50 dollars per million British

thermal units (Btu) of gas, in 2004 dollars. Ex. 57 at 9. If natural gas prices stay below 6.50 dollars per million Btu, lessees that produce gas will be forgiven royalty payments on the first volume of gas they produce. If the price rises above, lessees will have to pay royalties on any gas they produce. *Id.* The whole purpose underlying MMS's decision to modify leases, for the first time in recent Arctic leasing history, to include natural gas incentives, was to encourage bids based on natural gas potential and, ultimately, natural gas production. This decision is, thus, squarely at odds with the EIS's omission of natural gas production from its scenario upon which it assessed potential environmental impacts.

MMS attempted to justify its omission of natural gas production on the grounds that "there is no existing transportation infrastructure to move produced gas [from the North Slope] to markets." Ex. 49 at 108. MMS concluded that construction of such transportation infrastructure was "speculative at this time" because, in the case of an overland pipeline, "there is uncertainty about the route of such a pipeline, how and when it might be constructed, how long it would be until it might be operational, what the design capacity might be, etc.," and, in the case of other means of bringing natural gas to market, such as LNG tankering, these methods "were not considered to be as feasible or economically attractive as the overland pipeline system." Ex. 49 at 108, 109. These assertions, however, are inconsistent with industry's interest in the production of natural gas, *supra* at 11, MMS's decision to provide incentives for the production of natural gas in the leases, *supra* at 12, and its public statements promoting natural gas production in the Chukchi Sea, *supra* at 12-13.

Moreover, the EIS's summary rejection of LNG tankering as a means of getting gas to market as not "feasible or economically attractive" is contrary to the record and MMS's presentations to the public. Early in the administrative process, Shell requested MMS analyze tankering natural gas to market in the EIS. *See supra* at 11. MMS pointed out that Shell had not submitted supporting data with its scoping comments, Ex. 16 at 3 ("Shell offers a scenario but offers no supporting information or data for our consideration in deciding whether to change the scenario."); Ex. 19 at 1-3 (same), but rejected Shell's request because "resource estimates and economic models" that it used "consistently over many years" justified its omission of LNG analysis. Ex. 16 at 2. The models contained in the record do not, however, support MMS's assertion – they all *assume* that natural gas would be transported to market by pipeline. *See* Ex. 21 at 6 ("[f]uture gas from Arctic Alaska is assumed to be transported [by] pipeline"); *id.* at 8

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 44 of 78

(same); Ex. 3 at 3 ("For the present study, we assume that Burger gas production would feed into the future North Slope gas pipeline system . . . ."); *see also* Ex. 49 at 204 (explaining why natural gas development in the Chukchi Sea OCS should not be included in the scenario based entirely on discussion of over-land gas pipeline from the North Slope to southern markets).

In addition, the record demonstrates that the lease sale area may contain gas resources sufficient to justify LNG development. *See* Ex. 17 at 4 (stating that "minimum reserves needed to support a greenfield LNG project in this remote area could range from 5-10 [trillion cubic feet]") *and* Ex. 25 at 2 (noting that Burger prospect in the Chukchi Sea has "most likely resource of 14.0 trillion cubic feet" of gas). Further, MMS itself touted the use of LNG tankering in promoting the benefits of the lease sale in a letter to the Governor's office, Ex. 55 at 5, and in presentations to the North Slope Borough, Ex. 2 at 7-14.

MMS seems to have recognized the disjunction between the analysis contained in the EIS and its proposed action. As the lease sale approached, the agency prepared "discussion points", attempting to justify the limited EIS analysis in light of anticipated interest in, and lease incentives for, natural gas production. *See* Ex. 44 at 2-4; *see also* Ex. 45 at 1. These discussion points attempt to draw a distinction between NEPA documents, which "can be updated" and have a "shelf life …[of] perhaps 5 years at most", and lease terms and conditions, which "are fixed throughout the life of the lease". Ex. 44 at 2. This explanation, however, fundamentally misconstrues "the basic thrust" of MMS's responsibilities under NEPA—to "predict the environmental effects of proposed action before the action is taken and those effects fully known." *City of Davis*, 521 F.2d at 676. Here, MMS knew before the lease sale that natural gas, as well as oil, might be developed on the leases and, consequently, it wrote incentives for development of natural gas into the leases themselves. By omitting analysis of natural gas from the EIS, MMS disregarded this evidence and failed to provide the decision maker with

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 45 of 78

information necessary to visualize the potential environmental harms of the leases it was deciding to sell.[11]

By omitting analysis of natural gas from the EIS, MMS likely significantly understated the potential impacts of the lease sale. The MMS analyst who designed the lease sale 193 scenario acknowledged:

> As a practical matter, including gas development in the scenario will greatly increase potential environmental impacts because the number of wells and platforms will be greater, additional offshore pipelines will gather gas to a new major facility on the coastline, and LNG carriers will increase marine traffic to southern markets. To envision the scale of these operations, one should consider that the minimum reserves needed to support a greenfield LNG project in this remote area could range from 5-10 [trillion cubic feet]. These resources are likely to occur in several fields, each field requiring several platforms for development. Thus, the estimates for infrastructure, activities, and associated environmental consequences could more than double from the current "oil-first" scenario if natural gas production/export is included in the analysis.

Ex. 17 at 4. Similarly, an MMS's biologist analyzing Shell's comments during the scoping process stated that a scenario changed to incorporate LNG tankering of Chukchi Sea natural gas "through the Bering Sea though Unimak Pass . . . will already pick up essentially every ESA marine mammal and bird in Alaskan waters." Ex. 14 at 2. As described *infra* at 40-42, increased infrastructure and vessel traffic could increase disturbances to wildlife and subsistence.

MMS sold leases that permit and encourage natural gas production without analyzing the environmental consequences of such production in its EIS. This failure to consider the significant factor of gas production directly violated NEPA's requirement that the agency analyze likely impacts before taking action and understated the potential impacts of the action with potentially wide-ranging consequences.

---

[11] MMS also attempted in its discussion points to justify the discrepancy by pointing out the uncertainties surrounding development in the Chukchi Sea. Ex. 44 at 3. Uncertainty, however, does not distinguish development of oil from development of natural gas – both depend upon a variety of factors that are uncertain. *Id.* ("The eventual development plan *for either oil or gas* will depend on the location, size, and composition of the discoveries, as well as the marketing strategies of the companies.") (emphasis added).

### 2. MMS limited its scenario to one billion barrels of oil

The EIS also understated the potential impacts of oil development and production, because it relied on an arbitrary assumption about the amount of oil that would be developed as a result of the lease sale. MMS chose to base its oil development scenario on a projection of 1 billion barrels of oil from the entire Chukchi Sea. *See supra* at 10. This figure is not a projection of the actual level of development that could be expected in the Chukchi, but is instead the minimum volume of oil that must be discovered to justify *any* production; the EIS stated that development and production will only occur if a field of at least 1 billion barrels of recoverable oil resources is discovered, as "lower oil volumes are not likely to be economic." Ex. 49 at 109; *see also* Ex. 19 at 3 ("we assume that the discovery of a billion barrel field is needed for development to be economically feasible"). One billion barrels of oil, thus, is the floor, not the ceiling, of the amount of oil that will be produced as a result of the lease sale. The EIS acknowledges that once "the first project overcomes the cost, logistical, and regulatory hurdles, more projects are more likely to follow." Ex. 49 at 108-109. Indeed, the record described a range of economically recoverable oil resources in the Chukchi Sea, between 2.37 billion barrels of oil at a price of 46 dollars per barrel and 12 billion barrels of oil at an oil price of 80 dollars per barrel of oil, and the EIS disclosed a middle estimate of 8.4 billion barrels of oil at 60 dollars per barrel. *See supra* at 10-11. Development and production of such significantly larger amounts of oil would result in significantly higher levels of industrial activity than development of 1 billion barrels of oil, perhaps by an order of magnitude, *see infra* at 39-40. Nevertheless, MMS analyzed only the impacts associated with the discovery, development, and production of the minimum amount of oil, 1 billion barrels, necessary for development to occur at all. Ex. 49 at 109.

In the past, MMS analyzed a range of possible oil and gas activities resulting from a lease sale based on estimates of the amount of economically recoverable resources present in the area to be leased. Ex. 76 at 2-3, 13-20 (Chukchi Sea Oil and Gas Lease Sale 126); Ex. 74 at 2-4 (Chukchi Oil and Gas Lease Sale 109). As these earlier lease sale analyses stated, "[r]esource estimates serve as the focus of the assumed exploration and development activities that are fundamental to a rigorous assessment of the potential effects of a proposed sale." Ex. 76 at 18.

If one uses the wrong resource estimates, the entire analysis of potential impacts falls off track.[12] Thus, the analyses contained a low range estimate, which was "a minimum resource volume of hydrocarbons likely to be present," a base range estimate, which was "a most likely amount of hydrocarbon resources that is assumed to be developed if commercial quantities of hydrocarbons are discovered," and a high case, which was a maximum resource volume of hydrocarbons likely to be present in commercial quantities, and developed scenarios for each. Ex. 76 at 6; *see also id.* at 2-5, 7-9; Ex. 74 at 4a-5c. Even when it adopted a single scenario for a lease sale, MMS nevertheless closely tied that scenario to the actual estimated economically recoverable resource in the area. Ex. 60 at 5. For example, in the context of evaluating three lease sales in the Beaufort Sea, MMS stated that: "Resource estimates assumed to be discovered and developed for each of the proposed sales vary between 340 and 570 million barrels of oil, assuming market prices ranging between $18 and $30 per barrel (in 2000$). For purposes of analysis, the MMS has assumed that each sale would have the potential to produce 460 million barrels of oil over the lifetime of its field production." *Id.* Departing from its past practice, MMS here modeled just one case – the 1 billion barrel minimum amount of resources required for development to occur - untethered from the resources it estimates are economically recoverable in the Chukchi Sea.

The EIS attempted to justify its decision to analyze only 1 billion barrels of oil from the first field on the grounds that there is no petroleum infrastructure in the Chukchi Sea. Ex. 49 at 108-109. This explanation may support the proposition that it will take a large discovery to justify the infrastructure costs of initial development in the Chukchi Sea. It does not, however, justify the analysis of the impacts of only the minimum amount of oil that would have to be discovered to justify the development. The first field may contain more oil, which would be produced. It will also, as MMS recognized, catalyze further development. Ex. 49 at 108-09.

---

[12]  Indeed, the importance of the resource estimates to an effective analysis of a lease sale's impacts, coupled with its uncertainty, is precisely why MMS used to prepare a range of scenarios, each based on different possible resource volumes. Ex. 76 at 18 ("Recognizing the inherent uncertainty associated with resource estimates, the EIS includes an analysis of a range of potential outcomes as represented by three distinct scenarios."); *see also id.* at 19-20 ("The object of the three case analysis … is to scrutinize a spectrum of activity levels, rather than to assess a single scenario which can change because specific estimates change during the 2- to 3-year prelease process.").

The EIS does not explain why the impacts associated with the exploration, development, and production of these quantities of oil may be ignored.

The administrative record also fails to justify MMS's decision to analyze only the minimum amount of oil. An email in the administrative record justified the shift to a single case scenario on the ground that it "streamlines" the EIS. Ex. 19 at 3 (stating MMS has "abandoned this multiple-case approach in the interest of streamlining the EIS analysis to focus on significant concerns and issues"). This may explain why there was only one scenario, but it does not explain why that scenario only analyzed 1 billion barrels of oil. When an MMS employee questioned the 1 billion barrel scenario, *see supra* at 13, her question went unanswered.[13] Indeed, the record suggests that the scenario was developed early, even before scoping comments were in, and left unchanged to avoid delay as MMS rushed forward with the lease sale.[14]

MMS's flawed decision to model the impacts of producing just 1 billion barrels of oil, had tremendous implications for the analysis throughout the EIS. By choosing to model the minimum amount of oil, MMS projected infrastructure commensurate with the discovery, development, and production of that amount of oil. *See* Ex. 49 at 109, 448. As the EISs for prior Chukchi Sea lease sales demonstrate, the amount of activity projected in a scenario is closely linked to the resource volume estimates; every aspect of industrial activity, from the amount of seismic surveying to the number of production platforms, increases in almost direct correlation

---

[13] A supervisor, Deborah Cranswick did provide the following answer to Ms. William's email: "In a way the initial scenario is one platform because we can't have only a partial platform if that is all that the resource estimate support. The 12-29 billion barrels of oil is geologic potential and not the economically recoverable. Once the first platform goes in, it is likely that additional satellite subsea completions would be developed before another host platform would be considered." *Id.* This answer does not address the underlying inconsistency raised by Ms. Williams. The resource level either merits development or it does not, and MMS has determined that the minimum resource level at which development is merited is 1 billion barrels of oil. Ms. Cranswick did not address why MMS has to model no more than that minimum 1 billion barrels of oil.

[14] By finalizing the scenario so early, MMS failed to consider industry input into the type of potential development. Thus, for example, when Shell proposed that MMS include an analysis of LNG tankering in its EIS, Ex.13 at 2, MMS was unwilling to change its scenario. *See supra* at 11-12.

---

with the an increase in resource volume estimates.  *See* Ex. 76 at 4-5; Ex. 74 at 4a-5c.[15]
Modeling just the impacts of 1 billion barrels of oil in the lease sale 193 EIS, where , for
example, 12 billion barrels of oil could be economic to develop at 80 dollars a barrel, Ex. 21 at 5,
thus vastly understated—perhaps by as much as an order of magnitude—the potential level of
infrastructure and traffic that will result from the lease sale.  *See* Ex. 7 at 2 (noting the need for a
scenario based on the actual resource potential of the area); Ex. 49 at 144 ("[a]n increase in
exploration, development and production results in a greatly increased amount of marine vessel
activity including icebreakers, barges, sealifts, seismic vessels, supply boats, crew boats, and
tugs").

By basing its analysis of the impacts of the lease sale on the limited projection of
industrial activity associated with its 1 billion barrel scenario, the EIS understated the actual
potential for disturbance from the sale.  For example, the EIS acknowledged that exploration
drillships and supporting icebreakers have the potential to deflect bowheads at a considerable
distance, which, depending on location and timing, might have biologically significant impacts
on the population.  Ex. 49 at 143; *see also* Ex. *id.* at 144 (air traffic might have a biologically
important adverse impact on bowheads).  Nonetheless, based on the limited scenario, the EIS
concluded that effects from these disturbances are not likely to be significant.  *Id.*  The limited
scenario understates disturbance from exploration and development activities during the
summers, which are "likely to come into direct contact with adult females and subadult
walruses," and could have negative, population-level effects.  *Id.* at 158.  It understates
disturbance from industrial noise, which could "affect the long-term survival of the [cetacean]
population" if it kept individuals from important habitat.  *Id.* at 159; *see also id.* ("Problems can
arise in heavily industrialized areas where a variety of noisy activities take place such as seismic
exploration, oil drilling, offshore construction, and ship and air traffic.").  It also understates the
impacts to subsistence hunting of marine mammals, which could be negatively affected
industrial noise.  *Id.* at 189-90.  For example, the EIS acknowledged that the "greatest potential

---

[15]  Thus, for example, a resource of 1,610 million barrels of oil would require analysis of 7,055
km of seismic surveying, 39 exploration wells, 6 production platforms, and 23, 626 helicopter
flights.  Ex. 76 at 4-5, 2.  Approximately doubling the resource (to 3,540 million barrels of oil)
required analysis of over 35 percent more seismic surveying (9,631 km) and exploration wells
(53), twice as many platforms (12), and over twice as many helicopter flights (48,192).  *Id.*

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 50 of 78

disruption of the subsistence whale hunt would be expected in the traditional fall bowhead whale-hunting areas for Barrow," and that such disruption "could have significant effects on regional subsistence resources and harvest practices," *id.* at 189, but understated those effects by using its limited scenario.

MMS also used the 1 billion barrels of oil in its calculation of oil spill risks, which it denominated in spills per billion barrels of oil. Ex. 49 at 123. MMS calculated the risk of one or more large oil spills from two components, a constant spill rate, derived from a technical analysis of potential oil spill occurrence in the Chukchi Sea, and resource volume. *Id.* at 474, 477. Using this formula MMS modeled the risk for a maximum amount of only 1 billion barrels of oil, *see id.* at 123, and concluded that there is a 40 percent risk of one or more large oil spills resulting from the production of that quantity of oil. *Id.*; *see also id.* at 474-79. Given MMS's prediction that far more than 1 billion barrels of oil could be economical to produce form the Chukchi Sea, the EIS's calculation of oil spills from production of just 1 billion barrels of oil greatly understated the risks. *See* Ex. 70 at 1 ("more oil is more spill chance"); *see also* Ex. 76 at 7 (showing that chances of one or more large oil spills ranges from 87 percent to 100 percent depending on resource amount).[16]

Oil spills in the Chukchi Sea could have catastrophic consequences on the wildlife and communities of the Chukchi Sea and are early impossible to clean up. A spill could affect virtually every species in the Sea and could have multi-year effects on subsistence activities, significantly affecting Chukchi Sea communities that depend on Chukchi Sea wildlife for their way of life. Ex. 49 at 22, 190. It could significantly affect endangered bowhead whales, particular if it contacted large aggregations of mothers with calves, threatened polar bears, beluga whales, walrus, birds, and fish. Ex. 49 at 20, 21, 18. It could kill the majority of the threatened North Slope-breeding Steller's eider population and thousands of the threatened spectacled eiders. Ex. 72 at 28, 26; Ex. 68 at 1-2; Ex. 38 at 13. Oil spills likely would be impossible to remedy, because mechanical means of recovery are largely ineffective in the broken ice conditions that prevail throughout much of the year in the Chukchi Sea, and other

---

[16] Plaintiffs are not presenting an argument with respect to the additional flaws in the EIS's oil spill analysis set forth in Count IV of the Second Amended and Supplemental Complaint, Doc. No. 58.

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 51 of 78

means, such as in situ burning and chemical dispersants, are unproven. Ex. 49 at 126 (only between 10 and 20 percent of oil spilled in open water or broken ice conditions is recoverable); *id*. at 170; Ex. 38 at 12 (noting the "known ineffectiveness of any response during certain environmental conditions (e.g., broken ice)"); Ex. 77 at 2 ("reliance on mechanical recovery to clean up spills on the [offshore] North Slope is unlikely to be successful"). Understating the risks of such a spill fundamentally mislead the public and decisionmaker about the potential impacts of opening the Chukchi Sea to oil and gas activities.

MMS's failure to analyze the potential impacts of natural gas and its decision to analyze the impacts of only 1 billion barrels of oil fail to satisfy NEPA requirements. While courts recognize the staged nature of the OCS process in evaluating MMS's compliance with NEPA, none has held that MMS can ignore in its EIS a substantial part of the action it is taking or arbitrarily analyze a scenario that does not accurately reflect the evidence before the agency. *See Akutan,* 869 F. 2d at 1192; *False Pass*, 733 F. 2d at 613; *State of Cal.*, 683 F.2d at 1267-68. They require reasonable analysis, *id.*, and MMS did not satisfy that requirement here.

> D.  The EIS's analysis of seismic surveying failed to disclose potentially significant impacts

The EIS's disclosure of the potential impacts of seismic surveying associated with lease sale 193 was misleading because it failed to disclose fully the potential impacts of the activity. It assumed that certain mitigation measures would be imposed and would reduce the impacts of seismic surveying, but failed to disclose evidence that raised serious questions about the efficacy of the measures. It also failed to disclose the significant scientific issues, raised by its own scientific experts and others, about the need to protect bowhead mothers and calves from exposure to sound levels above 120 dB.

An EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1; *see also Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (requiring a "thorough analysis of the potential environmental impacts"). In an EIS, "federal agencies [must] take a hard look at environmental consequences" before undertaking any major federal action. *Natural Res. Def. Council v. U. S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005) (internal quotations omitted). A hard look "entail[s] both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. The EIS must not "improperly minimize negative side effects." *Id.* at 1159. Thus,

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 52 of 78

while an agency may incorporate mitigation measures into its analysis of the environmental effects of the action, *see, e.g., City of Sausalito v. O'Neill*, 386 F.3d 1186, 1212-13 (9th Cir. 2004); *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 957-58 (9th Cir. 2003), "[i]n order to rely on mitigation to obviate further analysis, the measure must be identified and its effectiveness analyzed." *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 829 (9th Cir. 2008). An EIS must also "'identify areas of uncertainty'", *Lands Council v. McNair*, 537 F.3d 981, 1001-02 (9th Cir. 2008) (quoting *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981)), and respond to comments "that raise significant scientific uncertainties and reasonably support that such uncertainties exist." *Id.* at 1001; 40 C.F.R. §§ 1502.9(a),(b) (EIS must discuss and disclose "all major points of view on the environmental impacts" including any "responsible opposing view"); *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 530 (9th Cir. 1997) (agency must respond to criticism from its own experts); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (agency "shall discuss at appropriate points . . . any responsible opposing views") (quoting 40 C.F.R. § 1502.9(b)).

First, failure to disclose in the EIS serious questions raised by 2006 seismic survey monitoring data violated NEPA. The EIS described the potential impacts of seismic surveying on marine mammals, acknowledging that, while those impacts are uncertain due to data gaps, *supra* at 8-9, they could be adverse. *See supra* at 14-15. However, it assumed mitigation measures, including the 180 dB and 190 dB safety zones for cetaceans and pinnipeds it imposed during the 2006 seismic surveying season in the Chukchi Sea, would dampen the effects of seismic surveying. Ex. 49 at 15*; see supra* at 16. Thus, with these mitigation measures in place, the EIS concluded, walrus, beluga whales, killer whales, and harbor porpoises are not likely to be injured by seismic surveying noise, Ex. 49 at 152-53, gray whales will not suffer significant impacts, *id.* at 156, adverse environmental impacts to bowhead whales will be prevented or minimized, *id.* at 142-43, and the probability of injury to seals will be mitigated, *id.* at 152.

The EIS did not, however, disclose that data collected during the 2006 seismic surveying season raised serious questions about the efficacy of the 180 dB and 190 dB safety zones for mitigating impacts to marine mammals. *See supra* at 15-16. Data from the 2006 season showed that, despite best efforts to implement the safety zones, scores of marine mammals were exposed to seismic blasts loud enough to potentially cause injury. *Id.* Rather than disclose these questions, the EIS simply assumed that the measures would effectively mitigate impacts of

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 53 of 78

seismic surveying to marine mammals, and reached its conclusions of impacts accordingly. The EIS's assertions that the impacts of seismic surveying will be mitigated through the use of safety zones, without also disclosing that these safety zones have proven ineffective in the past, misleadingly diminished the potential adverse impacts of the sale to marine mammals. *See Earth Island,* 442 F.3d at 1159; *Alaska Wilderness League*, 548 F.3d at 829-30.[17]

Second, the EIS's analysis of impacts to seismic surveying to endangered bowhead whales violated NEPA, because it failed to address adequately serious questions about the need to protect bowhead females and calves from seismic surveying noise louder than 120 dB. *Lands Council*, 537 F.3d at 1001-02. The EIS acknowledged that bowhead whale mothers and calves "merit special consideration", because of their biological significance to the bowhead whale population and uncertainty surrounding effects of anthropogenic noise on this vulnerable population segment. Ex. 49 at 131. MMS acknowledged the need to address in the EIS whether these vulnerable whales need to be protected from sound louder than 120 dB. *See id.* at 270a-270b ("the specific requirements for 120-dB and 160-dB restrictions are being evaluated … in this EIS for lease sale 193"). Nonetheless, the EIS failed to address the issue.

The EIS acknowledged that "[i]f seismic surveys were unmitigated, or are insufficiently mitigated to reduce impacts to the whales themselves, effects that are biologically significant could result if seismic surveys cause avoidance of feeding areas, resting (including nursing) areas, or calving areas by large numbers of females with calves or females over a period of many weeks." Ex. 49 at 143. It concluded that "[o]verall, bowhead whales exposed to noise-producing activities such as vessel and aircraft traffic, drilling operations, seismic surveys, and

---

[17] Last year, this Court ruled that separate permits issued to seismic survey operators in 2008 by NMFS and MMS did not violate the Marine Mammal Protection Act or 40 C.F.R. § 1506.1(c). *Native Vill. of Point Hope v. Minerals Mgmt. Serv.*, 564 F. Supp. 2d 1077 (D. Alaska 2008), *appeal docketed*, No.08-35571 (9th Cir. July 3, 2008). That case did not address the legal issue presented here, but instead addressed whether it violated NEPA for the agencies to issue permits before it had completed a still-ongoing programmatic seismic EIS.

construction activities most likely would experience temporary, nonlethal effects." *Id.* at 144.[18] In light of the EIS's acknowledgment that insufficiently mitigated seismic surveys could have potentially biologically significant effects, its conclusion that noise from the lease sale will not have such effects begs the question of what level of protection is sufficient to avoid significant impacts to the bowhead population. Moreover, the record reflects that the issue of whether bowhead cow and calf pairs must be protected from exposure to sound levels of 120 dB is unsettled and hotly contested. *See supra* at 17-18. MMS and NMFS imposed the 120 dB safety zone for 2006 seismic surveying based on scientific conclusions that it was required to ensure the surveys would not significantly affect the bowhead whale population. *Id.* at 16-17. MMS's scientists insisted that "basic principles of animal science" required that these measures remain in place for lease sale 193. Ex. 50 at 1; *see supra* at 18. Numerous members of the pubic raised the issue during the EIS comment period. *See supra* at 18. Indeed, NMFS and MMS have initiated preparation of a separate programmatic EIS, in part to reanalyze the very issue of the 120 dB safety zone for bowhead whales. Ex. 91 at 4. Yet the EIS did not analyze the issue or alert the public or decisionmaker to the potential importance protecting bowhead mothers and calves from exposure to sound above 120 dB. Rather, it simply listed the 120 dB safety zone as one of a number of mitigation measures that NMFS might apply through a separate administrative process under the Marine Mammal Protection Act, 16 U.S.C. § 1361, *et seq.*. Ex. 49 at 14-17. In so doing, the EIS failed to take a hard look at an issue of central importance to the lease sale decision and failed to disclose the reasoned expert viewpoints of its own scientists. 40 C.F.R. §§ 1502.9(a),(b); *Or. Natural Res. Council*, 109 F.3d at 530; *Ctr. for Biological Diversity*, 349 F.3d at 1167.

---

[18] Similarly, in its cumulative impacts analysis, the EIS stated that "the effectiveness of mitigations is not entirely clear, nor is it clear when, or if, the level of activity might become large enough to cause effects that are biologically significant to large numbers of individuals." Ex. 49 at 214. Nevertheless, it concluded that "seismic surveys, especially as mitigated under the Proposed Action alternatives, are not expected to add significantly to the cumulative impacts on bowhead whales from past, present, and future activities." *Id.*

E. The EIS failed to analyze the cumulative impacts of the lease sale to threatened spectacled and Steller's eiders in the context of other activities in eiders' Arctic habitat

The EIS violated NEPA because it failed to evaluate adequately the cumulative impacts of the lease sale to threatened spectacled and Steller's eiders in the context of the myriad other activities affecting eiders in their Arctic habitat. NEPA requires MMS to analyze the cumulative impacts on threatened Steller's eiders and spectacled eiders of the lease sale when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7; *see Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895 (9th Cir. 2002) ("NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with 'past, present and reasonably foreseeable future actions.'"); *see also N. Slope Borough v. Andrus*, 642 F.2d 589, 600 (D.C. Cir. 1980) ("Secretary of Interior must consider the significance of cumulative impacts and assimilate within his decisionmaking any synergistic threats to the environment …. An acknowledgment of the existence of cumulative impacts is not sufficient."). The EIS acknowledged that "significant impacts are anticipated to occur" to threatened eiders from the cumulative impacts of the lease sale and other past, present and reasonably foreseeable activities in their Arctic habitat, Ex. 49 at 195, 216, but it did not analyze these effects.

The EIS relied entirely for its analysis of the lease sale's impacts to eiders, including cumulative impacts, on a biological evaluation MMS prepared in connection with its obligation under the ESA to consult with FWS regarding the lease sale's impacts to ESA-listed eiders. *See supra* at 20-21. The biological evaluation, in turn, considers only the impacts of lease sale 193, failing to analyze other federal and state activities occurring in eiders' Arctic habitat. It does not identify, let alone analyze, past and present activities.[19] For example, it acknowledges that non-breeding Steller's eiders and breeding and non-breeding spectacled eiders use the near-shore waters of the Beaufort Sea, Ex. 38 at 5, 7-8, but nowhere discusses the potential impacts of the

---

[19] The EIS states that "the threatened spectacled eider has experienced stress from past and present environmental factors and human activities, and this stress is likely to continue in the future," but it defers description and analysis of those past effects to the biological evaluation. Ex. 49 at 206, 61(deferring analysis in existing environment section of EIS to the biological evaluation); *id.* at 145 (deferring analysis in impacts of the action section to biological evaluation).

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 56 of 78

significant past and present oil and gas development in these areas—activities the EIS acknowledges are properly part of a cumulative analysis under NEPA. *See* Ex. 49 at 199, 453, 454-55, 456. The biological evaluation also omits analysis of reasonably foreseeable future activities in eiders' Arctic habitat. These activities include the Sandpiper, Liberty, Hammerhead and Kuvlum off-shore development projects, Beaufort Sea OCS lease sales 209 and 217, Chukchi Sea OCS lease sale 212 and 221, a Northwest NPR-A lease sale, a Northeast NPR-A lease sale, a South NPR-A lease sale, and exploration activities resulting from those lease sales, all of which the EIS itself states must be analyzed as part of the cumulative impact analysis. *Id.* at 200, 453, 456. The eider biological evaluation upon which MMS relies for its NEPA analysis, however, addressed none of these projects. The biological evaluation's "cumulative effects" section acknowledges that industrial activities are reasonably foreseeable across eiders' Arctic habitat, including upcoming lease sales in the Beaufort Sea and the NPR-A, and that "synergistic effects" between offshore and onshore development could increase the likelihood of development, but it explicitly eschews analyzing lease sale 193 in the context of these activities, stating that such a cumulative analysis to "pro-actively ensure the continued existence of the Steller's and spectacled eiders breeding on the Arctic Coastal Plain" is "outside the scope of this biological evaluation for the proposed project." Ex. 38 at 14.[20]

MMS's failure to analyze cumulative impacts leads it to understate potential impacts to eiders from the lease sale when added to these ongoing activities across eiders' Arctic range. For example, by relying exclusively on the biological evaluation, the EIS understates the potential impacts of oil spills. Oil spills, particularly in the marine environment, kill eiders – as FWS states, "an oiled bird is a dead bird." Ex. 71 at 8; *see also* Ex. 72 at 21-22, 23 (any eiders that come into contact with oil in the Arctic environment will die). The biological evaluation

---

[20] That the biological evaluation does not consider future federal actions in eiders' habitat is not surprising. The document was prepared for purposes of consultation with FWS pursuant to Section 7 of the ESA. "[T]he ESA's Section 7 consultation process differs from the cumulative impacts analysis required by NEPA." *Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 134 (D.D.C. 2006). The ESA "only requires agencies to consider the cumulative impacts of non-federal actions, while NEPA requires agencies to consider the cumulative impacts of all actions." *Id.* at 136; *compare* 40 C.F.R. § 1508.7 (cumulative impacts for NEPA) *with* 50 C.F.R. § 402.02 (cumulative effects for ESA). Thus, cumulative impacts for purposes of ESA are not the same as cumulative impacts for purposes of NEPA, and MMS may not rely on that more limited ESA analysis to fulfill its NEPA requirement to analyze broader cumulative impacts.

analyzes the risks and impacts to threatened eiders of an oil spill only from lease sale 193. Ex. 38 at 9-13; *see also* Ex. 72 at 23-24. The EIS therefore omits analysis, which it conducts for other species, of the lease sale's oil spill risks in the context of the risks from other reasonably foreseeable on- and offshore development. *See* Ex. 49 at 205 (stating that calculation "of likely number of estimated large oil spills in our analysis of cumulative effects … includes our estimate of past, present, and reasonably foreseeable future production for the North Slope/Chukchi Sea"); EIS at table V-8 (cumulative scenario includes risk of oil spill from development of 10.1 billion barrels of oil in addition to the 1 billion barrels assumed to result from lease sale 193); *see also* Ex. 31 at 5 (stating, in the context of Beaufort Sea lease sale 202, "'large' spill (≥1,000 barrels) probabilities are much higher (47%) when one considers proposed actions in the Beaufort and Chukchi Seas together compared to the Beaufort Sea only scenarios (8-10%)"). This is an important omission because, "[a] large spill in the wrong place at the wrong time could effectively jeopardize the continued existence of the spectacled eider from the North Slope of Alaska." Ex. 38 at 13; *see also* Ex. 31 at 5.

By omitting analysis of the combined impacts of the lease sale together with the activities occurring across the North Slope in eiders' habitat, MMS failed to adequately analyze the potential impact of the lease sale in the context of these activities. As a result, the EIS understated the potential impacts of lease sale 193 to eiders, violating NEPA.

II.     THE DEPARTMENT OF THE INTERIOR VIOLATED SECTION 7 OF THE ESA BY FAILING TO ASSESS THE AGGREGATE IMPACTS OF ALL ACTIVITIES PLANNED IN THREATENED EIDERS' NORTH SLOPE HABITAT AND BY FAILING TO CONSULT ON THE LEASE SALE'S IMPACTS TO THREATENED POLAR BEARS

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184; *see also id.* at 185 (recognizing that the enactment of the ESA constituted "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species"). Under Section 7 of the ESA, when a federal agency undertakes or permits actions that "may affect" a listed species, the agency must consult with the Fish and Wildlife Service to "insure" that its activities are "not likely to jeopardize the continued existence of any endangered species or threatened species or

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 58 of 78

result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S .C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Section 7 applies "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. The duty to insure against the likelihood of jeopardy is continuing, and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the agency must reinitiate formal consultation on an action "if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

A.    FWS failed to analyze the lease sale in the context of other federal activities occurring in eiders' Arctic habitat in reaching its biological opinion

MMS consulted with FWS with respect to threatened spectacled and Steller's eiders pursuant to Section 7 of the ESA. *See supra* at 21. The consultation culminated in a biological opinion by FWS that the lease sale is not likely to jeopardize the continued existence of threatened eiders. *Id.* FWS is required to "make its jeopardy determination based on the full natural and human context of the proposed action." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 926 (9th Cir. 2008). A biological opinion must "include an analysis of the effects of the action on the species when 'added to' the environmental baseline – in other words, an analysis of the *total* impact on the species." *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) (quoting 50 C.F.R. § 402.02); *Nat'l Wildlife Fed'n*, 524 F.3d at 929-30; 50 C.F.R. § 402.14(g); *see also* Ex. 75 at 2. The "environmental baseline" includes "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation … ." 50 C.F.R. § 402.02 (identifying "effects of the action").

The biological opinion here does not meet the requirements because it does not analyze lease sale 193 impacts in the context of already-consulted-upon federal actions occurring throughout eiders' Arctic habitat. The actions include multiple OCS lease sales in the Beaufort Sea, which is used by both species of eiders, and oil and gas leasing plans for the Northwest NPR-A, important breeding habitat for over 70 percent of spectacled eiders and over 90 percent of Steller's eiders on the North Slope, and the Northeast NPR-A, important habitat for 15 percent of spectacled eiders on the North Slope. Ex. 38 at 5, 7-8; Ex. 64 at 4; Ex. 65 at 4. Although the biological opinion, unlike the biological evaluation, does include a section entitled "environmental baseline," the section does not analyze impacts from already-consulted upon

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 59 of 78

federal actions in eiders' Arctic habitat. Rather, the section only lists these activities on a table with a two to three word description of impacts and permitted "take." Ex. 72 at 17, 19. "But a mere listing of activities does not constitute an analysis of the *impacts* of these activities, which is what is required by the regulation defining the [environmental] baseline." *Defenders of Wildlife*, 130 F. Supp. 2d at 128 n. 8 (citing 50 C.F.R. § 402.02).

The ESA requires "an analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agencies." *Id.* at 128 (citing *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1149 (W.D. Wash. 2000)). The biological opinion does not do this. For example, it, like the biological evaluation, contains analysis only of the risks of oil spills from lease sale 193. Ex. 72 at 23. It does not add the risk of spills from the lease sale to the risk of spills from other federal activities—such as oil and gas activities under lease sales in the Beaufort Sea—across eiders' Arctic habitat. Thus, the biological opinion has "fail[ed] to specifically and comprehensively connect the agency action at issue with the environmental baseline," and its conclusion of no jeopardy is arbitrary. *Defenders of Wildlife v. Norton*, No. Civ. A. 99-927 (ESH), 2003 WL 24122459 at *6 (D.D.C. Jan. 7, 2003) (finding biological opinion inadequate where conclusion contained boilerplate language but no analysis); *see also Nat'l Wildlife Fed'n*, 524 F.3d at 929 (jeopardy analysis cannot be conducted "in a vacuum"); *Defenders of Wildlife*, 130 F. Supp. 2d at 128. The isolated analysis of lease sale 193 that FWS applied here would allow threatened eiders to "be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." *Nat'l Wildlife Fed'n*, 524 F.3d at 930. This "slow slide into oblivion" is exactly what the ESA seeks to prevent. *Id.* FWS's biological opinion, and MMS's reliance on it, violate Section 7 of the ESA.

B. <u>MMS failed to consult with FWS on the lease sale's potential to jeopardize the continued existence of the threatened polar bear</u>

MMS violated Section 7(a)(2) of the ESA because it has not consulted with FWS on the lease sale's potential to jeopardize the continued existence of the polar bear. MMS has determined that lease sale 193 "may affect" polar bears. *See supra* at 22. On May 15, 2008, the Department of Interior listed the polar bear as threatened under the ESA. *Id.* at 21. The listing obligated MMS to consult with the FWS on the impacts of the lease sale on polar bears, both for leases that it had not yet issued as of the listing and for leases that it had issued prior to the listing. MMS has done neither.

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*   50
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB  Document 82  Filed 02/05/09  Page 60 of 78

At the time the polar bear was listed as threatened, MMS had not issued leases for all of the tracts that received high bids during the lease sale.  Doc. No. 65, ¶ 152.  The issuance of the leases consummates the lease sale and is an agency action for purposes of the ESA.  50 C.F.R. § 402.02 (the term "action" "means … the granting of … leases"); *see also* 30 C.F.R. § 256.47(e)(1) ("the decision of the authorized officer on bids shall be the final action of the Department"); 30 C.F.R. § 256.47(b) ("[t]he United States reserves the right to reject any and all bids received for any tract, regardless of the amount offered").  Having determined that the lease sale "may affect" polar bears, MMS was required to consult with FWS on the potential for the lease sale to jeopardize the continued existence of the polar bear prior to issuing leases to high bidders after the bear was listed.  50 C.F.R. § 402.14(a); 16 U.S .C. § 1536(a)(2).  MMS did not do so.  Doc. No. 65 ¶ 87.  To the extent it issued leases after the May 15 listing without consulting with FWS, MMS violated Section 7(a)(2) of the ESA.  *See Peterson*, 753 F.2d at 763; *see also Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998).

"Reinitiation of formal consultation is [also] required … where discretionary Federal involvement or control over the action has been retained or is authorized by law and … a new species is listed or critical habitat designated that may be affected by the identified action."  50 C.F.R. § 402.16(d); *see also Wash. Toxics Coal. v. Envt'l Prot. Agency*, 413 F.3d 1024, 1033 (9th Cir. 2005); *Turtle Island Restoration Network*, 340 F.3d at 974-75; *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994).  MMS retains discretionary involvement and control over the leases and the actions they permit.  Ex. 62 at 3 ("MMS retains discretion and control over oil and gas activities that may affect polar bears through operating rules [governing leases]"); *see also* 43 U.S.C. § 1334(a)(1); 43 U.S.C. § 1334(a)(2); 30 C.F.R. § 250.172(d); 30 C.F.R. § 250.106; *N. Slope Borough*, 642 F.2d at 609 ("the Secretary of Interior retains strict control of an outer continental shelf project for its duration, from lease sale to depleted, run-dry well").  The listing of the polar bear thus obligated MMS to reinitiate and complete consultation with FWS on leases it had issued pursuant to lease sale 193 prior to the May 15 listing.  *Wash. Toxics Coal.*, 413 F.3d at 1033; *Pac. Rivers Council*, 30 F.3d at 1055; *Turtle Island*, 340 F.3d at 974.  MMS has not done so, Doc. No. 65 ¶ 87, and is thus in violation of Section 7(a)(2) of the ESA.  *Wash. Toxics Coal.*, 413 F.3d at 1033.

III.  BECAUSE THE DECISION TO HOLD THE LEASE SALE WAS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA, NEPA AND THE ESA, THE COURT SHOULD VACATE THE SALE AND ISSUANCE OF LEASES

MMS held lease sale 193 in reliance on an arbitrary EIS and an arbitrary biological opinion for threatened spectacled and Steller's eiders, and it failed to consult on the lease sale's impacts to threatened polar bears.  Accordingly, the Court should vacate the lease sale decision and leases issued thereunder and remand to MMS with direction to comply with NEPA and the ESA.  In the alternative, the Court should remand to MMS with direction to comply with NEPA and the ESA and enjoin further activities on the leases pending such compliance.  The Court should also vacate FWS's biological opinion on threatened spectacled and Steller's eiders and remand to FWS with direction to comply with the ESA.

The normal remedy under the Administrative Procedure Act for an unlawful agency action is to "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654-55 (9th Cir. 2007), *cert. granted* 128 S. Ct. 2995 (June 27, 2008) (quotation and citation omitted); *see also Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (stating that where a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order"); 5 U.S.C. § 706(2) (directing "reviewing court" to "hold unlawful and set aside" arbitrary or unlawful agency action).

Because sale 193 leases were sold and issued in reliance on an arbitrary EIS in violation of NEPA and without completion of lawful consultation under the ESA, they should be invalidated.  *See Alaska v. Andrus*, 580 F.2d 465, 485 (D.C. Cir. 1978), *vacated in part on other grounds*, 439 U.S. 922 (1978) ("Government leases issued in violation of the law may, in appropriate cases, be invalidated.") (citation omitted).  The deficiencies in the EIS go to the heart of the decision to sell leases in the Chukchi Sea.  Proper analysis and disclosure about the potential impacts of reasonably foreseeable production of natural gas and oil, the potential impacts of the lease sale in the context of the changing climate, the feasibility of obtaining basic information about the Chukchi Sea, questions surrounding the impacts of seismic surveying to endangered bowhead whales and other marine mammals, and potential cumulative impacts to threatened eiders could each "have led [the Secretary] to reject altogether a lease sale" in the Chukchi Sea.  *Alaska*, 580 F.2d at 485.  Cancellation of the leases will preserve the full opportunity for the Secretary to choose among alternatives that is contemplated by NEPA.  *Id.*;

Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 62 of 78

*Mass.*, 716 F.2d at 952 (Breyer, J.) ("when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered"). Similarly, leases issued without an adequate biological opinion addressing impacts to eiders and leases issued after the listing of the polar bear before any consultation under the ESA should be vacated.[21] *Houston,* 146 F.3d at 1129 (upholding rescission of 40-year water contracts issued in violation of the ESA).

In the alternative, the Court should enter an injunction prohibiting MMS from permitting further activity on the leases while it remedies the violations of NEPA and the ESA. The bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Vil. of Gambell*, 480 U.S. 531, 542 (1987). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Res. Def. Council*, 128 S. Ct. 365, 376, 555 U.S. ___ (2008) (quoting *Amoco Prod. Co.*, 480 U.S. at 542). However, as the Supreme Court held in *Amoco* once irreparable injury is shown to be "sufficiently likely," "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co*, 480 U.S. at 545.

This framework is modified for violations of the ESA. When the Court finds a procedural violation of the ESA, the proper remedy is "an injunction pending compliance with the ESA." *Wash. Toxics Coal.*, 413 F.3d at 1035; *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987); *Peterson*, 753 F.2d at 764. Congress has limited the courts' discretion over remedies for substantial procedural violations through its command that agencies must insure that their actions do not result in jeopardy to listed species. *Marsh*, 816 F.2d at 1383; *Peterson*, 753 F.2d at 764; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (ESA "foreclosed the exercise of the usual discretion possessed by a court of equity"); *Tenn. Valley Auth.*, 437 U.S. at 193-94 ("Congress has spoken in the plainest of words, making it abundantly

---

[21] MMS has also failed to reinitiate consultation with FWS on leases it issued prior to the listing of the polar bear as threatened under the ESA and is thus in continuing violation of Section 7(a)(2) of the ESA. With respect to this violation, the Court should suspend activity on the leases pending completion of the consultation. *Wash. Toxics Coal.*, 413 F.3d at 1034-35; *Connor v. Burford,* 848 F.2d 1441, 1455 n.34 (9th Cir. 1988).

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 63 of 78

clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.').

Consistent with *Amoco*, the NEPA cases in which the Ninth Circuit has denied or limited injunctive relief were those where the defendants presented "unusual circumstances," such that "no NEPA policy would be served" by complete injunctive relief. *Cady v. Morton*, 527 F.2d 786, 798 n.12 (9th Cir. 1975); *accord*, *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983) ("strong environmental considerations" counseled against enjoining land management plan which restricted motorized access to a fragile desert); *Alpine Lakes Prot. Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975) (logging not enjoined because of danger of spread of insect infestation). Thus, once the plaintiffs have submitted evidence of irreparable harm, the burden is on the opponent of the injunction to show "unusual circumstances" that would justify continued action in violation of the law. *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 722 (9th Cir. 1988); *Steamboaters v. Fed. Energy Regulatory Comm'n*, 777 F.2d 1384, 1385-86 (9th Cir. 1985); *Petersen*, 753 F.2d at 764.

Allowing activities to proceed on leases in the Chukchi Sea would irreparably injure plaintiffs, and an injunction is therefore appropriate pending compliance with NEPA and the ESA. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co.*, 480 U.S. at 545. "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* Activities on the leases, such as increased vessel and air traffic, seismic surveying, and exploratory drilling, pose significant threats of harm to the environment, including to endangered bowhead whales, threatened polar bears, eiders, beluga whales and seals, and on subsistence activities of communities that depend on a healthy ocean for their way of life. *See supra* at 6, 14, 15-16, 17, 20, 21, 25-26, 31-32, 40-42, 47-48.. Plaintiffs' use of the Chukchi Sea for subsistence, scientific, recreational, and spiritual purposes would be impaired significantly if such harm occurred. *See* Ex. 95 at 4-5, 6-7; Ex. 101 at 6; Ex. 99 at 5; Ex. 98 at 4-6; Ex. 112 at 10, 13-14; Ex. 107 at 13-14; Ex. 106 at 7-8, 11-13, 15.

The public interest also weighs heavily in favor of enjoining lease activities pending MMS's compliance with the law. This policy is embodied in the Outer Continental Shelf Lands

Case 1:08-cv-00004-RRB   Document 82   Filed 02/05/09   Page 64 of 78

Act pursuant to which sale 193 leases were issued, which declares that the outer continental shelf should be made "available for expeditious and orderly development, *subject to environmental safeguards*," including NEPA and the ESA.  43 U.S.C. § 1332(3) (emphasis added); *see also False Pass*, 733 F.2d at 608-09 (describing interplay between NEPA and OCSLA).  That policy cannot be met if activities are permitted to continue on leases issued in violation of NEPA and the ESA.

Dated: January 30, 2009.

*s/ Erik Grafe*

ERIK GRAFE (AK Bar # 0804010)
ERIC P. JORGENSEN (AK Bar # 8904010)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
(907) 586-2751
(907) 463-5891 [fax]
egrafe@earthjustice.org
ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Native Village of Point Hope, City of Point Hope, Inupiat Community of the Arctic Slope, Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, National Audubon Society, Natural Resources Defense Council, Northern Alaska Environmental Center, Oceana, Pacific Environment, Resisting Environmental Destruction on Indigenous Lands, a Project of the Indigenous Environmental Network (REDOIL), Sierra Club, The Wilderness Society, and World Wildlife Fund*

**CERTIFICATE OF SERVICE**

I, Erik Grafe, certify that on February 5, 2009, a true and correct copy of the foregoing PLAINTIFFS' OPENING BRIEF, with attachments, was filed electronically with the Court and consequently was served electronically on the following:

DAVID B. GLAZER
U.S. Department of Justice

KRISTEN L. GUSTAFSON
U.S. Department of Justice

KYLE W. PARKER
Patton Boggs, LLP

JEFFREY W. LEPPO
RYAN P. STEEN
Stoel Rives, LLP


*s/ Erik Grafe*
ERIK GRAFE (AK Bar # 0804010)
Earthjustice
325 Fourth Street
Juneau, AK 99801
(907) 586-2751
(907) 463-5891 [fax]
egrafe@earthjustice.org

Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 66 of 78

**TABLE OF EXHIBITS**
**TO PLAINTIFFS' OPENING BRIEF**

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 1 | MMS AR 1 | Johnnie Burton, Minerals Management Service, Briefing Notes: Potential Chukchi Sea Sale (undated) |
| 2 | MMS AR 6a | James Craig, Minerals Management Service, Presentation - Scenarios and Benefits from Development in the Chukchi OCS (undated) |
| 3 | MMS AR 27a | James D. Craig & Kirk W. Sherwood, Minerals Management Service, *Economic Study of the Burger Gas Discovery, Chukchi Shelf, Northwest Alaska* (revised December 2004) (excerpt) |
| 4 | MMS AR 65 | E-mail from James Craig, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: Chukchi EIS (July 28, 2005) |
| 5 | MMS AR 69 | E-mail from James Craig, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: Chukchi (August 2, 2005) |
| 6 | MMS AR 70 | E-mail from James Craig, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: Chukchi E&D (August 3, 2005) |
| 7 | MMS AR 81 | E-mail from Deborah Cranswick, Minerals Management Service, to Dee Williams, Minerals Management Service, Re: FW: Chukchi E&D (September 23, 2005) |
| 8 | MMS AR 95 | E-mail from Deborah Cranswick, Minerals Management Service, to James Lima, Minerals Management Service, Re: FW: Draft of E&D (September 16, 2005) |
| 9 | MMS AR 102 | E-mail from James Lima, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: Need some direction on the Chukchi Scenario regarding gas production for scoping (October 3, 2005) |
| 10 | MMS AR 137 | Minerals Management Service, Proceedings of the Chukchi Sea Science Update Meeting (October 31 and November 1, 2005), OCS Study MMS 2006-026 (2006) (excerpts) |

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 11 | MMS AR 153 | E-mail from James Craig, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: Revised Chukchi E&D Scenarios (November 18, 2005) |
| 12 | MMS AR 158 | E-mail from James Lima, Minerals Management Service, to Michael Burwell, *et al.,* Minerals Management Service, Re: Chukchi Sea Scenario, Version 11 (November 25, 2005) |
| 13 | MMS AR 169 | Letter from Kent Satterlee, III, Shell E&P Company, to Mr. Johnston, Minerals Management Service, Comments on the Notice of Intent to Prepare an EIS on Proposed Chukchi Sea Lease Sale 193 Included in the 5-Year Program, 2002-2007 (December 9, 2005) |
| 14 | MMS AR 174 | E-mail from Paul Stang, Minerals Management Service, to John Goll, Minerals Management Service, Re: RE: Final spp list ltr chukchi193beaufort202 (2) ps jg rev lr.doc (December 12, 2005) |
| 15 | MMS AR 175 | E-mail from Deborah Cranswick, Minerals Management Service, to John Goll, Minerals Management Service, Re: RE: Final spp list ltr Chukchi193beaufort202 (2) ps jg rev lr.doc (December 12, 2005) |
| 16 | MMS AR 181 | E-mail from James Craig, Minerals Management Service, to James Lima, Minerals Management Service, Re: RE: Final spp list ltr Chukchi193beaufort202 (2) ps jg rev lr.doc (December 13, 2005) |
| 17 | MMS AR 184 | E-mail from James Craig, Minerals Management Service, to Rance Wall and Larry Cooke, Minerals Management Service, Re: My Response to Shell's Request to Change the Chukchi Scenario (December 13, 2005) |
| 18 | MMS AR 185 | E-mail from Paul Stang, Minerals Management Service, to Deborah Cranswick and James Lima, Minerals Management Service, FW: Shell Comments on the Chukchi Lease Sale 193 NOI (December 9, 2005) |
| 19 | MMS AR 187 | E-mail from James Bennett, Minerals Management Service, to Deborah Cranswick, Minerals Management Service, Re: RE: Scenario for 193 (December 14, 2005) |

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*     ii
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 68 of 78

| Exhibit No. | AR No. | Description |
|---|---|---|
| 20 | MMS AR 188 | E-mail from James Craig, Minerals Management Service, to James Lima, Minerals Management Service, Re: RE: Scenario for 193 (December 14, 2005) |
| 21 | MMS AR 195a | Minerals Management Service, *Undiscovered Oil and Gas Resources, Alaska Federal Offshore As of 2006* (2006) (excerpts) |
| 22 | MMS AR 199 | E-mail from James Craig, Minerals Management Service, to Caryn Smith, Minerals Management Service, Re: RE: Resources in Spill Boxes (January 9, 2006) |
| 23 | MMS AR 226 | Minerals Management Service, Biological Evaluation of the Potential Effects of Oil and Gas Leasing and Exploration in the Alaska OCS Beaufort Sea and Chukchi Sea Planning Areas on Endangered Bowhead Whales (*Balaena mysticetus*), Fin Whales (*Balenoptera physalus*), and Humpback Whales (*Megaptera novaeangliae*) (March 3, 2006) (excerpts) |
| 24 | MMS AR 233 | E-mail from Paul Stang, Minerals Management Service, to Lisa Rotterman, Minerals Management Service, Re: FW: Feedback on Text (March 27, 2006) (excerpts) |
| 25 | MMS AR 240 | Kirk W. Sherwood, Minerals Management Service, Draft Manuscript: Sale 193 EIS, Petroleum Geology of Chukchi Sea Planning Area (April 2006) (excerpts) |
| 26 | MMS AR 277 | E-mail from Mark Schroeder, Minerals Management Service, to Michael Salyer, Minerals Management Service, Re: Brief outline of the topics we covered (May 17, 2006) |
| 27 | MMS AR 285 | Minerals Management Service, Arctic Ocean Outer Continental Shelf Seismic Surveys – 2006, Final Programmatic Environmental Assessment, OCS EIS/EA MMS 2006-038 (June 2006) (excerpts) |
| 28 | MMS AR 300 | National Marine Fisheries Service, Endangered Species Act - Section 7 Consultation, Biological Opinion, Oil and Gas Leasing and Exploration Activities in the U.S. Beaufort and Chukchi Seas, Alaska; and Authorization of Small Takes Under the Marine Mammal Protection Act (June 16, 2006) (excerpts) |

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*     iii
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB    Document 82    Filed 02/05/09    Page 69 of 78

| Exhibit No. | AR No. | Description |
|---|---|---|
| 29 | MMS AR 308 | E-mail from James Wilder, Minerals Management Service, to Deborah Cranswick, *et al.*, Minerals Management Service, Re: RE: 193 EIS (June 26, 2006) |
| 30 | MMS AR 358 | E-mail from Rance Wall, Minerals Management Service, to Ken Hollingshead, National Marine Fisheries Service, Re: FW: FW: Sale 193 EIS/NMFS IHA's for 2007 (August 9, 2006) |
| 31 | MMS AR 361 | E-mail from Dee Williams, Minerals Management Service, to Cleveland Cowles, Minerals Management Service, Re: 193 Review (August 10, 2006)  (excerpts) |
| 32 | MMS AR 376 | E-mail from James Wilder, Minerals Management Service, to Fred King, Minerals Management Service, Re: 193 (August 15, 2006) |
| 33 | MMS AR 385 | E-mail from Susan Banet, Minerals Management Service, to Jeffrey Walker and Pete Sloan, Minerals Management Service, Re: Section II RE Comments (August 18, 2006) (excerpts) |
| 34 | MMS AR 392 | E-mail from Susan Banet, Minerals Management Service, to Mike Salyer and Wayne Crayton, Minerals Management Service, Re: RE: Comments on Sec II (August 21, 2006) |
| 35 | MMS AR 415 | E-mail from Pete Sloan, Minerals Management Service, to Michael Salyer, Minerals Management Service, Re: Section 4 comments (August 28, 2006) |
| 36 | MMS AR 419 | E-mail from Wayne Crayton, Minerals Management Service, Mike Salyer and Deborah Cranswick, Minerals Management Service, Re: Sect IV T&E MM issues to resolve (August 28, 2006) |
| 37 | MMS AR 425a | E-mail from Wayne Crayton, Minerals Management Service, to Deborah Cranswick and Michael Salyer, Minerals Management Service, Re: Unresolved Issues Text (August 30, 2006) |
| 38 | MMS AR 435 | Minerals Management Service, Biological Evaluation of Spectacled Eider (*Somateria fischeri*), Steller's Eider (*Polysticta stelleri*), and Kittlitz's Murrelet (*Brachyramphus brevirostris*) for Chukchi Sea Lease Sale 193 (September 2006) (excerpts) |

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*                                        iv
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 70 of 78

| Exhibit No. | AR No. | Description |
|---|---|---|
| 39 | MMS AR 494 | E-mail from Fred King, Minerals Management Service, to James Lima, *et al.*, Minerals Management Service, Re: Sale 193 Briefing Paper (September 22, 2006) |
| 40 | MMS AR 497 | E-mail from David Johnston, Minerals Management Service, to Fred King, Minerals Management Service, Re: FW: Sale 193 Briefing Paper (September 25, 2006) |
| 41 | MMS AR 505-506 | Minerals Management Service, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, Draft Environmental Impact Statement, OCS EIS/EA MMS 2006-060 (October 2006) (excerpts) |
| 42 | MMS AR 518 | MBC Applied Environmental Sciences, *Alaska OCS Region, Proceeding of a Workshop on Chukchi Sea Offshore Monitoring in Drilling Area* (Anchorage, Alaska, November 1-3, 2006), OCS Study MMS 2007-002 (April 2007) (excerpts) |
| 43 | MMS AR 757 | Environmental Protection Agency, Comments on Draft Environmental Impact Statement: Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea (December 27, 2006) |
| 44 | MMS AR 877 | E-mail from James Craig, Minerals Management Service, to John Goll, *et al.*, Minerals Management Service, Re: Chukchi PNOS (March 19, 2007) |
| 45 | MMS AR 881 | E-mail from Marshall Rose, Minerals Management Service, John Goll, Minerals Management Service, Re: Question on Fiscal Terms for Chukchi Sale (March 21, 2007) |
| 46 | MMS AR 955 | E-mail from Deborah Cranswick, Minerals Management Service, to Cleveland Cowles, Minerals Management Service Re: RE: Additional considerations re 193 FEIS and/or other internal discussions (April 11, 2007) |
| 47 | | Omitted |
| 48 | MMS AR 969 | E-mail from James Wilder, Minerals Management Service, to Michael Salyer, Minerals Management Service, Re: RE: Comment responses to Lease Sale 193 letters (April 25, 2007) (excerpts) |

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*  v
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB     Document 82     Filed 02/05/09     Page 71 of 78

| Exhibit No. | AR No. | Description |
|---|---|---|
| 49 | MMS AR 975-977 | Minerals Management Service, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, Final Environmental Impact Statement OCS EIS/EA MMS 2007-026 (May 2007) (excerpts) |
| 50 | MMS AR 987 | E-mail from Jeffrey Denton, Minerals Management Service, to Wayne Crayton, *et al.,* Minerals Management Service, Re: RE: FEEDBACK NEEDED: Brief Recap of the 120 dB telecon (May 8, 2007) |
| 51 | MMS AR 988 | E-mail from Jill Lewandowski, Minerals Management Service, to Wayne Crayton, *et al.,* Minerals Management Service, Re: RE: FEEDBACK NEEDED: Brief Recap of the 120 dB telecon (May 8, 2007) |
| 52 | | Omitted |
| 53 | MMS AR 1043 | Letter from Christine Reichgott, Environmental Protection Agency, to John Goll, Minerals Management Service, Re: Final Environmental Impact Statement: Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea (July 13, 2007) |
| 54 | MMS AR 1304 | E-mail from Deborah Cranswick, Minerals Management Service, to Ken Holligshead, National Marine Fisheries Service, Re: FW: NMFS Letter on 193 Draft EIS (July 18, 2007) |
| 55 | MMS AR 1307 | E-mail from John Goll, Minerals Management Service, to John Katz and Larry Persily, Re: FW: MMS Chukchi Sea Sale 193 Proposed Notice (August 2, 2007) |
| 56 | | Omitted |
| 57 | MMS AR 1352 | Memorandum from Randall Luthi, Director, Minerals Management Service, to Assistant Secretary, Land and Minerals Management, Re: Recommendations for Decisions on the Final Notice of Sale for Outer Continental Shelf Oil and Gas Lease Sale 193, Chukchi Sea - February 2008 (December 12, 2007) (excerpts) |
| 58 | MMS AR 1361 | Minerals Management Service, Remarks Prepared for MMS Director Luthi, Chukchi Sea Sale 193 (February 6, 2008) |

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 59 | MMS AR 1363 | Minerals Management Service, Final Information to Lessees, Oil and gas Lease Sale 193, Chukchi Sea (February 6, 2008) (excerpts) |
| 60 | MMS AR 1370 | Minerals Management Service, Beaufort Sea Planning Area, Oil and Gas Lease Sales 186, 195, and 202, Final Environmental Impact Statement, OCS EIS/EA MMS 2003-001 (February 2003) (excerpts) |
| 61 | MMS AR 1372 | Letter from Erik Grafe, Earthjustice, to John Goll, Minerals Management Service, Re: Chukchi Sea OCS Lease Sale 193 (December 26, 2007) (excerpts) |
| 62 | MMS AR 1423 | E-mail from Cleveland Cowles, Minerals Management Service, to Jefferey Walker and Rance Wall, Minerals Management Service, Re: FW: Requests to Re-initiate consultation, Polar Bear, Beaufort and Chukchi (June 27, 2008) |
| 63 | MMS AR 1446 | E-mail from Sarah Conn, U.S. Fish and Wildlife Service, to Mark Schroeder, Minerals Management Service, Re: RD Memo Dated Nov. 26, 2008 (December 4, 2008) |
| 64 | FWS AR 3 | Memorandum from Steve Lewis, U.S. Fish and Wildlife Service, to Curt Wilson, Bureau of Land Management, Re: Endangered Species Act, Section 7 Biological Opinion for the Northwest National Petroleum Reserve-Alaska Integrated Activity Plan / Environmental Impact Statement (January 6, 2004) (excerpts) |
| 65 | FWS AR 5 | Memorandum from Steve Lewis, U.S. Fish and Wildlife Service, to Henri Bisson, Bureau of Land Management, Re: Endangered Species Act, Section 7 Biological Opinion for the proposed Amendment to the Northeast National Petroleum Reserve-Alaska Integrated Activity Plan / Environmental Impacts Statement (January 13, 2005) (excerpts) |
| 66 | FWS AR 38 | Hand-written meeting notes (August 7, 2006) |
| 67 | FWS AR 39 | Hand-written meeting notes (August 9, 2006) |
| 68 | FWS AR 40 | Hand-written meeting notes (August 9, 2006) |

*Native Village of Point Hope, et al., v. Kempthorne, et al.,*   vii
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB   Document 82   Filed 02/05/09   Page 73 of 78

| Exhibit No. | AR No. | Description |
|---|---|---|
| 69 | FWS AR 47 | E-mail from Mark Schroeder, Minerals Management Service, to Sarah Conn, U.S. Fish and Wildlife Service, Re: RE: Chukchi Meeting (September 6, 2006) |
| 70 | FWS AR 52 | Hand-written meeting notes Re: MMS Chukchi Lease Sale 193 (September 14, 2006) |
| 71 | FWS AR 79 | Hand-written meeting notes (November 14, 2006) |
| 72 | FWS AR 192 | U.S. Fish and Wildlife Service, Biological Opinion for Chukchi Sea Planning Area Oil and Gas Lease Sale 193 and Associated Seismic Surveys and Exploratory Drilling (March 2007) (excerpts) |
| 73 | FWS AR 212 | U.S. Fish and Wildlife Service, Programmatic Biological Opinion for Polar Bears (*Ursus maritimus*) on Chukchi Sea Incidental Take Regulations (June 3, 2008) (excerpts) |
| 74 | * | Minerals Management Service, Chukchi Sea Oil & Gas Lease Sale 109, Final Environmental Impact Statement, OCS EIS/EA MMS 87-0110 (November 1987) (excerpts) |
| 75 | ** | U.S. Fish & Wildlife Service and National Marine Fisheries Service, Endangered Species Consultation Handbook; Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act (March 1998) (excerpt) |
| 76 | * | Minerals Management Service, Chukchi Sea Oil & Gas Lease Sale 126, Final Environmental Impact Statement, OCS EIS/EA MMS 90-0095 (January 1991) (excerpts) |
| 77 | * | National Research Council of the National Academies, *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*, The National Academies Press, Washington, D.C. (2003) (excerpts) |
| 78 | * | National Research Council of the National Academies, *Ocean Noise and Marine Mammals*, The National Academies Press, Washington D.C. (2003) (excerpts) |
| 79 | * | Declan Troy, *Molt Migration of Spectacled Eiders in the Beaufort Sea Region*, Troy Ecological Research Associates, Anchorage, Alaska (July 2003) (excerpts) |

| Exhibit No. | AR No. | Description |
|---|---|---|
| 80 | * | Andrew E. Derocher, *et al.*, *Polar Bears in a Warming Climate*, INTEGR. COMP. BIOL., 44:163-176 (2004) (excerpts) |
| 81 | * | Center for Biological Diversity, Petition to List the Polar Bear (*Ursus maritimus*) as a Threatened Species Under the Endangered Species Act (February 16, 2005) (excerpts) |
| 82 | ** | *National Audubon Society v. Kempthorne*, 1:05-cv-00008 (JKS) (D. Alaska 2005), Plaintiffs' Opening Brief, Doc. No. 49 (May 24, 2006) (excerpts) |
| 83 | ** | *National Audubon Society v. Kempthorne*, 1:05-cv-00008 (JKS) (D. Alaska 2005), Plaintiffs' Reply Brief, Doc. No. 93 (August 18, 2006) (excerpts) |
| 84 | | Omitted |
| 85 | | Omitted |
| 86 | ** | *National Audubon Society v. Kempthorne*, 1:05-cv-00008 (JKS) (D. Alaska 2005), Memorandum Decision, Doc. No. 107 (September 25, 2006) |
| 87 | | Omitted |
| 88 | * | LGL Ltd. and JASCO Research Ltd., Marine Mammal Monitoring and Mitigation During Open Water Seismic Exploration by ConocoPhillips Alaska, Inc. in the Chukchi Sea, July-October 2006 (January 2007) (excerpts) |
| 89 | *** | LGL Ltd. and Greeneridge Sciences, Inc., Marine Mammal Monitoring and Mitigation During Open Water Seismic Exploration by Shell Offshore Inc. in the Chukchi and Beaufort Seas, July-September 2006: 90-Day Report (January 2007) (excerpts) |
| 90 | *** | LGL, Alaska Research Associates, Inc., and JASCO Research, Ltd., Marine Mammal Monitoring and Mitigation During Open Water Seismic Exploration by GX Technology in the Chukchi Sea, October-November 2006: 90-Day Report (February 22, 2007) (excerpts) |

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 91 | * | Minerals Management Service, Alaska Outer Continental Shelf, Seismic Surveys in the Beaufort and Chukchi Seas, Alaska, Draft Programmatic Environmental Impact Statement (OCS EIS/EA MMS 2007-001) (February 2007) (excerpts) |
| 91a | * | Minerals Management Service, Outer Continental Shelf Oil & Gas Leasing Program: 2007-2012, Final Environmental Impact Statement (OCS EIS/EA MMS 2007-003) (April 2007) (excerpts) |
| 92 | | Omitted |
| 93 | | Omitted |
| 94 | *** | LGL, Alaska Research Associates, Inc., Joint Monitoring Program in the Chukchi and Beaufort Seas, July-November 2006 (November 2007) (excerpt) |
| 95 | | Declaration of Steve Oomittuk |
| 96 | | Declaration of Steve Oomittuk, City of Point Hope |
| 97 | | Declaration of David U. Leavitt, Sr. |
| 98 | | Declaration of Earl Kingik |
| 99 | | Declaration of Daisy A. Sage |
| 100 | | Declaration of George Edwardson |
| 101 | | Declaration of Jack Schaefer |
| 102 | | Declaration of Robert Thompson |
| 103 | | Declaration of Lily H. Tuzroyluke |
| 104 | | Declaration of Bryan Weyauvanna |
| 105 | | Declaration of Caleb Pungowiyi |
| 106 | | Declaration of Brendan Cummings |
| 107 | | Declaration of Subhankar Banerjee |

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 108 | | Declaration of Pamela A. Miller |
| 109 | | Declaration of Melanie Duchin |
| 110 | | Declaration of Cindy Shogan |
| 111 | | Declaration of Charles M. Clusen |
| 112 | | Declaration of Cynthia R. Meyers |
| 113 | | Declaration of Michael Wald |
| 114 | | Declaration of Eleanor Huffines |
| 115 | | Declaration of Patricia Rolfe |
| 116 | | Declaration of Stanley E. Senner |
| 117 | | Declaration of Whit Sheard |
| 118 | | Declaration of Rachel James |
| 119 | | Declaration of Michael C. LeVine |
| 120 | | Declaration of Christopher Krenz |
| 121 | | Declaration of Karla M. Dutton |
| 122 | | Declaration of Jon H. Miller |
| 123 | | Declaration of Margaret Williams |
| 124 | | Declaration of Karen Olanna |
| 125 | | Declaration of Leena Ongley |
| 126 | | Declaration of Walter B. Parker |
| 127 | | Declaration of Wendy Van Norden |
| 128 | | Declaration of Jackie Ward |
| 129 | | Declaration of Counsel, with attached Compendium of Lease Sale 193 FEIS Unknowns |

*  Documents marked with asterisk (*) are contained in the bibliographies of the Lease Sale 193 Final Environmental Impact Statement (MMS AR 975-977) or the Biological Opinion for Threatened Steller's and Spectacled Eiders (FWS AR 192).  They are part of the Administrative Record, but were not produced separately.

** Documents marked with a double asterisk (**) are pleadings and other legal documents provided for the Court and parties' convenience.

*** Documents marked with a triple asterisk (***) are not in the Administrative Record but should be considered by the Court, as described in Plaintiffs' Opening Brief.