ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

ERIC P. JORGENSEN (AK Bar # 8904010)
NEIL E. GORMLEY (AK Bar # 1105020)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
T: 907-586-2751
F: 907-463-5891
E: ejorgensen@earthjustice.org
E: ngormley@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF POINT HOPE, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KENNETH L. SALAZAR, Secretary of the Interior, *et al.,* ) | Case No. 1:08-cv-00004-RRB |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| SHELL GULF OF MEXICO, INC., CONOCOPHILLIPS ) | |
| COMPANY, STATE OF ALASKA, and STATOIL USA ) | |
| E&P INC., ) | |
| ) | |
| Intervenor-Defendants. ) | |
| ) | |

**PLAINTIFS' OPENING REMAND BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

I. MISSING INFORMATION ......................................................................................2

    A. Procedural History ........................................................................................2

    B. Federal Defendants' continued reliance on and limitations of the original EIS.................................................................................................................3

    C. The SEIS and missing information ................................................................6

II. CLIMATE CHANGE ANALYSIS ...........................................................................9

ARGUMENT.........................................................................................................................11

I. BOEM'S CONCLUSION THAT THERE IS NO MISSING INFORMATION ESSENTIAL TO A REASONED CHOICE AMONG ALTERNATIVES FOR THE LEASE SALE IS ARBITRARY...............................................................................13

    A. Section 1502.22 furthers NEPA's basic requirement that an EIS contain an informed comparison of alternatives and design alternatives that avoid or minimize adverse effects...........................................................................13

    B. Critical decisions, requiring adequate information, are made at the lease sale stage. ....................................................................................................15

    C. BOEM is unable to compare and design alternatives in the EIS in light of missing information about the Chukchi Sea, and therefore its conclusion that none of the missing information is essential to the choice among alternatives is arbitrary...........................................................................17

        1. Bowhead Whales .............................................................................17

        2. Beluga Whales .................................................................................20

        3. Other Species ...................................................................................23

    D. BOEM's five boiler-plate explanations in the SEIS appendix conflict with the EIS and fail to justify BOEM's "not essential" conclusion. ............................25

II. BOEM VIOLATED NEPA BY REFUSING TO ANALYZE THE CONTRIBUTION TO CLIMATE CHANGE FROM BURNING THE OIL AND GAS FORECAST TO BE PRODUCED FROM THE LEASE SALE..............................29

A.    Greenhouse gas emissions from combustion of oil and gas and resulting global climate change are reasonably foreseeable indirect and cumulative effects of this lease sale............................................................................30

1.    Greenhouse gas emissions from burning oil and gas forecast to be produced from this lease sale are reasonably foreseeable .........................31

a.    Quantifying the oil and gas to be produced from the lease sale is not unreasonably speculative ................................................31

b.    The combustion of a significant portion of the oil and gas forecast to be produced is a reasonably foreseeable consequence of the lease sale because it is the lease sale's objective............................................................................................33

2.    Uncertainty about the response of oil and gas markets and the percent of oil and gas burned as energy does not excuse the failure to analyze these emissions. .......................................................................34

B.    The lease sale is a proximate cause of greenhouse gas emissions from burning the oil and gas produced..........................................................................36

III.    BECAUSE THE LEASE SALE WAS AFFIRMED IN VIOLATION OF NEPA AND THE APA, THE COURT SHOULD VACATE THE SALE AND ISSUANCE OF LEASES. ...............................................................................................39

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Alaska v. Andrus*,
580 F.2d 465 (D.C. Cir. 1978) ........................................................................................15, 39

*All Indian Pueblo Council v. United States*,
975 F.2d 1437 (10th Cir. 1992) ..............................................................................................14

*Am. Biosci., Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ..............................................................................................39

*Amber Res. Co. v. United States*,
538 F.3d 1358 (Fed. Cir. 2008) ..............................................................................................16

*Animal Def. Council v. Hodel*,
840 F.2d 1432 (9th Cir. 1988) ................................................................................................10

*Asarco, Inc. v. Occupational Safety & Health Admin.*,
647 F.2d 1 (9th Cir. 1981) ......................................................................................................40

*Barnes v. U.S. Dept. of Transp.*,
655 F.3d 1124 (9th Cir. 2011) ................................................................................................38

*Border Power Plant Working Group v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ....................................................................................38

*Cal. Wilderness Coal. v. U.S. Dept. of Energy*,
631 F.3d 1072 (9th Cir. 2011) ................................................................................................39

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
449 F.2d 1109 (D.C. Cir. 1971) ..............................................................................................14

*Cetacean Cmty. v. Bush*,
386 F.3d 1169 (9th Cir. 2004) ................................................................................................38

*City of Angoon v. Hodel*,
803 F.2d 1016 (9th Cir. 1986) ................................................................................................15

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ................................................................................................14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ............................................................................13, 29, 31, 36, 37

*Ctr. for Biological Diversity v. U.S. Dept. of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ..........................................................................................15, 38

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
349 F.3d 1157 (9th Cir. 2003) ............................................................................12

*Department of Transportation v. Public Citizen*,
541 U.S. 752 (2004)....................................................................................36, 38

*Dubois v. U.S. Dept. of Agric.*,
102 F.3d 1273 (1st Cir. 1996)............................................................................14

*Earth Island Inst. v. U.S. Forest Serv.*,
442 F.3d 1147 (9th Cir. 2006) ...........................................................................10

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
681 F.2d 1172 (9th Cir. 1982) ...........................................................................13

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .......................................................................39, 40

*Ideal Basic Indus., Inc. v. Morton*,
542 F.2d 1364 (9th Cir. 1976) ...........................................................................37

*Kastigar v. United States*,
406 U.S. 441 (1972)...........................................................................................38

*Kern v. U.S. Bureau of Land Mgmt.*,
284 F.3d 1062 (9th Cir. 2002) .....................................................................36, 38

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) .............................................................................31

*Massachusetts v. Watt*,
716 F.2d 946 (1st Cir. 1983)........................................................................16, 39

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) ......................................................................32, 36

*Mobil Oil & Producing Se., Inc. v. United States.*,
530 U.S. 604 (2000)...........................................................................................15

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................................................................................12, 13, 26

*N. Cheyenne Tribe v. Hodel*,
851 F.2d 1152 (9th Cir. 1988) ...........................................................................40

*Natural Res. Def. Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) .....................................................................39, 40

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 5 of 54

*Natural Res. Def. Council v. U.S. Forest Serv.*,
 421 F.3d 797 (9th Cir.2005) ..................................................................................28, 29, 31

*No GWEN Alliance of Lane Cnty., Inc. v. Aldridge,*
 855 F.2d 1380, 1385 (9th Cir.1988) ................................................................................33

*Paulsen v. Daniels*,
 413 F.3d 999 (9th Cir. 2005) ..........................................................................................39

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989).....................................................................................................32, 36

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
 588 F.3d 718 (9th Cir. 2009) .....................................................................................27, 31, 35

*S. O. Citizens Against Toxic Sprays, Inc. v. Clark*,
 720 F.2d 1475 (9th Cir. 1983) .........................................................................................27

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*,
 449 F.3d 1016 (9th Cir. 2006) .....................................................................................31, 33

*Save Our Sonoran, Inc. v. Flowers*,
 408 F.3d 1113 (9th Cir. 2005) .........................................................................................35

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
 649 F.3d 1050 (9th Cir. 2011) .....................................................................................14, 17

*Sec'y of the Interior v. California*,
 464 U.S. 312 (1984).........................................................................................................38

*Sierra Club v. Mainella*,
 459 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................................36

*Sun Oil Co. v. United States*,
 572 F.2d 786 (Ct. Cl. 1978) .............................................................................................16

*Thompson v. U.S. Dept. of Labor*,
 885 F.2d 551 (9th Cir. 1989) ...........................................................................................35

*Union Oil Co. of Cal. v. Morton*,
 512 F.2d 743 (9th Cir. 1975) ...........................................................................................16

*United States v. Johnson*,
 256 F.3d 895 (9th Cir. 2001) (en banc) ...........................................................................38

*Vill. of False Pass v. Watt*,
 565 F. Supp. 1123 (D. Alaska 1983) ............................................................................16, 17

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 6 of 54

*W. Oil & Gas Ass'n v. U.S. EPA*,
633 F.2d 803 (9th Cir. 1980) ...............................................................39

**FEDERAL STATUTES**

Administrative Procedure Act, 5 U.S.C. § 706........................................................12, 39

National Environmental Policy Act, 42 § 4332 ...........................................................37

Outer Continental Shelf Lands Act, 43 U.S.C. § 1332 ................................................37

43 U.S.C. § 1332(3) ...........................................................................37, 40

43 U.S.C. § 1334.................................................................................16, 38

43 U.S.C. § 1337(a)(1).........................................................................36, 38

43 U.S.C. § 1340.................................................................................15, 16

43 U.S.C. § 1344(a) ........................................................................15, 33, 38

43 U.S.C. § 1346(d) .................................................................................37

43 U.S.C. § 1351(h)(1)(D).........................................................................15

43 U.S.C. § 1352(b)(1) ..............................................................................32

ICC Termination Act of 1995, 49 U.S.C. § 13902(a)(1) ..............................................36

Energy Policy and Conservation Act, 49 U.S.C. § 32902 .............................................37

**FEDERAL REGULATIONS**

30 C.F.R. §§250.207-.210............................................................................16

30 C.F.R. §§ 250.231-.235...........................................................................16

40 C.F.R. § 1502.1 ..............................................................................14, 17

40 C.F.R. § 1502.14 ..................................................................................14

40 C.F.R. § 1502.22 ............................................2, 6, 7, 12, 13, 14, 15, 27, 32

40 C.F.R. § 1508.8(b) .................................................................................38

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 7 of 54

**FEDERAL REGISTER NOTICES**

51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986) ..................................................................13

74 Fed Reg. 56,260 (Oct. 30, 2009)................................................................................30

75 Fed. Reg. 31,514 (June 3, 2010) ...............................................................................30

75 Fed. Reg. 63,504 (Oct. 15, 2010)................................................................................2

76 Fed. Reg. 30,956 (May 27, 2011) ...............................................................................2

76 Fed. Reg. 53,481 (Aug. 26, 2011)...............................................................................2

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 8 of 54

# INTRODUCTION

This case challenges the Secretary of Interior's decision to offer offshore oil and gas leases in approximately 29.4 million acres of the Chukchi Sea off the northern coast of Alaska. The Secretary initially held Lease Sale 193 on February 6, 2008. He affirmed the lease sale in its entirety and without alteration on October 3, 2011, following the preparation of a supplemental environmental impact statement (SEIS) pursuant to this Court's remand order. The Secretary's decision to affirm Lease Sale 193 violates the National Environmental Policy Act (NEPA).

The Chukchi Sea, which provides habitat for hundreds of species of fish, birds, and marine mammals, including polar bears, bowhead whales, and walrus, and is at the heart of the subsistence culture practiced for millennia by Inupiat communities along its coast, is a poorly understood—and changing—place. As the United States Geological Survey (USGS) recently concluded, missing information is a "major constraint to a defensible science framework for critical Arctic decision making." However, the Secretary based his decision to affirm Lease Sale 193 on a conclusion that of the literally hundreds of items of information about the Chukchi Sea admitted to be missing in the lease sale environmental impact statement (EIS) not a single piece is essential to a reasoned choice among alternatives. The Secretary reached this decision even though missing information prevents the Bureau of Ocean Energy Management (BOEM)[1] from making an informed comparison of alternatives and designing alternatives that would avoid or mitigate effects. Additionally, although BOEM assumes one billion barrels of oil and 2.25 trillion cubic feet of natural gas will be produced as a result of Lease Sale 193, the SEIS fails to analyze the potentially significant climate change effects of the end use of the oil and gas, as NEPA requires.

For all these reasons, the Court should remand the decision to the Secretary and vacate the leases pending the Federal Defendants' compliance with the law.

---

[1] Effective October 1, 2011, the Bureau of Ocean Energy Management, Regulation and Enforcement, the successor to the Minerals Management Service, was reorganized into two agencies, one of which, the Bureau of Ocean Energy Management (BOEM) oversees leasing decisions. *See* Dkt. No. 231 at 1 n.1. BOEM's predecessor agencies will be referred to herein as BOEM.

I.    MISSING INFORMATION

    A.    <u>Procedural History</u>

This case arises out of Federal Defendants' decision to hold an oil and gas lease sale for approximately 29.4 million acres in the Chukchi Sea.  Plaintiffs filed their original complaint challenging the decision on January 31, 2008, prior to the lease sale, on the grounds that the decision violated NEPA because, among other things, the EIS for the lease sale failed to determine whether missing information about the Chukchi Sea was essential as required by 40 C.F.R. § 1502.22 (Section 1502.22).  Dkt. No. 1.  The Court granted Plaintiffs' summary judgment motion on this claim, agreeing that, in light of the "dozens if not hundreds of entries [in the EIS] indicating a lack of information about species/habitat, as well as a lack of information about effects of various activities on many species," Dkt. No. 164 at 17, BOEM's failure to determine whether missing information was essential to a reasoned choice among alternatives violated Section 1502.22 and "was arbitrary," *id.* at 18.  Accordingly, the Court remanded the decision to the agency with instruction for BOEM to "satisfy its obligations under NEPA" by determining whether missing information is essential to the lease sale decision and reconsider the lease sale in light of that analysis.  *Id.* at 20-21.

On October 15, 2010, BOEM issued a draft supplemental EIS (SEIS).  75 Fed. Reg. 63,504.  An appendix to the draft SEIS listed the EIS's hundreds of acknowledgments of missing information and for each applied one or more of five recurring rationales to conclude that not a single one of the hundreds of pieces of missing information listed in the appendix was essential to a reasoned choice among alternatives pursuant to Section 1502.22.  Ex. 15 at 6-7; *id*. at 3a-3b.  Plaintiffs submitted comments on the draft SEIS on November 30, 2010.  Ex. 19, Ex. 17, Ex. 18, Ex. 20.  On May 27, 2011, BOEM issued a revised draft SEIS.  76 Fed. Reg. 30,956.  The revised draft SEIS did not modify the October draft's conclusion about missing information and contained the same appendix A.  Ex. 21 at 11-12.  Plaintiffs submitted comments to the revised draft on July 8 and 11, 2011.  Ex. 29, Ex. 30, Ex. 31, Ex. 32, Ex. 33, Ex. 34.  On August 26, 2011, BOEM issued a final supplemental EIS.  76 Fed. Reg. 53,481.  The final SEIS contained the same appendix and conclusions about missing information as the previous two drafts.  Ex. 24 at 27-124; *id*. at 132 (stating in response to comments that BOEM "was not missing any

information that was essential to a reasoned choice amongst the alternatives at the time of Lease Sale 193 (February 2008)"). Plaintiffs submitted comments on the final SEIS between September 23 and 26, 2011. Ex. 25, Ex. 26. On October 3, 2010, the Secretary issued a decision to affirm the lease sale in its entirety with no changes. Dkt. No. 230-1; Ex. 27 at 41. The record of decision adopted BOEM's conclusion that not a single piece of missing information acknowledged in the Lease Sale 193 EIS is essential to the choice among lease sale alternatives. *Id*. at 19-21.

> B.      Federal Defendants' continued reliance on and limitations of the original EIS

Though the SEIS provides the rationale for the agency's conclusion on the importance of missing information, to affirm the lease sale decision, the Secretary still relied on the same alternatives and analysis of impacts contained in the original EIS. Ex. 27 at 7-9, 21. The alternatives and basic impact analysis in the EIS has not changed during the remand period.[2] The EIS analyzes three action alternatives that each postpone leasing in different sized coastal areas. Ex. 3 at 9-10, 21. The alternatives as designed were an attempt, based on the limited available information, to provide differing degrees of adverse effects to a variety of species by removing from the lease sale areas BOEM could identify as potentially important habitat. *Id*. at 21 (noting that deferral areas "attempt to reduce potential impacts to subsistence hunting . . . as well as various wildlife species and associated habitat"); *id*. at 23 (stating that the coastal deferral alternatives encompass areas where whales are "concentrated and particularly vulnerable to

---

[2] The SEIS added a description of the effects of natural gas development, a description of the effects of a very large oil spill, and an appendix A justifying BOEM's conclusion that not a single piece of missing information acknowledged in the EIS is essential to the reasoned choice among lease sale alternatives. Ex. 24 at 16-17. The only amendments the SEIS makes to the original EIS itself are to amend the EIS's significance criteria for water and air quality, subsistence harvest patterns, sociocultural systems, and environmental justice, Ex. 27 at 12 n.4; Ex. 24 at 16-17, and, as discussed *infra*, to adopt a new set of justifications for declining to analyze climate change effects of the end use of oil and gas produced as a result of the lease sale.

disturbance, such as calving areas, molting and brooding areas, and feeding areas").[3] The agencies ability to compare impacts of these alternatives and design other more effective alternatives was affected by the many data gaps.

As this Court has determined, the Lease Sale 193 EIS acknowledges many data gaps, including gaps about what areas of the Chukchi Sea provide important habitat for the species that inhabit them. *See* Dkt. No. 164 at 17; Dkt. No. 82 at 17-18 and Dkt. No. 85-46 (Exhibit 129, compendium of missing information acknowledgements). The EIS acknowledges that data gaps in many cases prevent BOEM from determining the potential impacts of the lease sale on many of the species that inhabit the Chukchi Sea, including important subsistence species. *See* Dkt. No. 82 at 18-19 and Dkt. No. 85-46 (Exhibit 129, compendium of missing information).

In turn, the data gaps and limits on assessing impacts affect the ability of the agency to compare the environment effects from the different lease sale alternatives. For example, for bowhead whales, a lynchpin species for Inupiat subsistence, the EIS states that differences in effects from lease sale activity noise to bowhead whales among the three coastal deferral alternatives are "difficult to quantify." Ex. 3 at 98. It limits its comparison among alternatives to the observation that different deferral zones would "somewhat reduce[] the likelihood of spring bowhead whale encounters with industrial noise," because they "would move sources of industrial noise . . . farther offshore and away from the spring lead system." *Id*.; *id.* at 100 (same). With respect to spills, the EIS observes that because the different alternatives move source of oil spills further from the spring lead system, they "allow[] more time to respond to the [oil] spill" because "any spill that would occur would take longer to reach and enter the spring-migratory route." *Id*. at 98; *id.* at 100. Because of information gaps, the EIS is reduced to comparing the effects of each alternative at a general, rather than a species, level for all of the

---

[3] At the close of the scoping process for the EIS, BOEM considered seven alternatives for detailed evaluation in the EIS. Ex. 1 at 5-7. Each of these alternatives was meant to protect particular resources. For example, a "Wildlife Deferral" was designed to defer from the lease sale areas near shore used by beluga, eider, and seals; a "Barrow Canyon Deferral" was designed to defer from the lease sale the area above Barrow Canyon in the northeastern Chukchi Sea; a "Walrus Deferral" was designed to defer from the lease sale areas used for walrus subsistence hunting. *Id*. at 5-6. One alternative, the "Whale Road Deferral," was designed to protect the bowhead whale's spring, near-shore migratory path through the Chukchi Sea. *Id*. at 5. In the end, the EIS analyzed two different versions of the "Whale Road Deferral" alternative, because they encompassed the other alternatives and thus, BOEM concluded, would reduce impacts to a number of wildlife species and associated habitats. Ex. 3 at 23.

marine mammals, fish, and birds not listed under the Endangered Species Act. *Id*. at 98-99; *id*. at 99a, 101. Not surprisingly, these general comparisons of alternatives are limited and speculative. The EIS, for example, limits its comparison of the effects of the alternatives on marine mammals, fish, all marine and coastal birds to the observation that "the primary benefit of this [coastal] corridor is that it would move sources of potential adverse effects further away from important . . . habitats" and "increased distance between offshore development and coastal . . . habitats *conceivably* would decrease the percent chance of spilled oil contact, increase weathering of spilled oil prior to contact, and increase available spill-response time." *Id*. at 98-99; *id*. at 99a-101 (emphasis added). It cannot compare the effects to marine mammals offshore under the different alternatives because of uncertainty due to missing information about their offshore distribution and habitat use. Ex. 3 at 99; *id*. at 101 (same).

Missing information also affected the agency's ability to formulate alternatives that could avoid or minimize adverse effects on species. For example, the EIS states that "[u]nderstanding the distribution and timing of movements of belugas is important for planning lease sales in the Chukchi Sea and designing possible mitigation measures." Ex. 3 at 95. But "[l] ate-summer distribution and fall-migration patterns are poorly known, wintering areas are effectively unknown, and areas that are particularly important for feeding have not been identified." *Id*. at 50. For bowhead whales, it states that whales use and aggregate in the Chukchi Sea in the summer and fall. Ex. 3 at 70-71. It states that oil and gas activities in important aggregation areas could have serious adverse effects. Ex. 3 at 69-71; 77-78. But the EIS states that it lacks the information to determine where the aggregations occur. *Id*. at 69 (current data unavailable to typify summer use of Chukchi Sea); *id*. at 71 (insufficient data to determine fall migration paths and how intensively bowheads feed during fall migration through the Chukchi Sea). The agency did not and could not formulate alternatives to respond to these potential impacts.

Other agencies voiced concern about the limited formulation of alternatives in light of missing information. The Environmental Protection Agency (EPA) submitted comments to the draft of the original EIS that stated:

> Alternatives to the Proposed Action that are presented in the Draft EIS include
> two variations of exclusion areas along the coastward side of the Planning Area.
> However, it is unclear how the boundaries of the excluded areas in the two
> alternatives (Alternatives III and IV) were determined. Due to the lack of
> information about the Planning Area, the use of the "Opportunity Index" and
> other assumptions regarding the potential level of exploration, development and

production activity as a result of a lease sale, it is unclear if the two alternatives, together with the Proposed Action and a No Action Alternative, represent a range of reasonable alternatives in the Draft EIS. The Final EIS should present a more thorough discussion of the decision criteria and the geophysical, biological and subsistence information that was used to develop the alternatives in order to demonstrate that a range of reasonable alternatives was considered.

Ex. 3 at 112-113. EPA suggested that BOEM "consider removal of additional areas with sensitive fish and wildlife, subsistence, and cultural resources, and at a minimum, deferring areas until further research and studies are conducted to ensure development can occur without significant impacts to critical resources." *Id*. at 22. The final EIS contained only the three coastal deferral alternatives. During the remand period, reviewers from the National Oceanic and Atmospheric Administration reiterated the concern that the coastal deferral alternatives provide no additional protection to polar bears, walruses, and ice seals, which prefer sea-ice habitats. Ex. 28 at 1.

        C.      The SEIS and missing information

As described above, BOEM did not revise the lease sale EIS to comply with the Court's remand order to analyze missing information, and indeed continues to base its decision to affirm the lease sale on the analyses of impacts and alternatives in the original lease sale EIS. Instead, to address the missing information obligation remanded to the agency by this Court, BOEM decided quickly after the Court's order to create a document separate from the EIS to demonstrate compliance with Section 1502.22. Ex. 4 at 1 (noting need to prepare supplement and document decision); Ex. 6 at 1 (suggesting a team of three BOEM employees "document" the Section 1502.22 analysis in an appendix); *see also* Ex. 5 at 1 (email of July 26 setting out the basic framework for "dealing with the 1502.22 issues"). It decided from the start that it would document compliance by focusing on each of the acknowledgments of missing information in the EIS. *See id*. (equating Section 1502.22 compliance with "dealing with the items in Exhibit 193[sic]"); Ex. 9 (setting forth search terms to be used to locate and list acknowledgments of missing information in the EIS). BOEM staff quickly developed five or six standard sentences to justify a conclusion that none of the missing information acknowledged in the EIS is essential. Ex. 7 at 1 (email of July 28 discussing the development of "standard language for 'not related to sig[nificant] effects', 'not essential for decision', and 'not doable'"); Ex. 11 at 1 (attaching draft analysis and stating "I am using one or more of six different reasons (a-f) for the response").

Case 1:08-cv-00004-RRB   Document 249   Filed 11/16/11   Page 14 of 54

BOEM employees created a check-box worksheet based on the standard rationales for the task and started compiling the statements and responses into a table. Ex. 8 at 2-4 (check-box worksheet); Ex. 11 at 2-9 (attaching draft table of EIS statements with Section 1502.22 responses); Ex. 12 (employing standard language approach to missing information statements).

Comments from reviewers of the draft SEIS at BOEM's Washington, D.C., headquarters raised concerns about how the standard responses contradicted acknowledgments in the EIS. Ex. 14 at 2. The commenters noted, for example, that "you can't say information is unknown and then turn right around and say . . . 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'" *Id.*; *see also id.* ("If site specific data is lacking and most information is 15-30 years old, we cannot just say 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'"); *id.* ("Repeatedly the statement is made that information is lacking or outdated, followed by 'sufficient information is available to support sound scientific judgments and reasoned managerial decisions.' This is unacceptable. This entire table should be scrutinized to eliminate such contradictory statements."). A staff member from the Alaska region suggested that conclusions should be better justified. Ex. 10 at 1 (suggesting that when the agency makes its determination about what information is or is not essential, it "may require suggesting what studies or information are possible and what they would get us (as specifically as possible)").

When BOEM issued a draft SEIS for public comment in October 2010, the document contained an appendix A based on this early approach. It listed all of the EIS's statements about missing information and for each and every acknowledged gap, the appendix stated the gap was either not relevant to significant adverse effects or not essential on the basis of one or more of the five standard statements BOEM had developed early in the remand process. Ex. 15 at 4-150. The most common of these standard statements was that despite the gap, BOEM had enough information to make sound scientific judgments and reasoned managerial decisions. *Id.* at 6-7. The four other descriptions stated various reasons why BOEM could proceed in the absence of information—because adverse effects were presumed, effects were common among all alternatives, environmental laws would preclude significant adverse effects, and information could be obtained at later stages in the Outer Continental Shelf Lands Act (OCSLA) process. *Id.* The Plaintiffs submitted comments on the draft SEIS, but the appendix was substantially unchanged when BOEM issued a second draft SEIS in May 2011. *See supra* at 2-3.

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 15 of 54

Shortly after BOEM issued the revised draft SEIS, the USGS released a report in June 2011, entitled "An Evaluation of the Science Needs to Inform Decisions on Outer Continental Shelf Energy Development in the Chukchi and Beaufort Seas, Alaska". Ex. 22. The report's purpose was to "conduct an initial, independent evaluation of the science needs that would inform the Administration's consideration of the right places and the right ways in which to develop oil and gas resources in the Arctic OCS." *Id*. at 6. It confirmed that there are significant data gaps in the Arctic Ocean for a large number of species. For example, for marine mammals generally, "seasonal, annual, and geographic variability in diet are poorly quantified and foraging areas are poorly described," *id*. at 14; for bowhead whales, "the understanding of essential spatial and temporal habitat needs … particularly the oceanographic parameters that most influence foraging, breeding, raising young, and migrating is not yet sufficient to confidently determine the times and places where whales might be most impacted by anthropogenic sounds," *id.* at 28; for beluga whales, "[t]he present understanding of essential spatial and temporal habitat needs . . . is limited and constrains the ability to confidently understand and efficiently mitigate potential anthropogenic noise impacts," *id.* at 30; and for fish, "[i]nformation about status and trends, habitat requirements, relative distribution and abundance, and knowledge of life history stages of marine fish is incomplete and unavailable for large expanses of Arctic nearshore and shelf waters," *id.* at 22. The list goes on. *See, e.g., id.* at 31 (gray whales); *id.* at 32 (ice seals); *id.* at 35 (walrus); *id.* at 7-13 (marine mammal species); *id.* at 13-21 (birds generally); *id.*at 24 (impacts of anthropogenic noise on mammals). Recognizing the scope and importance of the data gaps, the report states that missing information serves as a "major constraint to a defensible science framework for critical Arctic decision making." *Id*. at 23.

On August 18, 2011, BOEM released a final SEIS, which contained the same appendix and conclusions about missing information as the previous two drafts. Ex. 24 at 26-124. In the final SEIS, BOEM concluded that "[t]he USGS report does not . . . alter BOEM[]'s assessment of whether current information is adequate to support a decision on Lease Sale 193 . . . [and] no changes to Appendix A or the Final SEIS's general approach to incomplete or missing information have been made as a result of the USGS report." *Id*. at 137; *see also* Ex. 23 at 15 (BOEM draft decision memo concluding that the USGS report did not present "any 'show stopper'. . . for adopting the agency's preferred alternative of reaffirming the Chukchi Sea Sale 193 in its entirety"). The final SEIS also rejected public comments criticizing BOEM's missing

information analysis. *Id.* at 134 ("BOEM[] has reviewed and considered the specific criticisms summarized above, but determined that suggested changes to the existing 1502.22 methodology or analysis are not warranted."). The final SEIS concludes that "while many items of incomplete, missing, or unavailable information were broadly relevant to the important issues at hand, none were essential for a reasoned choice among alternatives." *Id.* at 16; *id.* at 29.

On October 3, 2011, the Secretary issued a record of decision adopting BOEM's conclusion that none of the missing information identified in the EIS is essential to a reasoned choice among Lease Sale 193 alternatives. Ex. 27 at 21. Accordingly, the Secretary continued to rely on the EIS to assess the impacts of Lease Sale 193. *Id.* ("Since none of the incomplete or unavailable information referred to in the Sale 193 FEIS was determined essential to a reasoned choice among alternatives, BOEM concludes that none of the incomplete or unavailable information could have reasonably led to a different decision than that made for the Final Notice of Sale for Chukchi Sea Sale 193, dated January 2, 2008."). The Secretary affirmed the original Lease Sale 193 decision in its entirety and without changes. *Id.* at 40-41.

II.     CLIMATE CHANGE ANALYSIS

In addition to addressing missing information, at the Court's direction the SEIS also incorporated a natural gas scenario and evaluated the impacts of natural gas production. *See supra* n. 2. As a part of this new analysis, BOEM reached new conclusions about the contribution to climate change from burning oil and gas forecast to be produced as a result of the lease sale.

In the original EIS, BOEM predicted that the Lease Sale 193 area contains 12 billion barrels of oil recoverable with current technologies, Ex. 3 at 24, and that "[a]t a $60 oil price, 8.4 [billion barrels] of oil . . . could be economic to develop." *Id.* at 61. For purposes of developing scenarios for environmental analysis, however, BOEM assumed that one billion barrels will be produced as a result of the lease and that annual production will peak at 80 million barrels. Ex. 24 at 24-25. In the new SEIS analysis, BOEMRE forecasts that 2.25 trillion cubic feet of natural gas will be produced as a consequence of the sale. *Id.* at 25. BOEM cites the goal of "increased domestic energy supply" in defining the lease sale's purpose and need. Ex. 3 at 17. *See also id.* ("[OCSLA's] purposes generally pertain to recognizing national energy needs . . . and addressing them by developing OCS oil and gas resources."). BOEM notes that the oil and gas forecast to be produced could "contribute significantly to the national energy supply." Ex. 24 at 15.

BOEM's original EIS addressed greenhouse gas emissions from combustion of oil produced in Lease Sale 193 in a couple of sentences. Ex. 3 at 105. The agency stated that the large increase in supply resulting from the lease sale "likely would not change" aggregate oil consumption or change, therefore, greenhouse gas emissions from oil consumption. *Id.* As a result, based only on emissions from exploration and production activities, the EIS concluded that the contribution to climate change from the lease sale would be "minor." *Id.* Natural gas emissions were not addressed.

On remand, BOEM took a different course. In the revised draft SEIS, BOEM said that NEPA did not require it to estimate the contribution to climate change from burning the oil and gas produced. Ex. 21 at 6a. BOEM claimed that uncertainty and a lack of reliable methodologies prevented it from making an estimate. *Id.*

Plaintiffs commented on the revised draft, urging BOEM to reconsider its conclusion that analysis of greenhouse gas emissions from combustion was not required.[4] Ex. 30 at 12-14. Plaintiffs brought figures and estimates to BOEM's attention indicating that over 90% of oil

---

[4] Exhibits 36 through 40 are relevant excerpts from the publicly available documents that Plaintiffs brought to BOEM's attention on this issue. Plaintiffs provided electronic hyperlinks to each document in comments on the revised draft EIS. Ex. 30 at 13–14. BOEM, however, did not include them in the administrative record for its remand decision. Plaintiffs believe these documents should be in the record and have asked BOEM to supplement the record to include these documents.

The Court should consider these materials regardless under the well-established rule permitting consideration of extra-record documents to demonstrate that an agency failed to give adequate consideration to relevant materials. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1162 (9th Cir. 2006) ("We allow extra-record materials if necessary to 'determine whether the agency has considered all relevant factors and has explained its decision.'") (quoting *S.W. Ctr. For Biological Diversity v. U. S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)), a*brogated on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). This exception is particularly important in the NEPA context where "a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988) (opinion amended by 867 F.2d 1244 (9th Cir. 1989)) (quoting *Suffolk Cnty. v. Sec'y of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064 (1978)). Plaintiffs contend, *see infra* at 31-36, that BOEM's conclusions about the feasibility of estimating greenhouse gas emissions are arbitrary in light of the agency's failure adequately to consider or address these documents, which contain data and methodologies that suggest BOEM could in fact make such an estimate.

---

consumed in the United States is burned as fuel,[5] that burning a barrel of oil releases .43 tons of greenhouse gases (calculated in $CO_2$ equivalent),[6] and that burning a cubic foot of natural gas releases $5.17 \times 10^{-8}$ tons of greenhouse gases.[7]  Applying these conversions and estimates to BOEM's own production forecasts, Plaintiffs pointed out that combustion of oil and gas produced from the lease sale could generate over 387 million tons of new greenhouse gas emissions.  *Id*. at 14.  For the years of peak production volumes, Plaintiffs explained, these estimates indicate that the contribution to global greenhouse gas emissions could exceed 31 million tons each year.  *Id.*  In the same comments, Plaintiffs urged BOEM to consider methodologies like those employed by the Department of State, the EPA, and the National Highway Traffic Safety Administration (NHTSA) in two recent environmental impact statements to estimate the response of oil and gas markets to agency-induced changes in supply and demand.  *Id*. at 13; Ex. 38 at 2; Ex. 37 at 7, 12-16.

In the final SEIS, BOEM adheres to the position that it is impossible to estimate greenhouse gas emissions from burning oil and gas produced in Lease Sale 193.  BOEM states that the productive capacity of the Chukchi is unknown and no reliable methodologies exist to estimate the response of oil and gas markets to new supplies.  Ex. 24 at 20-21.  BOEM also asserts that the burning of oil and gas for energy is not a reasonably foreseeable or proximate consequence of this lease sale.  *Id*.  BOEM refuses to estimate how much oil and gas will be burned as a result of this lease sale, the greenhouse gas emissions that will result, or the contribution of these emissions to global climate change.  BOEM has not addressed the analyses that Plaintiffs brought to its attention in comments.

## ARGUMENT

Federal Defendants have now approved Lease Sale 193 for the second time on the basis of a flawed NEPA analysis.  First, they have asserted on remand that not a single piece of

---

[5] Ex. 30 at 14 (citing *Oil Oozes Through Your Life*, THE NEW YORK TIMES (June 25, 2011) ("About 46 percent of [a typical barrel of oil] is refined into gasoline, and another 40 percent or so is turned into jet and fuel oil. Only about 2 percent becomes petrochemicals like polyethylene and benzene for everyday products (with the rest going to other uses)."); Ex. 39*;* Ex. 36 at 4-5 (breaking down U.S. petroleum consumption by type for each year 1949–2009).
[6] Ex. 30 at 14 (citing U.S. EPA, Green Power Equivalency Calculator Methodologies, Barrels of Oil Consumed, available at http://www.epa.gov/greenpower/pubs/calcmeth.htm.)
[7] *Id*. (citing U.S. EPA, Greenhouse Gas Equivalencies Calculator, available at http://www.epa.gov/cleanenergy/energy-resources/calculator.html).

information missing about the Chukchi Sea is essential to a reasoned choice among lease sale alternatives.  This conclusion is arbitrary, because it conflicts with the agency's analysis in the original EIS.  There is no dispute that there are extensive data gaps about nearly every aspect of the Chukchi Sea ecosystem, including lynchpin species like bowhead whales, beluga whales, walrus, birds, and fish.  As the Lease Sale 193 EIS demonstrates, because critical information is missing, BOEM is unable to make an informed comparison among alternatives and design alternatives that would avoid or minimize adverse effects, as NEPA requires.  As a result, the conclusion that none of the missing information is "essential to a reasoned choice among alternatives," 40 C.F.R. § 1502.22, is arbitrary.  The SEIS does not remedy this flaw—none of its five recurring explanations justifies BOEM's conclusion in light of its inability to compare or design alternatives in the EIS.

Second, Federal Defendants have refused to analyze and consider the climate change effects of burning fossil fuel produced as a result of the lease sale even though they assume one billion barrels of oil and 2.25 trillion cubic feet of natural gas will be produced as a result of Lease Sale 193.  They have offered several new justifications for this refusal—that they cannot determine the effects on consumption of the produced oil and gas, that they cannot estimate the amount of greenhouse gases that end use of the oil and gas would release, and that the lease sale is not a proximate cause of the emissions from burning oil and gas.  None of these justifications withstand scrutiny, and the failure to assess these reasonably foreseeable impacts violates NEPA.

Review for compliance with NEPA occurs under the provision of the APA that authorizes courts to set aside agency actions adopted "without observance of procedure required by law."  *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1165 (9th Cir. 2003) (quoting 5 U.S.C. § 706(2)(D)); *see also id.* at 1166 (noting that the NEPA review standard "is essentially applied in the same manner as the arbitrary and capricious standard" under the APA, 5 U.S.C. § 706(2)(A)).  The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious . . . ."  5 U.S.C. § 706(2)(A).  This requires that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  A decision would normally be arbitrary if the agency "offered an explanation for its

decision that runs counter to the evidence before the agency . . . ." *Id.* at 43. The reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1201-03 (9th Cir. 2008) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).[8]

I.  BOEM'S CONCLUSION THAT THERE IS NO MISSING INFORMATION ESSENTIAL TO A REASONED CHOICE AMONG ALTERNATIVES FOR THE LEASE SALE IS ARBITRARY

Important information essential to a choice among reasoned alternatives is missing here, and the Federal Defendants' conclusion to the contrary is arbitrary. As described below, Section 1502.22 requires agencies to obtain information that allows them to meet NEPA's requirement to make an informed comparison of alternatives and to develop alternatives that would avoid or minimize adverse impacts from the action. At the lease sale stage, information about the importance of different areas in the Chukchi Sea and the potential effects of oil and gas activities in those areas is essential to these key analyses underlying the choice among alternatives that NEPA requires. The EIS for Lease Sale 193, upon which the Federal Defendants continue to rely for their decision to reaffirm the sale, demonstrates that information essential to a reasoned choice among alternatives is missing, because without it, BOEM cannot compare the effects of existing alternatives or design alternatives that would minimize effects. The five recurring reasons for dismissing missing information offered by BOEM in an appendix to the SEIS fail to justify the conclusion that no information essential to the lease sale is missing in light of the agency's inability in the EIS to compare and design alternatives.

A.  Section 1502.22 furthers NEPA's basic requirement that an EIS contain an informed comparison of alternatives and design alternatives that avoid or minimize adverse effects.

By requiring agencies to obtain information essential to an informed analysis in an EIS, Section 1502.22 furthers NEPA's core purposes. *See* 51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986) (regulation furthers NEPA policy goals and early NEPA case law); *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("The very purpose of NEPA's [EIS] requirement is . . . to obviate the need for . . . speculation by insuring that

---

[8] Plaintiffs have standing to challenge Federal Defendants' decision to affirm Lease Sale 193 for the same reasons and evidence set forth in their initial opening brief, Dkt. No. 82 at 33, which are incorporated by reference.

available data is gathered and analyzed prior to the implementation of the proposed action."). The "heart of the environmental impact statement" is its analysis of alternatives, 40 C.F.R. § 1502.14, and Section 1502.22 requires, where possible, agencies to secure information "essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22.

There are two components to NEPA's requirement that an EIS discuss alternatives. First, the EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public" and it shall "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14. To fulfill this mandate, an EIS must present the alternatives in manner that provides sufficient information to "make an informed comparison of the alternatives." *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1058 (9th Cir. 2011) (quotation and citation omitted); *see also All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) ("'[I]t is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and *possible alternatives,* a requirement that we have characterized as 'the linchpin of the entire impact statement.''") (quoting *Natural Res. Def. Council v. Callaway,* 524 F.2d 79, 92 (2d Cir. 1975)); *Dubois v. U.S. Dept. of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996) ("The discussion of environmental effects of alternatives . . . [requires] information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.") (quotation and citation omitted).

Second, an agency must develop alternatives to its projects that would minimize environmental impacts. "NEPA provides that federal agencies must, to the fullest extent possible, '[s]tudy, *develop*, and describe appropriate alternatives to recommended courses of action . . . .'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004) ((quoting and citing 42 U.S.C. § 4332(2)(E)) (emphasis added). An EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1; *see Se. Alaska Conservation Council*, 649 F.3d 1050, 1056 ("We have repeatedly recognized that if the agency fails to consider a viable or reasonable alternative, the EIS is inadequate.") (citing cases); *see also Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114

(D.C. Cir. 1971) (an EIS must study alternatives "to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit balance").

The determination required by Section 1502.22—whether information is "essential to a reasoned choice among alternatives"—thus necessarily centers around these two key NEPA obligations: comparison of the impacts of alternatives and formulation of reasonable alternatives to minimize impacts. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir. 1986) ("'[a]n EIS's *selection* and *discussion* of alternatives [must] foster[]informed decision-making and informed public participation.'") (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)) (emphasis added); *see also Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir. 1978) *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978) (NEPA's review of alternatives requirement encompasses "both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.") (emphasis in original).

B.    Critical decisions, requiring adequate information, are made at the lease sale stage.

Whether information is essential to a reasoned choice among alternatives depends on the nature of the decision being made. A lease sale decision under the OCSLA is the "critical stage" in which the government makes an "irreversible and irretrievable commitment of resources." *See Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009). Fundamentally it is a spatial decision—BOEM must decide which areas of the Chukchi Sea to open now for oil development activities and which areas to defer until the future. *See Mobil Oil & Producing Se., Inc. v. United States.*, 530 U.S. 604, 621 (2000) (leases are the "gateway" through which other oil exploration and development rights are exercised). It is also a consequential decision. After the lease is sold, BOEMRE's discretion under OCSLA to halt development for environmental reasons is significantly more constrained than at the lease sale stage. *Compare* 43 U.S.C. § 1344(a) (setting forth considerations that guide leasing decisions) *with id*. §§ 1334(a)(2), 1340(c)(1)(A), 1351(h)(1)(D) (setting forth the exacting standard governing cancellation of leases, disapproval of exploration plans, and disapproval of development plans). *See also Mobil Oil,* 530 U.S. at 620–21 (holding that a lease sale obligates the government not to "deviate significantly" from specific procedures established by law and explaining that "lease contracts g[i]ve the companies more than rights to obtain approvals. They

Case 1:08-cv-00004-RRB     Document 249     Filed 11/16/11     Page 23 of 54

also g[i]ve the companies rights to explore for, and to develop, oil."). A lessee may immediately conduct preliminary industrial activities without further BOEM approval, including certain types of seismic surveying and drilling. 30 C.F.R. § 250.207-.210. Of course, the government has authority to approve or disapprove subsequent activities, such as exploration drilling, on leases once they are issued, but its discretion is constrained. *See, e.g.,* 30 C.F.R. §§ 250.231-.235; 43 U.S.C. § 1340(c)(1) (proscribing the agency's ability to prevent exploration activities from proceeding on the leases); *see also Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 752 (9th Cir. 1975) (noting limited grounds for suspension of leases and remanding agency's suspension for failure to justify claim of potential risks that led to decision); *Sun Oil Co. v. United States*, 572 F.2d 786, 816 (Ct. Cl. 1978) (holding agency had not adequately justified threat of environmental harm to substantiate denial of platform installation permit on a lease); *Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (noting that each step in the OCSLA process represents a "bureaucratic commitment that will become progressively harder to undo the longer it continues"). The government can suspend or cancel leases, but only after making findings about the potential for harm to the environment, 43 U.S.C. § 1334(a); *Union Oil Co.*, 512 F.2d at 751-53; *Sun Oil Co.*, 572 F.2d at 816, and potentially subjecting itself to substantial liability to the lessees. 43 U.S.C. § 1334(a)(2)(C); *Amber Res. Co. v. United States*, 538 F.3d 1358, 1374-76 (Fed. Cir. 2008). In other words, once a lease sale decision is made, the same discretionary choice cannot be made later in the OCSLA process.

Accordingly, as this Court has held, information about how oil and gas activities will affect wildlife and other resources in the area under consideration for leasing is essential to the choice among alternatives. *See Vill. of False Pass v. Watt*, 565 F. Supp. 1123, 1151 (D. Alaska 1983) (stating "[i]n making an informed choice among the alternatives [of a lease sale] . . . consideration of the impacts of preliminary exploration and seismic activity on whales [is] essential"), *aff'd on other grounds sub nom Vill. of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984). In *Village of False Pass*, the Court addressed a lease sale in the Bering Sea. The EIS underlying the lease sale decision asserted that there was adequate evidence about effects of noise from the lease sale on whales to allow reasoned choice among the alternatives. *Village of False Pass v. Watt*, 565 F. Supp. at 1152. The Court rejected this conclusion, finding it to be unjustified in light of the EIS's acknowledgment that "limited" data on noise effects to whales rendered conclusions about the effects of seismic surveying "uncertain." *Id.* at 1151-53. As

described below, missing information about the Chukchi Sea similarly prevents BOEM from assessing the effects of Lease Sale 193, rendering its conclusions limited and uncertain, and precluding the agency from comparing and formulating alternatives. BOEM's conclusion that not a single piece of missing information is essential to the choice among alternatives is therefore arbitrary.

      C.      <u>BOEM is unable to compare and design alternatives in the EIS in light of missing information about the Chukchi Sea, and therefore its conclusion that none of the missing information is essential to the choice among alternatives is arbitrary.</u>

The EIS underlying the lease sale decision manifestly demonstrates that there is missing information that is essential to a reasoned choice among alternatives. As this Court recognized, the EIS contains "dozens if not hundreds" of acknowledgments of missing information. Dkt. No. 164 at 16-17; *see also* Ex. 24 at 28 (noting "hundreds of catalogued statements" acknowledging missing information). The EIS states repeatedly that basic ecological data about the Chukchi Sea is missing, making the effects of the lease sale uncertain or unknown for a wide variety of species that inhabit the Sea. *See supra* at 4. As described below, missing information about the Chukchi Sea, including data gaps for key species like bowhead whales, beluga, and walrus, prevents BOEM from "mak[ing] an informed comparison" of the lease sale alternatives, *Se. Alaska Conservation Council*, 649 F.3d at 1058, or formulating "alternatives which would avoid or minimize adverse impacts," 40 C.F.R. § 1502.1. BOEM's conclusion on remand that the missing information is not essential to a reasoned choice among alternatives is arbitrary in light of its inability in the EIS to compare and design alternatives because of missing information.

      *1.      Bowhead Whales*

BOEM lacks the information to describe in the Lease Sale 193 EIS important effects of oil and gas activities on bowhead whales—the lynchpin of Inupiat subsistence culture and a primary focus of BOEM's analysis in the EIS. As a result, the agency is unable to make an informed comparison of lease sale alternatives and formulate alternatives that would avoid or minimize adverse effects on the species.

One of the "principles" underlying the EIS's analysis of potential effects to bowhead whales is that "'key habitat types' such as those used for calving, feeding, breeding, and resting; and those portions of the migratory pathway where the movements of the whales are constrained

(e.g., the spring lead and polynya systems used by bowhead whales) merit special consideration." Ex. 3 at 64. This is because "[w]hales do not use all portions of their range in random fashion" and "impacts in all portions of the range are not of equal importance." *Id*. at 65-66. Thus, the EIS states that "to the extent information exists" it has "highlighted potential effects that could affect the use of" key areas by whales. *Id*. at 66.

However, the EIS acknowledges that information about bowhead whale habitat use in the Chukchi Sea is missing. *See supra* at 4. Accordingly, BOEM cannot fully assess how disturbance from lease sale activities may affect bowhead whales. *See supra* at 4-5. The EIS states that there are "[a]reas and [s]ituations [w]here [p]otential [i]mpacts are [l]ikely to be [g]reater than [t]ypical." Ex. 3 at 69. One of these situations is if disturbance occurred "in areas where large aggregations of whales were present." *Id*. at 70. The EIS states that these aggregations could occur in summer or autumn, *id*. at 71, but BOEM lacks the information to determine where the aggregations occur. *Id*. at 69 (current data unavailable to typify summer use of Chukchi Sea); *id*. at 71 (insufficient data to determine fall migration paths and how intensively bowheads feed during fall migration through the Chukchi Sea). Thus, it can only speculate about the potential for these "greater than typical," *id*. at 69, effects to occur, stating that they might occur, for example, "if bowheads use the Chukchi Sea in the summer more than is commonly assumed," or if whales feed and aggregate during their fall migration through the Chukchi Sea, which is unknown. *Id*. at 71.

Missing information similarly precludes full assessment of the effects of a large oil spill on bowhead whales. The original EIS identifies two "[e]xtraordinary [c]ircumstances" in which oil spills could have particularly severe effects on bowhead whales. Ex. 3 at 77 (noting instances when "bowheads are at particular risk in the event of a large oil spill"). One of those circumstances is "if a large spill of fresh oil . . . contacted one or more large aggregation of bowheads especially (but not exclusively) if such an aggregation contained large numbers of females and calves." *Id*. There is some historical evidence of such aggregations in the Chukchi Sea, but "the factors associated with the presence of such groups are not yet clear." *Id*. "Variability in the distribution of bowhead whales in the Beaufort Sea over time and among years, and lack of recent data on bowhead seasonal distribution and abundance in the Chukchi Sea makes attempts to quantitatively model the numbers of whales that might be contacted by oil problematic." *Id*. Accordingly, BOEM is left to speculate about effects, stating "*[p]robably* the

greatest potential for a large number of whales to contact spilled oil would be if there was an oil spill in the spring lead system, or if an oil spill occurred when whales were aggregating in large feeding groups." *Id*. at 78 (emphasis added).

As a result of this missing information, BOEM cannot make an informed comparison of alternatives in the EIS. BOEM concludes that, because of missing information, differences in effects from lease sale activity noise to bowhead whales among the three coastal deferral alternatives are "difficult to quantify." Ex. 3 at 98. BOEM is left to observe generally that different deferral zones would "somewhat reduce[] the likelihood of spring bowhead whale encounters with industrial noise," because they "would move sources of industrial noise farther offshore and away from the spring lead system." *Id*.; *id.* at 100 (same). With respect to spills, BOEM can only say that, because the different alternatives move source of oil spills further from the spring lead system, they allow "more time to respond to the [oil] spill" because "any spill that would occur would take longer to reach and enter the spring-migratory route." *Id*. at 98; *id.* at 100.

Missing information also precludes BOEM from designing alternatives that would avoid or minimize potential adverse effects to bowhead whales. The purpose of the alternatives analyzed in the EIS is to provide protection to wildlife that could be affected by oil and gas activities in the deferral areas. *See supra* at 3-4. Specifically, the deferrals were intended to include those areas in the Chukchi Sea where bowheads "are concentrated and particularly vulnerable to disturbance, such as calving areas, molting and brooding areas, and feeding areas." Ex. 3 at 23. The alternatives developed by BOEM to date attempt to do so by distancing lease sale industrial activity from one area of the Chukchi Sea—the spring coastal migration corridor—that BOEM believes is important to bowhead whales, *id*. at 98; *id.* at 100, and where industrial activities could certainly have significant effects, *id*. at 70 (stating that "[i]t is clear that if 2D/3D seismic surveys impacted areas of the spring lead and polynya system during the spring migration, impacts could potentially be biologically significant"); *id*. at 73 (stating "[d]rilling operations in the spring lead system and polynya system during the spring bowhead migration has a fairly high potential of affecting threatened and endangered whales").[9] BOEM itself

---

[9] There is even uncertainty about the location of this sensitive area around which the alternatives are designed. *See* Ex. 3 at 73 (stating "the general location of the spring lead system is based on relatively limited survey data and is not well defined"); *id*. at 70 (same).

acknowledges in the EIS that there is at least one other area where lease sale activity could have serious, even "extraordinary," effects on bowhead whales—namely in the areas in which fall migrating whales aggregate to rest and feed, particularly if the areas attract large numbers of mothers and calves. *See supra* 18-19. The EIS stated that "marine 'protected areas' . . . where whales concentrate their feeding activities . . . would greatly help to mitigate potential impacts to cetaceans from human activities." Ex. 3 at 90. Similarly, EPA noted that there might be other locations important to bowhead whales and other species. *Id*. at 113 (EPA comment noting that it is unclear if the coastal deferral alternatives represent a reasonable range of alternatives); *id*. at 22 (EPA suggesting that BOEM should "consider removal of additional areas with sensitive fish and wildlife . . . resources, and at a minimum, deferring areas until further research and studies are conducted to ensure development can occur without significant impacts to critical resources"). But without data to identify these areas, BOEM cannot and did not formulate alternatives that minimize effects to bowheads by deferring those areas from leasing, as it did with the better-understood spring lead system.

The EIS thus demonstrates that BOEM lacks information it itself describes as fundamentally important to the analysis of the lease sale's effects to bowhead whales. In the face of that missing information, it can neither conduct an informed comparison of alternatives nor formulate alternatives that would minimize adverse effects to the species, as NEPA requires. In light of this inability to compare and design alternatives in the EIS, BOEM's conclusion on remand that there is no information essential to the reasoned choice among alternatives is arbitrary.

### 2. *Beluga Whales*

The EIS's analysis of beluga whales suffers from the same flaw—missing information prevents BOEM from describing the lease sale's effects, and therefore it cannot meet NEPA's obligation to make an informed comparison among alternatives and formulate alternatives that minimize adverse effects. Again the EIS identifies information that is key to the lease sale decision. It states that "[u]nderstanding the distribution and timing of movements of belugas is important for planning lease sales in the Chukchi Sea and designing possible mitigation measures." Ex. 3 at 95. But it acknowledges that much of this information is missing, particularly for late summer and fall—the open-water period when lease sale activities like seismic surveying and exploration drilling would take place. *Id*. at 50. Without this information,

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 28 of 54

BOEM cannot analyze the effects on the lease sale on beluga whales. For example, the EIS states that "[a]dditional analysis must then be considered on how seismic activity may affect these concentrations of whales, especially when they are engaged in important biological behaviors such as feeding or molting." *Id*. at 84. It claims such analysis is contained in an earlier environmental assessment by BOEM of seismic surveying for the year 2006 that has been summarized in the Lease Sale 193 EIS, *id.*, but the earlier analysis also concludes that "[a]dditional analysis must then be considered on how seismic activity . . . may affect these concentrations of whales, especially when they are engaged in important biological behaviors such as feeding or molting." Ex. 2 at 11.[10] It can only offer general hypotheses about the effects of the lease sale on cetaceans generally. For example, it states "[i]f noise causes disruption of important behaviors such as mating, nursing, or feeding, or if animals are scared away from important habitat over long periods of time, then these impacts [of noise and disturbance from lease sale activities] could affect the long-term survival of the population." Ex. 3 at 88; *see also id*. at 89 (evidence of whales changing behavior and lost feeding opportunities due to vessel disturbance "suggest" that "avoiding impacts to important feeding areas would provide considerable benefits to cetaceans"); *id*. at 90 (noting that "marine 'protected areas' could play a role in reducing 'take' of cetaceans, as long as these areas are located where whales concentrate their feeding activities" and "[s]uch areas would greatly help to mitigate potential impacts to cetaceans from human activities"). Indeed, the EIS does not offer a conclusion at all about the potential effects of noise and disturbance from lease sale exploration and development on beluga whales. Rather, it states generally that because of missing information, BOEM is "unable to determine at this time if significant impacts would or would not occur to marine mammal populations in the project area as a result of the Proposed Action." *See id*. at 79 ; *see also id*. at 89-90 (end of discussion of exploration and development noise effects—no conclusion about effects).

---

[10] The earlier analysis of seismic surveying in 2006 concludes that although "the potential exists, without appropriate mitigation, for seismic activities to displace whales from these areas," the short time frame for seismic activity for 2006 and the mitigation measures lead the agency to conclude that 'seismic activities at these areas potentially would result in an adverse but not significant impacts to beluga whales." Ex. 2 at 12. For a lease sale, which encompasses many years of activity, the effects cannot be so dismissed, nor does the Lease Sale 193 EIS do so.

Similarly, missing information—and specifically missing information about habitat use—renders conclusions about effects of oil spills on beluga whales uncertain. The EIS concludes that an oil spill could have significant effects on beluga whales. Ex. 3 at 79. But it acknowledges that "[t]here is uncertainty about effects on cetaceans in the event of a large spill," because "there are, in some years and in some locations, relatively large aggregations of feeding and molting whales within the proposed lease-sale area" and "[i]f a large amount of fresh oil contacted a significant portion of such an aggregation, effects potentially could be greater than typically would be assumed" and population level effects could not be ruled out if a large number of females and newborn or very young calves were contacted. *Id*. at 94 Without knowing the locations and timing of these aggregations of beluga whales, BOEM cannot make rational, or even consistent, conclusions about the effects of an oil spill on the species. *Compare id*. at 79 ("significant effects could occur to belugas . . . in the event of a large oil spill") *with id*. at 94 (effects uncertain but "available information indicates it is unlikely that whales would be likely to suffer significant population-level adverse effects").

The EIS's inability to describe effects on beluga whales because of missing information prevents BOEM from making an informed comparison of different lease sale alternatives. Indeed, BOEM does not attempt to compare the different effects to beluga specifically under each alternative. Instead, it discusses those differences at the level of all marine mammals as a group. *See* Ex. 3 at 99; *see also id.* at 101 (same). Even at this general level, the analysis is cursory, *id*. at 99; *id*. at 101 ("[t]he primary benefit of this corridor is that it would move sources of potential adverse effects farther away from important coastal habitats"), at times conjectural, *id*. at 24a, 27 ("The increased distance between offshore development and coastal habitats also would *conceivably* decrease the percent chance of spilled oil contact with marine mammals . . . .") (emphasis added), and completely omits the issue of offshore aggregations identified by BOEM as a concern.

The lack of data about beluga habitat use in the late summer and fall also precludes BOEM from developing alternatives that might minimize effects to beluga whales. Each of BOEM's alternatives defer different coastal areas, potentially minimizing effects to beluga's coastal habitat areas. But, as EPA noted in comments to the EIS, *see supra*, without information about important offshore beluga habitat, BOEM cannot and did not formulate alternatives that

offer varying levels of protection to beluga whales by deferring those areas from leasing and thereby minimize effects on the species.

As it does for bowhead whales, the EIS demonstrates that BOEM lacks information it acknowledges is central to the analysis of the lease sale's effects on beluga whales. As a result it cannot compare or design alternatives that would minimize adverse effects, and therefore its conclusion on remand that there is no missing information essential to the reasoned choice among alternatives is arbitrary.

### 3. Other Species

The EIS's analysis of other species suffers from similar flaws. Missing information about walrus, marine and coastal birds, and fish, for example, precludes BOEM from comparing and designing alternatives that would reduce adverse impacts to walrus, as NEPA requires, and therefore its conclusion in the SEIS that there is no missing information that is essential to a reasoned choice among alternatives is arbitrary.

Missing information precludes comparison of how different alternatives affect walrus. The EIS does not compare the effects among different alternatives to walrus specifically, but only at the broad level of marine mammals generally. Ex. 3 at 99; *id.* at 101. Even at this level the comparison is limited, because information about marine mammal offshore habitat use and distribution is missing. *Id.* at 99 (comparing alternatives and noting uncertainty due to missing data on offshore habitat use); *id.* at 101 (same).

Without data on offshore walrus habitat use, BOEM is also precluded from formulating alternatives that would minimize effects to walrus. The EIS describes the potential for lease sale activities in important habitat areas to have substantial adverse effects on walrus. Ex. 3 at 87 ("[i]f disturbance causes walruses to abandon preferred feeding areas or interferes with calf-rearing, resting, or other activities, then the walrus population could be negatively affected"); *id.* at 81 ("[t]he potential for a given sound to cause adverse effects to Pacific walruses is expected to be habitat dependent"); *id.* at 87 ("[p]otential impacts to female walruses and dependent calves are a major concern and merit special consideration"); *id.* at 90-91 (noting oil spill could have serious effects to walrus, particularly if it contacts areas where they aggregate). It describes generally the importance to the species of offshore habitat in the Chukchi Sea during summer, noting that the walrus aggregate on the ice in offshore areas. *Id.* at 48; *id.* (noting "[b]y July, large groups of up to several thousand walruses can be found along the edge of the pack ice

between Icy Cape and Point Barrow.").  But it concludes, as it does for all marine mammals, that it cannot assess potential effects in these offshore areas—and therefore formulate alternatives that would minimize those effects—without more information.  *Id*. at 99; *id*. at 101 ("because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas").

For marine and coastal birds, the EIS states that effects of birds may be greatest in important habitat areas, but "[d]espite the importance of [coastal habitat areas], as well as the entire Chukchi Sea within the proposed lease-sale area, little recent site-specific data are available on habitat-use patterns, routes, and timing to assess impacts."  Ex. 3 at 79.  "For many species, the most recent data are between 15 and 30 years old, making accurate analysis difficult."  *Id.*  As a result, BOEM cannot meet its obligation to make an informed comparison among lease sale alternatives.  It can assess differences among alternatives only generally, stating that "[t]he primary benefit of [the coastal deferral corridor] is that it would move sources of potential adverse effects further away from important bird habitats" and it is left to speculate that the "increased distance between offshore development and coastal bird habitats conceivably would decrease the percent chance of spilled oil contact, increase weathering of spilled oil prior to contact, and increase available spill-response time."  *Id*. at 99; *id*. at 101 (similar).  Further, it must concede that even this general comparison of effects could be inaccurate—"[b]ecause of this long data gap, it is unknown if population abundance or distribution of many species have changed."  *Id*. at 79.  In the absence of recent information about the location of important habitat areas for marine and coastal birds, BOEM cannot make an informed comparison among alternatives nor can it formulate alternatives that might avoid or minimize effects to birds by removing those habitats from the lease sale.

Data on Chukchi Sea fish are even sparser.  BOEM barely knows what species inhabit the lease sale area, let alone understands what different habitat areas are important to the species.  Ex. 3 at 33-34.  As a result, it cannot make an informed comparison among alternatives in the EIS, but can only offer the same general observations about different alternatives as it does for marine birds.  *Id*. at 98 (noting "[t]he primary benefit of [the coastal deferral corridor] is that it would move sources of potential adverse effects further away from important fish habitats" and the "increased distance between offshore development and coastal fish habitats would conceivably decrease the percent chance of spilled oil contact with nearshore fish habitats,

increase weathering of spilled oil prior to contact, and increase available spill-response time.”); *id*. at 99a (similar).  Further, it must concede that it knows so little that effects—even effects as dramatic as extinction—might go unnoticed.  *Id*. at 64 (“[g]iven the lack of contemporary abundance and distribution information, effects on rare or unique species (including potential extirpation) could occur, but it would likely go unnoticed or undetected”).  In the absence of recent information about fish that inhabit the Chukchi Sea and the areas that are important to those species, BOEM cannot make an informed comparison of alternatives or formulate alternatives that would minimize adverse effects to fish by removing important habitat areas from the lease sale.

The Court, of course, need not, indeed cannot in the first instance, decide what information is essential to the lease sale decision.  The question to be decided in this case is only whether the agency has arbitrarily concluded that *none* of the missing information is essential.  As these examples show, BOEM cannot compare and design alternatives that minimize effects in the EIS because of missing information, and therefore the agency’s conclusion on remand that there is no missing information essential to a reasoned choice among alternatives is arbitrary.

> D.    BOEM’s five boiler-plate explanations in the SEIS appendix conflict with the EIS and fail to justify BOEM’s “not essential” conclusion.

As described above, NEPA requires an informed comparison of lease sale alternatives and formulation of alternatives that would avoid or minimize adverse effects to the environment, but critical missing information about the Chukchi Sea renders BOEM unable to compare or design alternatives in the EIS.  Yet BOEM concludes on remand that not a single piece of missing information about the Chukchi Sea is essential to a reasoned choice among alternatives.  The conclusion is supported solely by one or more of five standard statements which in Appendix A of the SEIS BOEM applied to each of the EIS’s acknowledgments of missing information.  Ex. 24 at 27-30.  One, an unsupported assertion that is inconsistent with BOEM’s inability in the EIS to compare and formulate alternatives, is that BOEM has sufficient information despite the data gaps, and the four others are flawed excuses about why the agency can proceed in the absence of the information.  These statements, offered by BOEM to “shor[e] up [the] EIS for the 2008 lease sale,” Ex. 16 at 1, do not justify the agency’s conclusion in light of its inability due to missing information to compare and design alternatives in the EIS.

The first and most frequently used statement is that, notwithstanding the data gaps, there is "sufficient information to support sound scientific judgments and reasoned managerial decisions", so missing information is not essential. Ex. 24 at 29. But as the EIS itself demonstrates, missing information means BOEM is unable to make informed comparisons among alternatives and design alternatives that avoid or minimize adverse effects. BOEM cannot, therefore, based on the EIS reasonably conclude no missing information is essential to a reasoned choice among alternatives. *See supra* at 17-25. The assertion in the SEIS, repeated regularly and never with support, that BOEM has sufficient information, cannot be squared with the EIS's analysis. BOEM does not anywhere in the SEIS appendix A for any of the data gaps describe the information it has and which it believes to be sufficient and how the information allows it to choose among and design alternatives in the face of data gaps. As a headquarters' staff member who reviewed the SEIS stated, "you can't say information is unknown and then turn right around and say . . . 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions.'" Ex. 14 at 2; *see supra* at 7. But this is just what the assertion in the Appendix amounts to. When the USGS report published during the remand process stated that missing information about the Arctic Ocean is a "major constraint[] to a defensible science framework for critical Arctic decision making," Ex. 22 at 23, BOEM dismissed the report. *See supra* at 8. Without supportive analysis on each key issue, BOEM's bare assertion that it has the information it needs for the decision conflicts with the analysis in the EIS and is therefore arbitrary. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

BOEM's other four statements each offer a different excuse—none of them effective— explaining why BOEM believes it can proceed without the missing information. First, BOEM states for many data gaps that missing information is not essential because it can be obtained at later stages of the OCLSA offshore oil and gas development process. Ex. 24 at 29. But this statement ignores the nature of the decision being made at the lease sale stage. At the lease sale stage, the Federal Defendants are deciding what areas to open now for oil and gas activities. *See supra* 15-17. Before a lease sale, they have broad discretion to decide if, when, where, and how oil and gas development will proceed in an area. *Id.* After a lease sale, their decisions are much more constrained—they can no longer exercise their full discretion to defer oil and gas activities in an area. *Id.* The fact that information can be obtained in the future to inform later decisions does not address what is essential to the lease sale decision being made now. In framing

alternatives for the lease sale, BOEM recognizes the spatial and consequential nature of the lease sale decision in that it creates alternatives that defer leasing from those areas it believes provide important habitat for various Chukchi Sea species with the intent of thereby minimizing adverse effects to the species. *See supra* 3-4. But BOEM's ability to frame and compare alternatives that might minimize impacts is clearly constrained now by missing information. Once the lease sale choice is made, it cannot be made again or differently at later stages of the OCSLA process. Thus, BOEM's statement in the SEIS that it can obtain information later fails to meet the agency's obligation to identify information essential to the reasoned choice among alternatives at the lease sale stage.

Second, BOEM states that some of the missing information is not essential because other environmental laws and regulations would preclude significant adverse effects. Ex. 24 at 29. This statement misapprehends the agency's obligations under NEPA. An agency may not rely on future permitting processes under other environmental laws to avoid analyzing the impacts of an activity under NEPA. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (holding EIS violated NEPA because it failed to analyze a project's air quality impacts in reliance on separate Clean Air Act permitting process); *S. O. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1479-80 (9th Cir. 1983) (assessing a NEPA analysis for an herbicide spraying project and rejecting argument that agency could avoid preparing a worst case analysis under pre-amendment Section 1502.22 on the basis that the herbicides were also subject to registration under FIFRA).

Third, for oil spill effects, BOEM consistently states that missing information is not essential to the lease sale decision because adverse effects are presumed significant. Ex. 24 at 29. But NEPA requires agencies to make informed comparisons among alternatives and formulate alternatives that would minimize adverse effects. BOEM's assumption that adverse effects are significant avoids its obligation to ensure that it designs and compares alternatives that might reduce effects. For example, the EIS acknowledges that there may be areas where "bowheads are at particular risk in the event of a large oil spill," Ex. 3 at 77, but it cannot identify those areas, because "the factors associated with the presence of [large aggregations of whales] are not yet clear," *id*. The EIS notes that oil spills contacting aggregations of other marine mammals, such as walrus females and calves in coastal areas, would result in population level impacts. *Id*. at 90-91. It notes that deferring areas where species aggregate could

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                        27
Case No. F.08-cv-00004-RRB
Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 35 of 54

conceivably reduce the effects of an oil spill to marine mammals, including bowhead whales, by increasing the distance between oil drilling and important habitat areas. *Id.* at 98-99; *id.* at 100-101. However, "because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas." *Id.* at 99. In other words, with some of the missing information, BOEM could potentially develop an alternative with fewer effects in the event of a spill. The excuse that significant effects are presumed avoids NEPA's requirement to compare and formulate alternatives which *reduce* effects. It does not justify BOEM's conclusion that there is no information missing that is essential to the choice among lease sale alternatives.

Fourth, BOEM states that missing information is not essential to a reasoned choice among lease sale alternatives because effects among alternatives will be nearly identical. Ex. 24 at 29. This excuse contradicts the EIS, which concludes, albeit speculatively, because of missing data, that alternatives may be different. *Compare id.* at 31 ("Neither the probability nor severity of [oil spill] impacts [to cetaceans] would vary amongst any of the action alternatives.") *with* Ex. 3 at 98-99 (noting oil spill effects under different alternatives could conceivably differ); *id.* at 100-101 (same). It also fails for the same reason as the third excuse, because it avoids the NEPA obligation to compare and design alternatives that minimize effects. As the examples above demonstrate, if some of the missing information were available, the agency could assess the potential for differences in effects among alternatives and formulate alternatives minimize those effects. The assumption that effects among existing alternatives are common thus does not justify a conclusion that none of the missing information is essential.

BOEM's five boiler-plate explanations do not justify its conclusion that not a single piece of missing information acknowledged in the EIS is essential to the choice among alternatives in light of the EIS's inability to make informed comparisons among alternatives and design alternatives that would avoid or minimize adverse effects. The Federal Defendants' affirmation of Lease Sale 193 is thus predicated on an unlawful NEPA analysis and is arbitrary. *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806 (9th Cir.2005) (agency must "state a rational connection between the facts found and the decision made") (citation omitted).

## II. BOEM VIOLATED NEPA BY REFUSING TO ANALYZE THE CONTRIBUTION TO CLIMATE CHANGE FROM BURNING THE OIL AND GAS FORECAST TO BE PRODUCED FROM THE LEASE SALE

NEPA does not compel the most environmentally protective decision, but it does require "that agency action is 'fully informed and well considered.'" *Natural Res. Def. Council*, 421 F.3d at 811 (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558 (1978)). BOEM must confront the full range of environmental harms that foreseeably flow from its lease sale decision if it is to make a fully informed decision. Here, BOEM has not made a fully informed decision because it has refused to analyze a serious and salient consequence of oil and gas production—the contribution to climate change from burning the oil and gas.

Global climate change is among the most serious problems facing our country and the world. As the Ninth Circuit recently summarized:

> Global warming has already affected plants, animals, and ecosystems around the world. Some scientists predict that on the basis of mid-range climate-warming scenarios for 2050, that 15-37% of species in our sample of regions and taxa will be committed to extinction. In addition, there will be serious consequences for human health, including the spread of infectious and respiratory diseases, if worldwide emissions continue on current trajectories. . . . Several studies also show that climate change may be non-linear, meaning that there are positive feedback mechanisms that may push global warming past a dangerous threshold (the "tipping point").

*Ctr. for Biological Diversity*, 538 F.3d at 1190-91 (internal citations and quotation marks omitted). There have already been severe impacts in the Arctic due to warming. *Id*. at 1190; Ex. 19 at 18.

BOEM concedes that climate change is a reasonably foreseeable consequence of increasing greenhouse gas emissions. Ex. 3 at 52. Emissions are projected to increase over the course of this century, and those increases are "virtually certain to be mainly due to fossil-fuel emissions." *Ctr. for Biological Diversity*, 538 F.3d at 1190. BOEM's own production forecasts, in combination with publicly available data on patterns of oil and gas consumption, suggest that

Lease Sale 193 may cause a large increase in greenhouse gas emissions—for years of peak production, it could be 31 million tons per year.[11] *See supra* at 11.

BOEM has refused to estimate these emissions or analyze their contribution to climate change. BOEM formerly justified this omission by concluding that oil consumption, and therefore greenhouse gas emissions, "likely would not change" in response to increased production from this lease sale. Ex. 3 at 105. But now, after remand, BOEMRE has taken a new direction and states that it cannot determine the effect of increased production on consumption and greenhouse gas emissions. Ex. 24 at 20-21. BOEM proffers several new justifications for its decision to forego analysis of these climate change impacts, but none of them withstand scrutiny.

A. Greenhouse gas emissions from combustion of oil and gas and resulting global climate change are reasonably foreseeable indirect and cumulative effects of this lease sale.

Greenhouse gas emissions from combustion of oil and gas are an indirect effect of this lease sale. "Council on Environmental Quality regulations define indirect effects as those 'caused by the action, [and] later in time or further removed in distance, [but] still reasonably

---

[11] Draft guidance from the Council on Environmental Quality (CEQ) identifies 25 *thousand* tons of annual emissions as an indicator of environmental significance under NEPA for federal actions that will generate greenhouse gas emissions directly. Council on Environmental Quality, Memorandum for Heads of Federal Departments and Agencies re: Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions at 3 (February 18, 2010), *available at* http://ceq.hss.doe.gov/nepa/regs/Consideration_of_Effects_of_GHG_Draft_NEPA_Guidance_FINAL_02182010.pdf; Ex. 30 at 13. CEQ has not offered guidance applicable to land and resource management decisions, but this draft guidance responds to current science on climate change and provides a useful point of reference.

Recent EPA rules also suggest that emissions in this range would be significant. Under the Final Rule on Mandatory Reporting of Greenhouse Gases, emissions must be reported when they exceed *25 thousand* tons per year. 74 Fed Reg. 56,260, 56,264 (Oct. 30, 2009) (codified at 40 C.F.R. part 86 *et seq*). Petroleum producers are required to calculate and report emissions from the end use of their oil output. *Id.* at 56,272. Under EPA's Final Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31,514 (June 3, 2010) (codified at 40 CFR parts 51, 52, 70, & 71), annual emissions greater than *100 thousand* tons trigger technology requirements under the Prevention of Significant Deterioration program. *Id.* at 31,516, 31,520.

BOEM has not considered whether emissions in the range suggested by Plaintiffs' calculations—amounting to more than *one thousand* times the threshold proposed by CEQ and adopted by EPA for reporting—would be significant.

---

*Native Village of Point Hope, et al., v. Salazar, et al.,*
Case No. 1:08-cv-00004-RRB

30

foreseeable.'" *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 725 (9th Cir. 2009) (quoting 40 C.F.R. § 1508.8(b)) (alterations in original). "An agency must consider them." *Id.* NEPA requires analysis of these greenhouse gas emissions because, as explained below, they are both reasonably foreseeable and caused by this lease sale.

For the same reasons, NEPA also requires that BOEM analyze, as cumulative effects, the contribution of these emissions to global climate change in combination with "other past, present, and reasonably foreseeable future actions." *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (quoting 40 C.F.R. 1508.7). "The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity*, 538 F.3d at 1217. This consideration of climate change "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts." *See Klamath-Siskiyou Wildlands*, 387 F.3d at 994 (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 361 F.3d 1108, 1128 (9th Cir. 2004)). Only after giving full consideration to the contribution of this oil and gas lease to national and global greenhouse gas emissions, in the context of increasing risk of grave and irreversible environmental harm, can BOEM make the "fully informed and well considered" decision that NEPA requires. *Natural Res. Def. Council*, 421 F.3d at 811.

> 1.    *Greenhouse gas emissions from burning oil and gas forecast to be produced from this lease sale are reasonably foreseeable.*

In the Ninth Circuit, effects caused by an action are reasonably foreseeable unless they are "too 'remote and highly speculative' to warrant consideration." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1030 (9th Cir. 2006) (quoting *No GWEN Alliance of Lane Cnty., Inc. v. Aldridge,* 855 F.2d 1380, 1385 (9th Cir.1988)). For the reasons that follow, greenhouse gas emissions from combustion of oil and gas produced on this lease are reasonably foreseeable.

> a.    Quantifying the oil and gas to be produced from the lease sale is not unreasonably speculative.

BOEM asserts that greenhouse gas emissions from burning oil and gas produced from this lease cannot be estimated because productive capacity is unknown. Ex. 24 at 20. But BOEM has itself adopted a forecast of one billion barrels of oil for its NEPA analysis. BOEM describes this production scenario in a section of the EIS entitled "Reasonably Foreseeable

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                                                31
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 39 of 54

Future Development/Production (within the next 15-20 years)." Ex. 3 at 104. BOEM states that it uses the quantity of one billion barrels "to provide a common basis for the analysis of potential environmental impacts," Ex. 24 at 25, and in fact uses this projection to evaluate the lease sale's expected contribution to tax revenue and employment. Ex. 3 at 96-97. BOEM nowhere explains why its production estimates are reliable for analysis of environmental impacts of all types and for economic benefits but not for the impacts of greenhouse gas emissions. The conclusion is arbitrary.[12]

This assertion that productive capacity is unknown is also contradicted by the record, which contains extensive discussion of petroleum and natural gas reserve estimates and references several analyses of Chukchi Sea geology prepared by BOEM and other agencies. *E.g.*, Ex. 3 at 61 (citing BOEM's own 2006 petroleum assessment for the Chukchi Sea and natural gas reserve estimates by the U.S. Geological Survey); Ex. 24 at 23-24 & Fig. 12. Indeed, OCSLA requires that BOEM produce such forecasts in administering outer continental shelf (OCS) resources. *See*, *e.g.*, 43 U.S.C. 1352(b)(1) ("Data [from the oil and gas information program] . . . shall be processed, analyzed and interpreted by the Secretary for purposes of carrying out his duties under this subchapter."); *id.* § 1344(a)(2)(A) ("[E]xploration, development, and production . . . shall be based on . . . [the] geological . . . characteristics of [the region].").

Moreover, analysis of environmental impacts is not excused in the face of uncertainty. Rather, NEPA requires that agencies faced with uncertainty "evaluat[e] . . . impacts based upon theoretical approaches . . . generally accepted in the scientific community." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989) (quoting 40 C.F.R. § 1502.22(b)). *See also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549-50 (8th Cir. 2003) (applying 40 C.F.R. 1502.22(b) to require agency to consider the climate change impacts of expanded coal consumption resulting from a new train line, despite uncertainty about the size of the contribution). As Plaintiffs pointed out in comments, citing an interagency reference guide prepared by the Bureau of Land Management, the Fish and Wildlife Service, the EPA, the National Park Service, and the Forest Service, agencies managing oil and gas resources routinely

---

[12] Plaintiffs, in Count III of the Second Amended and Supplemental Complaint (Dkt. No. 58), dispute the validity of this one billion barrel scenario as not fairly presenting the full potential impacts of the decision, but regardless BOEM's failure to use its own projection on this issue is arbitrary.

employ estimates of future production to guide analysis of environmental impacts under NEPA. Ex. 30 at 14 (citing Ex. 40 at 9, 11, Interagency Reference Guide: Reasonably Foreseeable Development Scenarios And Cumulative Effects Analysis For Oil and Gas Activities On Federal Lands In the Greater Rocky Mountain Region at 10, 12 (2003)).

BOEM has forecast for purposes of analysis that one billion barrels of oil and 2.25 trillion cubic feet of natural gas will be produced as a result of this lease sale. It is arbitrary and contrary to NEPA for the agency simultaneously to plead ignorance in order to avoid analysis of greenhouse gas emissions.

      b.      The combustion of a significant portion of the oil and gas forecast to be produced is a reasonably foreseeable consequence of the lease sale because it is the lease sale's objective.

It is reasonably foreseeable that oil and gas forecast to be produced on these leases will be burned as fuel. BOEM's contrary conclusion is inconsistent with BOEM's own declaration of purpose in carrying out the action and with OCSLA. Both indicate that the ultimate objective of this lease sale is to develop energy supplies. The EIS cites the goal of "increased domestic energy supply" in defining the "purpose and need" of the lease sale. Ex. 3 at 17. *See also id.* ("[OCSLA's] purposes generally pertain to recognizing national energy needs . . . and addressing them by developing OCS oil and gas resources . . . ."). OCSLA directs the Secretary of Interior to schedule leasing in the way that, among other considerations, "will best meet national energy needs." 43 U.S.C. § 1344(a). BOEMRE's action is premised on an assumption that OCS oil and gas production will contribute to the national energy supply. *See supra* at 9. This is plainly inconsistent with a conclusion that use of this oil and gas as energy is unforeseeable. *See San Luis Obispo*, 449 F.3d at 1030–31 & n.8 (holding that the conclusion that terrorist attacks were unforeseeable was unreasonable because the agency took various actions to address that risk). Combustion of oil and gas is a far cry from the situation in which an agency is asked to evaluate some unintended, incidental, or highly unlikely consequence of carrying out an action. *Compare id.* (terrorist attack was a foreseeable consequence) *with No GWEN*, 855 F.2d at 1385–86 (nuclear war was not a foreseeable consequence). If an action's stated objective is not foreseeable under NEPA, then few consequences are.

2. *Uncertainty about the response of oil and gas markets and the percent of oil and gas burned as energy does not excuse the failure to analyze these emissions.*

BOEM asserts that it need not analyze emissions because it cannot estimate how much produced oil and gas will be consumed or predict what form that consumption will take. Ex. 24 at 20-21. BOEM states that no reliable methodologies exist for doing so. *Id.* at 23. It is arbitrary for BOEM to conclude that no adequate methodologies exist when it has not considered methodologies employed by recent federal environmental analyses, addressed the methodologies it used itself in other parts of the EIS, or explained why existing data on patterns of oil and gas consumption are unreliable.

BOEM first asserts that no reliable methodologies exist to estimate how much of the oil and gas forecast to be produced will actually be consumed. Ex. 24 at 20. But two recent environmental impact statements prepared by federal agencies and brought to BOEM's attention by commenters, Ex. 30 at 13, employ modes of economic analysis that BOEMRE may be able to use to model the effect of this lease sale on aggregate oil and gas consumption.[13] In an April 2011 draft EIS, the Department of State employed modeling to estimate the Keystone XL Pipeline project's impact on oil consumption and net greenhouse gas emissions. Ex. 38 at 2-3. Likewise, the EPA and NHTSA modeled the impact on world oil markets of their Proposed Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards. Ex. 37 at 7, 12-16. In addition, BOEM's EIS suggests that BOEM in the past has used methodologies that would allow it to estimate the effect of these new supplies on oil consumption. Ex. 3 at 62a (summarizing the conclusions of BOEM's internal analysis in *Energy Alternatives and the Environment* (2001)); Ex. 35 at 11-12 (predicting that each barrel of oil produced from the OCS will reduce conservation, fuel switching, and imports,

---

[13] Plaintiffs provided these studies to illustrate that relevant methodologies exist, not to endorse their modeling or conclusions.

and estimating the magnitude of those impacts per 100 barrels produced).[14]  In light of BOEM's own analysis and the recent analyses brought to its attention by commenters, BOEM cannot simply assert that no methodologies exist.  BOEM must, at the very least, consider these analyses and explain why these and other forecasting methods are inadequate to estimate the response of oil and gas markets to new supply from this lease sale.  The agency's failure to do so is arbitrary.

BOEM also asserts that it cannot determine what portion of oil and gas produced will be put to non-energy uses.  Ex. 24 at 20-21.  Specifically, BOEM notes that end users do not fall within its regulatory authority.  *Id*. at 21  Whether this is intended as a legal justification or a factual one, BOEM misses the mark.  The Ninth Circuit rejects agency regulatory authority as a limit on the effects that an agency must analyze under NEPA.  *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1122 (9th Cir. 2005) ("[W]hile it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility."); *S. Fork Band Council*, 588 F.3d at 726 (requiring agency to analyze mercury emissions that would be released during off-site processing of ore before permitting a mine expansion).  As a factual matter, there is no reason why BOEM's lack of regulatory authority prevents it from estimating the climate change effects of its decision.  BOEM to date has given no basis for concluding that economic modeling employing existing data on patterns of oil and gas consumption is inadequate to estimate what percentage of oil and gas produced will be burned as energy.  The conclusion is arbitrary in light of BOEM's failure to consider the Department of State's EIS for the Keystone pipeline, which modeled the impact of increased oil supply on emissions.

Estimates that Plaintiffs brought to BOEM's attention indicate that over 90% of oil consumed in the United States is burned as fuel.  *See supra* at 10-11.  Because greenhouse gas pollution is fungible, the contribution to climate change from this combustion does not depend on exactly when, where, or how the fuel is burned.  NEPA requires that BOEM make an effort to

---

[14] BOEM did not include this report in the administrative record, potentially because it was impractical to do so.  *See* Doc. 235-1 at 2 ("The Administrative Record DVD does not include voluminous publicly available scientific reports.").  The EIS cites, discusses, and incorporates it by reference.  Ex. 3 at 62a.  As with other documents that the agency failed to include, *see supra* n. [], Plaintiffs have asked BOEM to add this report to the record.  There can be no dispute that this report should be considered on review of this agency decision because it was in fact considered by the agency.  *See Thompson v. U.S. Dept. of Labor,* 885 F.2d 551, 555 (9th Cir. 1989).

estimate, using generally accepted theoretical approaches, the greenhouse gas emissions from burning this oil and gas. *See Methow Valley*, 490 U.S. at 354 (citing 40 C.F.R. § 1502.22(b)); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) (holding that environmental consequences must be analyzed if analysis is "reasonably possible"); *Mid States Coal.*, 345 F.3d at 549 ("[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not, we think that the agency may not simply ignore the effect.").

 "[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of the agency's control . . . does not release the agency from the duty of assessing the effects of *its* actions on global warming[.]" *Ctr. for Biological Diversity*, 538 F.3d at 1217 (9th Cir. 2008) (internal quotation marks omitted) (emphasis in original).

      B.      <u>The lease sale is a proximate cause of greenhouse gas emissions from burning the oil and gas produced.</u>

BOEM's SEIS asserts that the lease sale is not a proximate cause of greenhouse gas emissions from burning the oil and gas forecast to be produced. Ex. 24 at 20. But the principles enunciated by the Supreme Court in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the case that announced the proximate-cause requirement, indicate that the lease sale is a proximate cause of the emissions.

For purposes of NEPA, an agency action is not a proximate cause of an environmental impact when the agency has "no ability" to address the impact. *Id.* at 768. *Accord Ctr. for Biological Diversity*, 538 F.3d at 1213; *Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 105 (D.D.C. 2006) ("The holding in *Public Citizen* extends only to those situations where an agency has 'no ability' because of lack of 'statutory authority' to address the impact."). The governing statutory provision in *Public Citizen*, 49 U.S.C. § 13902(a)(1), compelled the Federal Motor Carrier Safety Administration (FMCSA) to issue a permit for cross-border trucking if certain safety and financial requirements were satisfied. *Public Citizen*, 541 U.S. at 766. "[I]f FMCSA refused . . ., it would violate [the statute]." *Id.* It made no sense, the Court held, to require the agency to consider "the environmental impact of an action it could not refuse to perform." *Id.* at 769.

Nothing in OCSLA, by contrast, compels BOEM to grant this lease irrespective of environmental impacts. *See* 43 U.S.C. § 1337(a)(1) ("The Secretary is *authorized* to grant to the highest responsible qualified bidder . . . any oil and gas lease[.]") (emphasis added). OCSLA confers significant discretion to take environmental impacts into account at the lease-sale stage.

43 U.S.C. § 1346(d) ("The Secretary shall consider available relevant environmental information in making decisions [and] in developing appropriate . . . lease conditions[.]"); 43 U.S.C. § 1332(3) ("[T]he Outer Continental Shelf . . . should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."). This is consistent with important background principles of public lands law. "[I]t has long been recognized that the Secretary of Interior has broad plenary powers over the disposition of public lands." *Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1367 (9th Cir. 1976)). Accordingly, in holding this lease sale, BOEM based its decision on the broad objectives articulated in 43 U.S.C. section 1332, which include energy development and "other national needs." Ex. 27 at 40 (citing 43 U.S.C. § 1332).

As the Ninth Circuit recently explained, "NEPA's legislative history reflects Congress's concern that agencies might attempt to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA. Section 102(2) of NEPA therefore requires government agencies to comply 'to the fullest extent possible.'" *Ctr. for Biological Diversity.*, 538 F.3d at 1213 (quoting *Forelaws on Bd. v. Johnson,* 743 F.2d 677, 683 (9th Cir. 1985); *see also id. at* 1213–15 (holding that NEPA compelled consideration of climate change in setting fuel efficiency standards even though the controlling provision of the Energy Policy and Conservation Act, 49 U.S.C. § 32902, does not mention consideration of environmental factors). Because OCSLA neither restricts BOEM's discretion to consider environmental impacts at the lease-sale stage, nor compels BOEM to grant leases without regard for such impacts, this lease

sale is a proximate cause of greenhouse gas emissions and associated climate change impacts under *Public Citizen*.[15]

It is well-established in the Ninth Circuit that the effects of an action must be analyzed even if private activity is part of the chain of causation. *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1137 (9th Cir. 2011) (requiring consideration of increased aviation activity prior to construction of a new runway); *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1017, 1030 (S.D. Cal. 2003) (requiring analysis of the operations of Mexican power plants before issuance of permits for construction of power lines because transmission capacity and power generation were "two links in the same chain"); *see* 40 C.F.R. § 1508.8(b). Likewise, the effects of an action must be analyzed even if they depend on further site-specific actions that are themselves subject to NEPA review. *Kern*, 284 F.3d at 1072. NEPA "is designed to require . . . analysis as soon as it can reasonably be done." *Id.*

---

[15] The D.C. Circuit's decision in *Ctr. for Biological Diversity v. U.S. Dept. of Int.*, 563 F.3d 466, is not to the contrary. The agency action there at issue was a five-year leasing program, which is a separate stage of OCSLA's four-stage process, *see Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984), governed by a separate statutory section, 43 U.S.C. § 1344. Unlike the granting of a particular lease, the preparation of a five-year program is mandatory. *Compare* 43 U.S.C. § 1344(a) *with id.* § 1337(a)(1).

In rejecting a claim that section 1344 obligates the Secretary to consider climate change impacts from burning produced oil and gas, *Center for Biological Diversity* suggests section 1344 prohibits consideration of those impacts in formulating the lease program. 563 F.3d at 484–85. That reading of section 1344 is dicta, because the only question actually presented for decision in *Center for Biological Diversity* was whether consideration of the impacts was *required*, not whether consideration would be permissible. *Id.* at 484; *see Kastigar v. United States*, 406 U.S. 441, 454–55 & n.39 (1972) ("[B]road language . . . unnecessary to the Court's decision . . . cannot be considered binding authority."); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004). Once the D.C. Circuit had determined that the consideration of climate change was not required, the discussion of whether it would be authorized was not "germane" to the resolution of the case. *See United States v. Johnson,* 256 F.3d 895, 914 (9th Cir. 2001) (en banc).

More importantly, the dicta are inapposite here. Even if section 1344 prohibited the consideration of certain environmental impacts during formulation of a five-year program— which it does not, *see id.* § 1344(a)(3)—no such prohibition applies to the decision whether to grant a lease under section 1337(a)(1). Section 1337(a)(1) *authorizes* the Secretary to grant leases; it contains no mandatory language that could be read to require that leases be granted without regard to environmental consequences.

Greenhouse gas emissions from burning oil and gas forecast to be produced are a reasonably foreseeable, proximate consequence of this lease sale. NEPA requires that BOEM analyze those emissions and their contribution to global climate change.

III.    BECAUSE THE LEASE SALE WAS AFFIRMED IN VIOLATION OF NEPA AND THE APA, THE COURT SHOULD VACATE THE SALE AND ISSUANCE OF LEASES.

Because BOEM affirmed Lease Sale 193 in reliance on unlawful NEPA analyses, Plaintiffs request that the Court vacate the decision and the leases affirmed thereunder and remand to BOEM with direction to comply with NEPA. The normal remedy under the APA for an unlawful agency action is to vacate the agency's action and remand to the agency to act in compliance with its statutory obligations. *Cal. Wilderness Coal. v. U.S. Dept. of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *W. Oil & Gas Ass'n v. U.S. EPA*, 633 F.2d 803, 813 (9th Cir. 1980); *see* 5 U.S.C. § 706(2)(A) (court shall set aside arbitrary or unlawful actions); *see also Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (stating that where a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be vacatur of the agency's order"). Because the decision to affirm Lease Sale 193 was made in reliance on arbitrary NEPA analyses, it should be invalidated and the leases should be vacated. *See Andrus*, 580 F.2d at 485 ("Government leases issued in violation of the law may, in appropriate cases, be invalidated.") (citation omitted). The deficiencies in the NEPA analyses underlying the decision to affirm the leases go to the heart of the decision to sell leases in the Chukchi Sea. Proper analysis of what missing information is essential to a reasoned choice among Lease Sale 193 alternatives and of the climate change effects of burning oil and gas that could be produced as a consequence of the lease sale could each "have led [the Secretary] to reject altogether a lease sale" in the Chukchi Sea, *id.* at 485, or at least to revise significantly the areas subject to the lease sale.

Vacatur of the lease sale would thus best preserve the full opportunity for the Secretary to choose among alternatives that is contemplated by NEPA. *See Watt*, 716 F.2d at 952 (1st Cir. 1983) (Breyer, J.) ("when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to

prevent has been suffered").[16]  As the record in this case demonstrates, in the absence of an order vacating the leases, Federal Defendants did not—as they must—ensure during their reconsideration of the lease sale that the prior "decision based on a legally insufficient EIS counts for nothing."  *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).  In a draft of a decision document included in the record, for instance, the existence of outstanding leases is described as a prominent "decision consideration."  Ex. 23 at 23.  The document describes that the decision not to reaffirm the lease sale "would result in a lease buyback" which is "relatively rare" and could cost the government an amount "approach[ing] $46 billion dollars (or basically equivalent to the amount the Federal government would receive under its 12½% royalty share . . .)."  *Id*. at 26.[17]  The draft memo characterizes this information as "probably important" to the remand decision.  *Id.*  The final Record of Decision itself takes prominently factors the existence of the unlawfully issued leases into the decision.  It states, "If I decide to cancel or rescind the sale, the Department would have to find it was in error in issuing the leases. To do this, the Department would have to refund over $2.662 billion in high bonus bids and all rental monies collected to date."  Ex. 27 at 39.  The existence of outstanding and issued leases thus did factor into the Federal Defendants' reconsideration of Lease Sale 193 on remand here. Vacatur would avoid the prejudice such consideration introduces, would "'preserv[e] the decision makers' opportunity to choose among policy alternatives,'" *Houston*, 146 F.3d at 1129 (quoting *Forelaws on Bd.,* 743 F.2d at 685), and would further OCSLA's mandate of ensuring "orderly" offshore development "subject to environmental safeguards," 43 U.S.C. § 1332(3).

In the alternative, for the reasons set forth in Plaintiffs' initial opening brief, Dkt. No. 82 at 63-65, as supplemented by additional evidence of potential irreparable harm, Ex. 30 at 17-75,

---

[16] While vacatur is the ordinary remedy, it is certainly true that the courts have discretion in some circumstances to leave a rule in place while the agency corrects its errors on remand in order to prevent harm to the environment or risks to human health.  *See*, *e.g.*, *Idaho Farm Bureau Fed'n*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (leaving endangered species listing in place where species was threatened with extinction); *Asarco*, *Inc. v. Occupational Safety & Health Admin.*, 647 F.2d 1, 2 (9th Cir. 1981) (leaving OSHA standard for exposure to arsenic in place where employees would face "serious health risk" if standard were not maintained).  Here, vacatur would cause no harm to the environment or human health, as in *Idaho Farm Bureau* or *Asarco*.

[17] Whether a decision by the Secretary to rescind the sale or portions of it would trigger a legal obligation to buy back the leases or create any other financial exposure for the government is an issue not presented by this case.  But these documents indicate that relevant decision makers so expected and improperly took that prediction of financial exposure into account in making the decision on remand.

the Court should enter an injunction prohibiting BOEM from permitting further activity on the leases while it remedies the violations of NEPA.

Dated: November 16, 2011.

Respectfully submitted,

*s/ Erik Grafe*

ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

ERIC P. JORGENSEN (AK Bar # 8904010)
NEIL E. GORMLEY (AK Bar # 1105020)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
T: 907-586-2751
F: 907-463-5891
E: ejorgensen@earthjustice.org
E: ngormley@earthjustice.org

*Attorneys for Plaintiffs Native Village of Point Hope, City of Point Hope, Inupiat Community of the Arctic Slope, Alaska Wilderness League, Center for Biological Diversity, Defenders of Wildlife, National Audubon Society, Natural Resources Defense Council, Northern Alaska Environmental Center, Oceana, Pacific Environment, Resisting Environmental Destruction on Indigenous Lands (REDOIL), Sierra Club, The Wilderness Society, and World Wildlife Fund*

# CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2011, a copy of foregoing PLAINTIFS' OPENING REMAND BRIEF, with attachments, was served electronically on David B. Glazer, Kristen L. Gustafson, Kyle W. Parker, Jeffrey W. Leppo, Ryan P. Steen, Martin T. Schultz, Steven E. Mulder, Rebecca Kruse, and James N. Leik.

*s/ Erik Grafe*

ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 50 of 54

**TABLE OF EXHIBITS**
**TO PLAINTIFFS' OPENING REMAND BRIEF**

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 1 | MMS AR 89 | Minerals Management Service (MMS), Chukchi Sea Planning Area, Oil and Gas Lease Sale 193, Scoping Report (Sept. 2005) (excerpts) |
| 2 | MMS AR 285 | MMS, Final Programmatic Environmental Assessment, Arctic Ocean Outer Continental Shelf Seismic Surveys – 2006, OCS EIS/EA MMS 2006-038 (June 2006) (excerpts) |
| 3 | MMS AR 975-977 | MMS, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, Final Environmental Impact Statement, OCS EIS/EA MMS 2007-026 (May 2007) (excerpts) |
| 4 | Remand Supplemental AR 13 | Email from John Goll, BOEM, to OMM AK/Staff, Re. Chukchi Sea Sale 193 - remand decision (July 21, 2010) |
| 5 | Remand Supplemental AR 23 | Email from Michael Routhier, BOEM, to Deborah Cranswick, BOEM, Re. 1502.22 mechanics (July 26, 2010) |
| 6 | Remand Supplemental AR 24 | Email from Deborah Cranswick, BOEM, to Cleveland Cowles, BOEM, Re. supplemental EIS (sEIS) (July 28, 2010) |
| 7 | Remand Supplemental AR 26 | Email from Cleveland Cowles, BOEM, to Deborah Cranswick, *et al.*, BOEM, Re. revised milestones for supplemental EIS (sEIS) (August 5, 2010) |
| 8 | Remand Supplemental AR 32 | Email from James Lima, BOEM, to Mark Schroeder, BOEM, Re. Draft 1502 22 checklist 8-5-10.doc (August 5, 2010) |
| 9 | Remand Supplemental AR 33 | Email from James Lima, BOEM, to Scott Blackburn, BOEM, Re. FW: Arctic Multi-sale Search.doc (August 5, 2010) |
| 10 | Remand Supplemental AR 43 | Email from Scott G. Blackburn, BOEM, to Mark Schroeder, BOEM, Re. statements (August 16, 2010) |

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                          i
Case No. 1:08-cv-00004-RRB
Case 1:08-cv-00004-RRB    Document 249    Filed 11/16/11    Page 51 of 54

| Exhibit No. | AR No. | Description |
|---|---|---|
| 11 | Remand Supplemental AR 45 | Email from Mark Schroeder, BOEM, to James Lima, *et al.*, BOEM, Re. Draft of review of Art 129 et al.(August 18, 2010) |
| 12 | Remand Supplemental AR 46 | Email from Scott G. Blackburn, BOEM, to Mark Schroeder, BOEM, Re. Statements Analysis (August 18, 2010) |
| 13 | | Omitted |
| 14 | Remand Supplemental AR 123 | Email from Michael Routhier, BOEM, to Tim Holder, BOEM, Re. RE: responses to HQ review comemtns otn he Sale 193 SEIS (Sept. 16, 2010) |
| 15 | Remand Supplemental AR 176 | Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Draft Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2010-034 (Sept. 2010) (excerpts) |
| 16 | Remand Supplemental AR 181 | Email from Thomas Lillie, BOEM, to Tim Holder, BOEM, Re.FW: Urgent -- need feedback by 1:45 (Oct. 8, 2010) |
| 17 | Remand Supplemental AR 303 | Native Village of Point Hope, Comments on Draft Chukchi Sea Lease Sale 193 Supplemental Environmental Impact Statement (OCS EIS/EA BOEMRE 2010-034) (Nov. 30, 2010) |
| 18 | Remand Supplemental AR 305 | The Wilderness Society, Comments on Draft Chukchi Sea Lease Sale 193 Supplemental Environmental Impact Statement (OCS EIS/EA BOEMRE 2010-034) (Nov. 30, 2010) |
| 19 | Remand Supplemental AR 313 | Alaska Wilderness League, *et al.*, Comments on Draft Chukchi Sea Lease Sale 193 Supplemental Environmental Impact Statement OCS EIS/EA BOEMRE 2010-034 (Nov. 30, 2010) |
| 20 | Remand Supplemental AR 314 | Inupiat Community of the Arctic Slope, Comments on Draft Chukchi Sea Lease Sale 193 Supplemental Environmental Impact Statement (OCS EIS/EA BOEMRE 2010-034) (Nov. 30, 2010) |

| Exhibit No. | AR No. | Description |
|---|---|---|
| 21 | Remand Supplemental AR 660 | BOEMRE, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Revised Draft Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2010-034 (May 2011) (excerpts) |
| 22 | Remand Supplemental AR 747 | Holland-Bartels, Leslie, and Pierce, Brenda, eds., 2011, An evaluation of the science needs to inform decisions on Outer Continental Shelf energy development in the Chukchi and Beaufort Seas, Alaska: U.S. Geological Survey Circular 1370 (excerpts) |
| 23 | Remand Supplemental AR 993 | Email from David Johnston to Jeffrey Loman, *et al.*, Re. Please join the review of Sale 193 Draft Supplemental Decision(080411)_review.pdf (Aug. 9, 2011) |
| 24 | Remand Supplemental AR 1009 - 1010 | BOEMRE, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Final Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2011-041 (August 2011) (excerpts) |
| 25 | Remand Supplemental AR 1035 | Oceana, Comments on Final Supplemental Environmental Impact Statement for Outer Continental Shelf Oil and Gas Lease Sale 193, Chukchi Sea, Alaska (OCS EIS/EA BOEMRE 2011-041) (Sept. 23. 2011) |
| 26 | Remand Supplemental AR 1040 | Alaska Wilderness League, *et al.*, Comments on Chukchi Sea Lease Sale 193 (Sept. 26, 2011) |
| 27 | Remand Supplemental AR 1048 | Bureau of Ocean Energy Management (BOEM), Chukchi Sea OCS Oil & Gas Lease Sale 193, Record of Decision (Oct. 2011) |
| 28 | Remand Supplemental AR 598 | Email from Mary B. Cody, BOEM, to Sharon E. Warren, *et al.*, BOEM, Re. Due by COB April 26 - Additional review of NOAA"s [sic] 2/28/2011 comments (April 25, 2011) |
| 29 | Remand Supplemental AR 822 | Inupiat Community of the Arctic Slope, Comments on Revised Draft Supplemental Environmental Impact Statement for Lease Sale 193 (July 8, 2011) |

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 30 | Remand Supplemental AR 871 | Alaska Wilderness League, *et al.*, Comments on Chukchi Sea Lease Sale 193 Revised Draft Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2010-034 (May 2011) (July 11, 2011) |
| 31 | Remand Supplemental AR 891 | Northern Alaska Environmental Center, Comments on Chukchi Sea Lease Sale 193 Revised Draft Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2010-034 (May 2011) (July 11, 2011) |
| 32 | Remand Supplemental AR 895 | Native Village of Point Hope, Comments on Comments on Revised Draft Supplemental Environmental Impact Statement for Lease Sale 193 (July 11, 2011) |
| 33 | Remand Supplemental AR 896 | Oceana, Comments on Chukchi Sea Lease Sale 193 Revised Draft Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2010-034 (July 11, 2011) |
| 34 | Remand Supplemental AR 909 | The Wilderness Society, Comments on Revised Draft Supplemental Environmental Impact Statement (OCS EIS/EA BOEMRE 2010-034) (July 11, 2011) |
| 35 | | Minerals Management Service (MMS), Energy Alternatives and the Environment, OCS Report MMS 2001-096 (Nov. 2001) (excerpts) |
| 36 | | U.S. Energy Information Administration, Annual Energy Review (2009) (excerpts) |
| 37 | | U.S. EPA and NHTSA, Draft Joint Technical Support Document for Proposed Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards (Sept. 2009) (excerpts) |
| 38 | | U.S. Department of State, Keystone XL Project Supplemental Draft Environmental Impact Statement (April 22, 2011) (excerpts) |
| 39 | | U.S. Energy Information Administration, U.S. Refinery Yield |
| 40 | | Rocky Mountain Federal Leadership Forum, Interagency Reference Guide – Reasonably Foreseeable Development Scenarios and Cumulative Effects Analysis for Oil and Gas Activities on Federal Lands in the Greater Rocky Mountain Region (June 2003) |