ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

ERIC P. JORGENSEN (AK Bar # 8904010)
NEIL E. GORMLEY (AK Bar # 1105020)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
T: 907-586-2751
F: 907-463-5891
E: ejorgensen@earthjustice.org
E: ngormley@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF POINT HOPE, *et al.,*     ) <br>            ) <br>     Plaintiffs,         ) <br>            ) <br>         v.           ) <br>            ) <br> KENNETH L. SALAZAR, Secretary of the Interior, *et al.,*   ) <br>            ) <br>     Defendants,         ) <br>            ) <br> and            ) <br>            ) <br> SHELL GULF OF MEXICO, INC., CONOCOPHILLIPS   ) <br> COMPANY, STATE OF ALASKA, and STATOIL USA   ) <br> E&P INC.,            ) <br>            ) <br>     Intervenor-Defendants.    ) <br>            ) | Case No. 1:08-cv-00004-RRB |

**PLAINTIFFS' REMAND REPLY  BRIEF**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I. BOEM'S CONCLUSION THAT NONE OF THE MISSING INFORMATION IS
   ESSENTIAL IS ARBITRARY ................................................................................... 1

   A. Defendants do not dispute that information "essential to a reasoned choice among
      alternatives" means information needed to develop and compare alternatives. ................. 2

   B. Defendants do not dispute that a key decision is being made at the lease sale stage. ........ 3

   C. Defendants cannot dispute that the EIS acknowledges that key information is missing for
      many species and that this prevents BOEM from developing and
      comparing alternatives. ................................................................................. 4

   D. Federal Defendants and Shell cannot successfully defend BOEM's five boiler-plate
      excuses for why none of the missing information is essential. ........................................... 6

      1. The assertion that missing information can be obtained at later OCSLA stages ............. 6

      2. The statement that information suffices ........................................................................ 7

      3. The assumption of adverse effects under all circumstances ........................................... 9

      4. The assertion that there are identical effects under all alternatives .............................. 10

      5. The assertion that future compliance with environmental laws renders information not
         essential ................................................................................................................. 11

II. BOEM VIOLATED NEPA BY REFUSING TO ANALYZE THE CONTRIBUTION TO
    CLIMATE CHANGE FROM BURNING THE OIL AND GAS FORECAST TO BE
    PRODUCED FROM THE LEASE SALE ............................................................................ 12

   A. BOEM disavowed on remand its prior conclusion that the lease sale would have no net
      impact on oil consumption and associated emissions ...................................................... 14

   B. Combustion of oil and gas is a reasonably foreseeable consequence of the lease sale .... 15

   C. BOEM has discretion to consider global climate change. ................................................ 17

   D. BOEM cannot avoid analysis of consumption impacts on the basis that no reliable
      methodologies exist without giving some consideration to existing methodologies ........ 19

III. THE COURT SHOULD VACATE THE AGENCY DECISION OR, IN THE
     ALTERNATIVE, ENJOIN ACTIVITIES UNDER THE LEASES AND REMAND FOR
     COMPLIANCE WITH NEPA ........................................................................................ 21

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                       i
Case No. 1:08-cv-00004-RRB

# TABLE OF AUTHORITIES

## CASES

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)........................................................................................................23

*Barnes v. U.S. Dept. of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) .......................................................................................17

*California v. Watt*
  668 F.2d 1290, 1326 (D.C. Cir. 1981).............................................................................22

*Ctr. for Biological Diversity v. U.S. Department of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) .............................................................................18, 19, 23

  No. 07-1433, Order (July 28, 2009).................................................................................23

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) .............................................................................13, 17, 18

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004).............................................................................................16, 17, 18, 19

*Edwardsen v. U.S. Dep't of Interior*,
  268 F.3d 781 (9th Cir. 2001) .........................................................................................12

*Forest Conservation Council v. U.S. Forest Serv.*,
  66 F.3d 1489 (9th Cir. 1995) .........................................................................................24

*Metrop. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983)...................................................................................................16, 17

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) .........................................................................................17

*Monsanto Co. v. Geertson Seed Farms*,
  130 S. Ct. 2743 (2010)....................................................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*,
  463 U.S. 29 (1983)..........................................................................................................15

*N. Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) .......................................................................................11

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980).................................................................................10, 12

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                    ii
Case No. 1:08-cv-00004-RRB

*Natural Res. Defense Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) .................................................................22

*Natural Resources Defense Council v. Nuclear Regulatory Commission*
685 F.2d 459 (D.C. Cir. 1982), *rev'd on other grounds sub nom Baltimore Gas and Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87 (1983) ...............................................10

*Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) .................................................................19

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..............................................................................17

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*
449 F.3d 1016, 1030-31 (9th Cir. 2006) ........................................................15, 16, 17

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*
588 F.3d 718, 726 (9th Cir. 2009) ...............................................................11, 17

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,
720 F.2d 1475 (9th Cir. 1983) ..................................................................11

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) ..................................................................17

*Sec'y of the Interior v. Cal.*,
464 U.S. 312 (1984)..............................................................................24

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 77 (D. D.C. 2010) ...............................................................22

*Taxpayers of Mich. Against Casinos v. Norton*,
433 F.3d 852 (D.C. Cir. 2006)...................................................................12

*The Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ....................................................................20

*United States v. Boynton*,
No. 05-V-2243-WQH RBB, 2007 WL 737725 (S.D. Cal. Feb. 1, 2007)................................15

*Vill. of False Pass v. Watt*,
565 F. Supp. 1123 (D. Alaska 1983), *aff'd on other grounds sub nom Vill. of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984)..............................................................4

*W. Oil & Gas Ass'n v. U.S. Envtl. Prot. Agency,*
633 F.2d 803 (9th Cir. 1980) ....................................................................22

*Native Village of Point Hope, et al., v. Salazar, et al.,*       iii
Case No. 1:08-cv-00004-RRB

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
    222 F.3d 1105 (9th Cir. 2000) ...................................................................................12

## STATUTES

5 U.S.C. §§ 701-706 ........................................................................................................21

43 U.S.C. § 1332(3) ..................................................................................................18, 22

43 U.S.C. § 1337.......................................................................................................18, 19

43 U.S.C. § 1344........................................................................................................19

43 U.S.C. § 1346................................................................................................18, 19, 24

49 U.S.C. § 32902.........................................................................................................18

## FEDERAL REGULATIONS

40 C.F.R. § 1502.1 ......................................................................................................2, 11

40 C.F.R. § 1502.14 ........................................................................................................2

40 C.F.R. § 1502.22 ..............................................................1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 17

Case 1:08-cv-00004-RRB    Document 262    Filed 12/21/11    Page 5 of 32

INTRODUCTION

During the remand period, BOEM[1] concluded that none of the information identified as missing in the EIS is essential to a reasoned choice among alternatives for the Chukchi Sea Lease Sale 193 decision. As Plaintiffs demonstrate in their opening remand brief, BOEM's conclusion is arbitrary in light of the agency's acknowledgments of missing information in the EIS and its inability to design and compare alternatives as a result of the missing information. The government and intervenors make a number of arguments in defense of BOEM's remand conclusion. The arguments fail because they do not and cannot address the fundamental inconsistency between BOEM's acknowledgments and limited analysis in the EIS, on the one hand, and its remand conclusion that none of the missing information is essential, on the other.

BOEM also refused to estimate and consider the contribution to global warming that will occur if this massive lease sale results in production of oil and gas. On this issue, two primary questions are in dispute in light of the response briefs: are climate change impacts from consumption of oil and gas resulting from the lease sale reasonably foreseeable and is BOEM's conclusion that no methodologies exist to conduct the analysis reasonable in light of the evidence presented to the agency. None of the legal arguments defendants offer excuses BOEM's refusal to examine potential climate change impacts, and their arguments about methodologies are post-hoc rationales that should be rejected.

I.    BOEM'S CONCLUSION THAT NONE OF THE MISSING INFORMATION IS ESSENTIAL IS ARBITRARY

BOEM concludes in the remand SEIS that none of the information acknowledged as missing in the Chukchi Sea Lease Sale 193 EIS is essential to a reasoned choice among alternatives within the meaning of 40 C.F.R. § 1502.22. That conclusion is arbitrary. Plaintiffs in their opening remand brief demonstrate that: (1) information is "essential to a reasoned choice among alternatives" if it is necessary to develop alternatives that minimize adverse effects and to conduct an informed comparison among alternatives for a given decision, Dkt. 249 at 21-23; (2) key spatial decisions are made at the lease sale stage about where and whether to open areas for oil and gas activity, *id.* at 23-25; and (3) the lease sale EIS, on which BOEM continues to rely for its analysis of impacts and alternatives, demonstrates that essential information is missing here,

----

[1] Abbreviations used herein are defined in Plaintiffs' opening remand, Dkt. 249, and initial summary judgment reply briefs, Dkt. 134.

because the missing information prevents the agency from developing and comparing alternatives about where and whether to lease, *id.* at 25-33. BOEM advances five recurring rationales in the remand SEIS to explain its conclusion that none of the missing information in the EIS is essential. Ex. 24 at 31-32.[2] But these explanations do not justify the conclusion in light of the EIS's acknowledgments that missing information impedes its development and analysis of alternatives. Dkt. 249 at 33-36.

In their response briefs, the government and intervenors are unable to rebut the three main points of Plaintiffs' argument. They do not dispute that information is essential if it is needed to develop and compare alternatives. Although they attempt to downplay the nature of the lease sale decision, they do not dispute that it entails a key decision about where and whether to open areas to oil and gas activities. Although they attempt in a number of ways to divert attention from the issue, they cannot dispute that the EIS concludes key information is missing that impairs BOEM's development and comparison of alternatives about where and whether to lease. Unable to rebut successfully these three points that demonstrate BOEM's conclusion is arbitrary, defendants can only re-state in various ways the five standard rationales BOEM provides in the remand SEIS for its conclusion. However, the briefs do not offer any better explanation for these flawed rationales than did the SEIS itself.

    A.    <u>Defendants do not dispute that information "essential to a reasoned choice among alternatives" means information needed to develop and compare alternatives.</u>

By requiring agencies to obtain information "essential to a reasoned choice among alternatives," CEQ's Section 1502.22 regulation, 40 C.F.R. § 1502.22, furthers the alternatives analysis that is at the "heart" of an EIS, 40 C.F.R. § 1502.14. As Plaintiffs explain in their opening remand brief, there are two components to the alternatives analysis. First, an agency must develop alternatives to its projects that would "avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1; *see* Dkt. 249 at 22-23. Second, it must present the alternatives it designs in a manner that provides sufficient information to make an informed comparison of alternatives. 40 C.F.R. § 1502.14; *see* Dkt. 249 at 22. Thus, information is essential to a reasoned choice among alternatives if it is needed to develop alternatives that avoid or minimize adverse effects or to make an informed comparison

_____

[2] Plaintiffs herein refer to, and use the same citing convention for, the exhibits attached to their opening remand brief, Dkt. 249.

of alternatives.  Defendants do not dispute that this is what "essential to a reasoned choice among alternatives" means under Section 1502.22.[3]

> B.    <u>Defendants do not dispute that a key decision is being made at the lease sale stage.</u>

Plaintiffs describe, Dkt. 249 at 23-25, that a lease sale—the second stage in the four stage OCSLA process and the first stage at which rights are transferred from the government to private entities—involves a key spatial decision about where and whether to open areas to oil and gas activities.  Emphasizing the authority BOEM has to regulate activities on leases once they are issued, the defendants argue that Plaintiffs overstate the significance of the lease sale decision. Dkt. 259 at 18-19 (misstating Plaintiffs' position as "once leases are issued under OCSLA, BOEM loses the ability to effectively regulate lease activities . . . and that therefore BOEM's NEPA obligations are somehow heightened at the lease sale stage"); Dkt. 256 at 13 ("Plaintiffs argue at length about the heightened significance of a lease sale decision. . . ."); Dkt. 260 at 23 (stating that Plaintiffs imply "that bureaucratic inertia precludes BOEM from imposing restrictions on impacts identified at subsequent OCSLA stages"); Dkt. 258 at 8 ("Plaintiffs' assertion that BOEM lacks discretion at later phases is thoroughly unfounded.").  Defendants' arguments mischaracterize Plaintiffs' opening remand brief.  Plaintiffs do not argue that BOEM lacks the ability to regulate activities on leases once they are issued or that NEPA obligations are "heightened" at the lease sale stage.  *See* Dkt. 249 at 23-24.  Of course, BOEM can regulate activities on leases after it has held a lease sale, and it can even suspend and cancel leases, as long as it follows OCSLA's rules.  *Id.* at 24.  But it can only make the lease sale decision—the unfettered spatial decision about where and whether to open areas to oil and gas activities—at the lease sale stage.  *Id.* at 23-24.  The nature of this decision determines the alternatives the

---

[3] The Federal Defendants and Conoco both complain that Plaintiffs are challenging the adequacy of the range of alternatives considered in the EIS and relied upon by the government for its remand decision.  Dkt. 259 at 19 n.15; Dkt. 256 at 12 n.9.  Shell complains that Plaintiffs are asserting that NEPA requires agencies to select the most environmentally beneficial alternative. Dkt. 260 at 15-16.  These complaints are misplaced.  Plaintiffs do not here raise a challenge to the range of alternatives in the EIS or assert that NEPA requires selection of the most environmentally protective alternative.  Plaintiffs' argument is that the meaning of "essential to a reasoned choice among alternatives" in Section 1502.22 is tied to NEPA's mandate to develop and analyze alternatives.  None of the defendants dispute that information that is "essential to a reasoned choice among alternatives" means information needed to develop and compare alternatives.

agency must develop and analyze and thus what information is essential to a reasoned choice among alternatives under Section 1502.22. *Id.* at 23.

Conoco and Shell make an additional argument that there will always be uncertainty at this stage about the site-specific effects of future, later-stage projects like exploration drilling and development. Dkt. 256 at 14; Dkt. 260 at 23-24. But Plaintiffs do not fault BOEM for failing to obtain information about future projects. Rather, Plaintiffs argue that missing information about the Chukchi Sea constrains the agency's development and comparison of *lease sale* alternatives in the EIS—alternatives about different approaches to where and whether to lease—and such information, therefore, is essential within the meaning of Section 1502.22.[4] Dkt. 249 at 25-33.

    C.    <u>Defendants cannot dispute that the EIS acknowledges that key information is missing for many species and that this prevents BOEM from developing and comparing alternatives.</u>

As Plaintiffs have described, Federal Defendants continue to rely on the EIS's analysis of impacts and alternatives for the remand decision. Dkt. 249 at 11-12.[5] The EIS acknowledges that included among the many items of missing information is information about the importance of different areas of the Chukchi Sea as habitat for a number of species. *Id.* at 12. The absence of this and other information cripples BOEM's ability in the EIS to develop or analyze lease sale alternatives. *Id.* at 12-14; *see also id.* at 25-33. It is in light of these facts, which demonstrate that information essential to a reasoned choice among alternatives is missing, that BOEM's remand conclusion is arbitrary. Defendants in their response briefs attempt in various ways to

---

[4] This Court long ago recognized that there is information that is essential in the meaning of Section 1502.22 to a reasoned choice among alternatives at the lease sale stage. *Vill. of False Pass v. Watt*, 565 F. Supp. 1123, 1152 (D. Alaska 1983), *aff'd on other grounds sub nom Vill. of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984); *see also* Dkt. 249 at 24-25. Shell alone asserts this Court's decision in *Village of False Pass* does not stand for this proposition. Dkt. 260 at 26. Shell apparently relies on the Court's determination that it was not essential to have information to analyze effects from a 100,000 barrel oil spill when the EIS already analyzed effects from a 10,000 barrel oil spill. *Id.* But Shell concedes, as it must, that in fact this Court determined in *Village of False Pass* that information about the effects of preliminary exploration and seismic activities on whales was essential at the lease sale stage. *See id.*; Dkt. No. 249 at 24-25; Dkt. No. 134 at 13 n.6.

[5] With respect to the missing information issue, the remand SEIS only provides the rationale for BOEM's conclusion that it was not missing any essential information in the EIS. Dkt. No. 249 at 11-12, 6.

---

shift attention from the EIS, but they cannot dispute the EIS's acknowledgments of missing information and the resulting inability to develop and assess alternatives.

Initially, the Federal Defendants, Conoco, and Shell attempt to confuse the basic facts in two ways. First, they try to obscure the fact that Federal Defendants continue to rely on the EIS. They point out that the SEIS describes new information that has been gathered since the EIS was completed. Dkt. 259 at 20-22; Dkt. 256 at 18 n.11, 19; Dkt. 260 at 17-18.[6] These descriptions are beside the point, however. It is not surprising that in the years since the agency completed the EIS new information has been obtained, such as new tracking data on bowhead whales migrating through the Chukchi Sea, Ex. 42 at 3-4, 9. But BOEM does not conclude in the remand SEIS—nor do defendants argue—that this new information fills the gaps identified in the EIS. Rather, BOEM asserts in the SEIS that the gaps need not be filled, because the missing information identified in the EIS is not essential to the lease sale decision. Ex. 24 at 134 (concluding that "it was not necessary to evaluate 'new' information (again used here to mean information published subsequent to the Sale 193 FEIS) in the 1502.22 analysis," because the agency "was not missing any information that was essential to a reasoned choice amongst the alternatives at the time of Lease Sale 193 (February 2008)").

Second, the defendants attempt to sow confusion by mischaracterizing Plaintiffs' argument. Federal Defendants say Plaintiffs' argument is that *all* missing information must be gathered before a NEPA analysis is complete. Dkt. 259 at 17. Shell and Conoco assert Plaintiffs' argument is based on the *volume* of information that is missing. Dkt. 256 at 16-17 (characterizing "[t]he basic premise of Plaintiffs' argument" as "there must be at least one piece of essential information missing such that BOEM should cancel Lease Sale 193"); Dkt. 260 at 12-13 (characterizing Plaintiffs' argument as a "'large numbers' theory"). Relatedly, Conoco claims Plaintiffs are asking the Court "to act as a scientist to reevaluate and redecide what information is, or is not," essential. Dkt. 256 at 12. But Plaintiffs' argument is none of these; it

---

[6] Shell makes an additional attempt to confuse the issue. It faults Plaintiffs for citing data gaps acknowledged in the EIS and states that "[a]ny alleged shortcomings in the prior analysis are not sufficient to establish a deficiency in the agency's current analysis." Dkt. 260 at 27; *see also id.* at 10 ("The only criticisms Plaintiffs identify are those based on the analysis in the *prior* 2007 FEIS."); *id.* at 16-17. It is difficult to make sense of these statements. Plaintiffs cite the EIS because that is the document BOEM continues to rely on for its remand decision. In light of the evidence in that document, BOEM's conclusion on remand that there is no missing information essential to a reasoned choice among lease sale alternatives is arbitrary.

is only that the EIS demonstrates that without at least some of the missing information, BOEM is unable to develop or compare alternatives, and that therefore BEOM's "nothing is essential" conclusion is inconsistent with the analysis in the EIS and arbitrary. Dkt. 249 at 25-33. Plaintiffs explicitly do not ask this Court to determine what information is and what is not essential. *See* Dkt. 249 at 33. Plaintiffs ask this Court to remand the decision to the agency to make that determination applying the correct standard in light of its own EIS.

In the end, on this central issue, defendants' remaining arguments effectively restate one or more of the five excuses BOEM offers in the SEIS to justify its conclusion that none of the missing information is essential. Federal Defendants restate all five of the recurring excuses. *Compare* Dkt. 259 at 19-23 *with* Ex. 24 at 31-32 (SEIS App. A, listing five recurring excuses). Conoco's brief mainly reiterates BOEM's most commonly used recurring excuse—that there is "sufficient information to support sound scientific judgments and reasoned managerial decisions, even without the identified incomplete or unavailable information," Ex. 24 at 31. Dkt. 256 at 18-20. Plaintiffs address these arguments in Section D below.

In sum, defendants cannot and have not disputed that the EIS, upon which BOEM continues to rely, acknowledges missing information in the Chukchi Sea. They cannot dispute that the lack of this information prevents the agency from developing and analyzing alternatives for the lease sale. As such, the missing information is essential within the meaning of Section 1502.22, and BOEM's contrary conclusion on remand is arbitrary.

        D.       <u>Federal Defendants and Shell cannot successfully defend BOEM's five boiler-plate excuses for why none of the missing information is essential.</u>

Federal Defendants, Shell, and Conoco attempt in their briefs to defend the five recurring rationales and assertions BOEM employs in the SEIS to justify its conclusion that none of the missing information is essential to a reasoned choice among alternatives. As described below, the defendants' arguments do not offer any better explanation for the conclusion than the SEIS.

              1.      *The assertion that missing information can be obtained at later OCSLA stages*

Defendants try to rehabilitate the rationale that missing information is not essential because it can be obtained at later stages in the OCSLA process. Dkt. 259 at 24; Dkt. 260 at 23-26. Federal Defendants point to the fact that there are ongoing studies after the lease sale. Dkt. 259 at 24. Shell emphasizes the discretion BOEM has to regulate activities on leases and impose

conditions on future lease sale activities. Dkt. 260 at 23-25. But as described above, Plaintiffs' undisputed point is that the lease sale decision itself is a key decision that cannot be made later. The fact that BOEM retains discretion to regulate activities on leases, and information essential to those later decisions can be obtained at later OCSLA stages, does not address the question of what information is essential to this lease sale stage.

### 2. The statement that information suffices

Defendants attempt to rehabilitate the SEIS's assertion that, notwithstanding data gaps, information available about the Chukchi Sea suffices for reasoned decisions. However, their arguments do not amount to anything more than a recitation of the excuses BOEM asserted in the SEIS. Federal Defendants assert that statements in Appendix A to the SEIS, which contains BOEM's Section 1502.22 analysis, demonstrate that existing information provides a sufficient basis for decision-making about certain species. Dkt. 259 at 19 (marine mammals generally), 20 (beluga whales). But these statements, of course, just offer BOEM's flawed rationale. Federal Defendants additionally cite descriptions in the body of the SEIS for the proposition that information suffices. *Id.* at 20 (beluga), 22 (walrus and birds). But on their face these portions of the SEIS do not purport to fill, or even address, the gaps identified in the EIS. In the end, Federal Defendants brief does not meaningfully attempted to reconcile the remand assertion that information suffices with the EIS's acknowledgments to the contrary—it just repeats that assertion.[7]

Conoco argues specifically that agency's response to public comments in Appendix E to the SEIS demonstrates that information suffices. Dkt. 256 at 18-20. But the responses to

---

[7] Federal Defendants additionally attempt to distance themselves from comments offered by headquarters' staff calling into question the basis for BOEM's assertions that information suffices in the face of acknowledgments of missing information in the EIS. Dkt. No. 249 at 15, 34 (citing Ex. 14). They argue that these comments were on a draft of the SEIS that had not been vetted within the region. Dkt. 259 at 16 n.9. But Federal Defendants do not and cannot argue that BOEM heeded these comments. The final SEIS contained the same boiler-plate language that information sufficed notwithstanding the statements to the contrary in the EIS. *Compare* Ex. 14 at 2 (headquarters comments, first row, noting that if "most information is 15-30 years old, we cannot just say 'sufficient information is otherwise available to support sound scientific judgments and reasoned managerial decisions'") *with* Ex. 24 at 37 (final SEIS, responding to EIS statement that bird data is 15-30 years old, making accurate analysis difficult with the statement that "sufficient information (population ranges, preferred habitat types, etc.) is available to support sound scientific judgments and informed decision-making").

*Native Village of Point Hope, et al., v. Salazar, et al.,*      7
Case No. 1:08-cv-00004-RRB

Case 1:08-cv-00004-RRB    Document 262    Filed 12/21/11    Page 12 of 32

comments do not explain BOEM's conclusion that none of the missing information is essential any better than BOEM's Section 1502.22 analysis in Appendix A to the SEIS. Neither section explains how that conclusion can be squared with the agency's acknowledgments in the EIS that missing information limits analysis of alternatives. For example, Conoco cites a BOEM assertion in the SEIS that there is no evidence that supports a deferral of additional specific portions of the lease sale to protect fall migrating bowheads and argues that this statement demonstrates there is no essential missing information about the species. Dkt. 256 at 18 (citing SEIS App. E at E57). But this statement conflicts with BOEM's acknowledgment in the EIS that "[i]nsufficient data exist to determine the current migration paths or the numbers of whales that might be deflected from those paths . . . [or] how intensively bowheads feed during the autumn migration in the Chukchi Sea or whether large aggregations exist in certain places due to prey resources." Ex. 3 at 71 (discussing potential for aggregations but conceding that information is not known); *see id.* at, 38-39 (data missing about summer and fall migration), Dkt. 249 at 27-28 (describing how missing information about fall aggregations precludes development of deferrals to protect these areas).

Similarly, Conoco cites BOEM's assertion in the SEIS that none of the missing information about beluga whales is essential. Dkt. 256 at 19 (citing SEIS App. E at E62-66). But this statement directly conflicts with the EIS's acknowledgment that information is missing about beluga whale offshore habitat use in summer and fall, or the conclusion that as a result of those gaps BOEM cannot analyze or develop alternatives that minimize those effects. Dkt. 249 at 28-31. Likewise, BOEM's SEIS assertion that available information suffices for walrus, Dkt. 256 at 19 (citing SEIS App. E at E64, 65), does not square with its conclusion in the EIS, that "because of the lack of data on marine mammal distributions and habitat use in offshore areas of the Chukchi Sea, it is uncertain what the level of effects would be in offshore areas" and thus alternatives to minimize those effects cannot be developed. Ex. 3 at 101; Dkt. 249 at 31-32. The same is true for the BOEM assertions with respect to fish and birds, Dkt. 256 at 19 (birds, citing SEIS App. E at E59-60), 20 (fish, citing SEIS App. E at E52-53), because they cannot be squared with the EIS's acknowledgments that data about coastal habitat areas is so outdated for birds that it may no longer be accurate, Ex. 3 at 79, and that there is so little data about fish that extirpation of entire species could go unnoticed, *id.* at 64, and that these data gaps cripple the analyses of effects and alternatives. *See* Dkt. 249 at 32-33.

The additional defenses of the rationale offered by defendants also fail. Federal Defendants suggest Plaintiffs' argument is focused on the contrast between the remand SEIS's conclusion and the USGS report. *Id.* That is incorrect. Although the USGS report supports the EIS's analysis that there are large and important data gaps for the Chukchi Sea, the salient—and unresolved—conflict at issue here is between the remand SEIS's conclusion and the EIS's acknowledgments and limited analysis in light of missing information. Dkt. 259 at 25-33. Shell argues that Plaintiffs have not provided examples of where missing information is essential to a reasoned choice among alternatives. Dkt. 260 at 16-17. But this argument is also incorrect. Plaintiffs have provided examples. *See* Dkt. 249 at 25-33.[8]

### 3. The assumption of adverse effects under all circumstances

Federal Defendants and Shell attempt to defend the assertion that, with respect to oil spills, BOEM can answer the question of whether a type of missing information is essential to a reasoned choice among alternatives by assuming that effects will be adverse under all alternatives. Dkt. 259 at 17, 25-26; Dkt. 260 at 18-19. However, as Plaintiffs explained, assuming adverse effects avoids one of the main purposes of the Section 1502.22 inquiry—determining whether information is essential to design alternatives that could avoid or minimize adverse effects. *See* Dkt. 249 at 35.

Moreover, Defendants' assertion that Section 1502.22 permits assumption of adverse effects in the face of missing information misstates the law by confusing the two parts of Section 1502.22. The first part, subsection (a), addresses what an agency must do when confronted with missing information. 40 C.F.R. § 1502.22(a). The second part, subsection (b), addresses what an agency must do if it determines that it cannot obtain the missing information. 40 C.F.R. § 1502.22(b). Before Section 1502.22 was amended in 1986, subpart (b) required an agency to assume adverse effects and describe a worst case analysis if it could not obtain information. Dkt. 134 at 10 n.2 (describing 1986 amendments). The amendments replaced the worst case analysis

---

[8] Both Shell and the Federal Defendants additionally attempt to confuse the relationship between the EIS and the SEIS. Federal Defendants make the point that the EIS does not contain an analysis of what information is essential. Dkt. 259 at 23. This is obviously true. It is why the Court remanded the decision in the first place. Plaintiffs point is not that the EIS reaches a direct "essential" conclusion, but that its analysis demonstrates that some information is. Plaintiffs have responded above, supra n.6, to Shell's effort on this point to again fault Plaintiffs for failing to cite examples of essential missing information in the SEIS. Dkt. 260 at 16-17.

requirement.  *Id.*  But neither the original nor the amended Section 1502.22 suggested that the analysis in subpart (b)—an assumption of adverse effects (original) or post-amendment analysis of effects based on generally accepted theoretical approaches (amended)—obviated the need for the threshold analysis in subpart (a)—determining what information is relevant and essential. But this is just what the defendants now argue.  Dkt. 259 at 17; Dkt. 260 at 18 (noting agency assumed "worst case").  The authority Federal Defendants cite, *Natural Resources Defense Council v. Nuclear Regulatory Commission* demonstrates the confusion.  685 F.2d 459, 485-86 (D.C. Cir. 1982), *rev'd on other grounds sub nom Baltimore Gas and Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87 (1983).  *NRDC* does not address the inquiry required by subpart (a) of Section 1502.22.  The language the Federal Defendants cite from the case refers to principles of the since-repealed worst case analysis of part (b) of Section 1502.22.  685 F.2d at 485-86, 486 n.144 (describing principle that worst case analysis suffices and citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C. Cir. 1980), a case that addressed a worst case discharge analysis under pre-amendment 1502.22(b)).  The case has no bearing on the inquiry at issue here—the Section 1502.22(a) inquiry about whether information is essential—and it does not support BOEM's attempt to avoid that inquiry by assuming adverse effects.

> 4.       *The assertion that there are identical effects under all alternatives*

Defendants also offer a flawed defense of the SEIS excuse that missing information is not essential with respect to oil spill effects, because effects among alternatives would be nearly identical.  Dkt. 259 at 26; Dkt. 260 at 20.  As Plaintiffs describe in their opening remand brief, the assertion of common effects among alternatives is factually incorrect.  Dkt. 249 at 36 (citing EIS conclusion that effects of oil spills differ among alternatives).  BOEM's assumption on remand that effects are the same among all alternatives thus conflicts with the conclusions in the EIS, which BOEM does not disavow.  The defendants do not address this conflict.[9]  Federal Defendants instead assert that the type of information that is missing "would not increase the utility of [the] analysis" of alternatives.  Dkt. 259 at 26.  But the EIS demonstrates that missing information does in fact constrain BOEM's ability to make a reasoned choice among

---

[9] Shell's defense suggests that missing information is not salient to the differences among alternatives.  Dkt. 260 at 20.  But, as described above and in Plaintiffs' opening remand brief, the EIS acknowledges that effects of oil spills will differ among different alternatives, and missing information limits comparison of those differences.

alternatives. For example, BOEM in the EIS acknowledges that there are likely offshore areas that are important to bowhead whales, but it lacks the information to ascertain where those areas are, and thus it cannot develop and consider alternatives that would defer those areas from leasing. Dkt. 249 at 25-28. Contrary to the Federal Defendants' assertion in their brief, Dkt. 259 at 26, BOEM cannot predict "that a disturbance such as an oil spill in a given area might have a certain anticipated effect," because it lacks information to identify the important areas. Because of missing information, BOEM can only develop alternatives that defer *some* important bowhead areas from the lease sale. This impairs its ability to make a reasoned choice among alternatives. *See* Dkt. 249 at 21-23 (describing that a reasoned choice among alternatives entails development of alternatives that minimize effects, 40 C.F.R § 1502.1).[10]

     5.     *The assertion that future compliance with environmental laws renders information not essential*

Finally, Federal Defendants and Shell attempt to defend BOEM's justification that information is not essential because other environmental laws will preclude significant effects. Dkt. 259 at 24-25; Dkt. 260 at 21-23. Their defense fails, because it misstates the law. The Ninth Circuit long ago embraced, *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1479-80 (9th Cir. 1983), and recently reaffirmed, *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009), the principle that NEPA does not permit an agency to defer analysis of effects on the basis of future permitting processes under other environmental laws. Shell unsuccessfully attempts to distinguish *South Fork Band* on the basis that the case concerned a site-specific agency decision. Dkt. 260 at 22-23. But nothing in *South Fork Band* depends on whether the NEPA analysis is for a specific project or a broader decision like a lease sale. The Federal Defendants make an equally flawed attempt to distinguish *SOCATS*. Dkt. 259 at 25 n.24. The case pre-dates the amendments to Section 1502.22, but those amendments did not change the section of the regulation, part (a), relevant here. *See* Dkt. 134 at

---

[10] Federal Defendants' additionally attempt to confuse the issue by asserting that "there is now, post-lease, no meaningful difference between" the coastal alternatives because the difference between the two alternatives now is limited to 12 lease blocks. Dkt. 259 at 17 n.13. However, this defense ignores NEPA's obligation to design alternatives that would minimize adverse effects. Dkt. No. 249 at 22-23. It is also flawed, because on remand BOEM was required to consider the lease sale anew, ensuring that the prior unlawful decision to hold the sale and the existence of leases issued pursuant to that sale "count[] for nothing." *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

10 n.2 (describing 1986 amendments).[11] To the extent the defendants are suggesting in their brief that future mitigation renders missing information not "relevant to reasonably foreseeable significant adverse impacts," 40 C.F.R. § 1502.22(a), Ex. 24 at 30, rather than not "essential to a reasoned choice among alternatives," 40 C.F.R. § 1502.22(a), that suggestion is inconsistent with the record. *See, e.g.,* Ex. 24 at 108 (noting that missing information about beluga whales summer and fall distribution is relevant but stating future compliance with environmental laws means the information is not essential).

II.      BOEM VIOLATED NEPA BY REFUSING TO ANALYZE THE CONTRIBUTION TO CLIMATE CHANGE FROM BURNING THE OIL AND GAS FORECAST TO BE PRODUCED FROM THE LEASE SALE

BOEM violated NEPA by refusing to estimate and consider the contribution to global warming that will occur if this massive lease sale results in production of oil and gas. In the opening remand brief, Plaintiffs explain that greenhouse gas emissions resulting from combustion are potentially of significant magnitude, have not been estimated, and are reasonably foreseeable effects of the lease sale. Plaintiffs further argue that BOEM cannot conclude that estimating these emissions is impossible without considering methodologies used by other agencies in related contexts. The first of these points is not in dispute—no party argues that the quantities of fossil fuels here involved are insufficient to merit analysis of the combustion impacts. The second point is conceded by the Federal Defendants, who in their brief state that BOEM in the SEIS "candidly acknowledges that it did not ascertain the incremental effect on greenhouse ('GHG') gas emissions" from combustion. Dkt. 259 at 15, 27. Intervenors Shell and

---

[11] The additional authority the defendants cite is inapplicable. None of the authorities address the issue here, whether an agency can avoid obtaining missing information relevant to potentially significant effects in reliance on future compliance with environmental laws. *See Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863-64 (D.C. Cir. 2006) (cited by Shell, Dkt. 260 at 22; addressing whether an EA must be supplemented when the status of an area under the Clean Air Act changes); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121–22 (9th Cir. 2000) (cited by Federal Defendants, Dkt. 259 at 25; addressing an agency's finding of no significant impacts); *N. Slope Borough*, 642 F.2d at 606 (D.C. Cir. 1980) (cited by Federal Defendants, Dkt. 259 at 25; addressing the since-repealed worst case analysis requirement of Section 1502.22(b)); *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 789 (9th Cir. 2001) (cited by the Federal Defendants, Dkt. 259 at 25; holding that an EIS that contained an "extensive analysis" of air pollution from a project could take into account the existence of air pollution laws); Council on Environmental Quality, Memorandum for Heads of Federal Departments and Agencies (Jan. 14, 2011) at 6-7 (cited by Shell, Dkt. No. 260 at 22 n.9; providing guidance on mitigation measures identified and analyzed in NEPA documents).

Conoco argue nevertheless that BOEM is not changing course in the SEIS but is standing by its EIS determination that the contribution to global warming from combustion is negligible. Dkt. 256 at 22-27; Dkt. 260 at 28-30. Not only is this argument completely undercut by Federal Defendant's concession, it is based on an untenable reading of the SEIS, as Plaintiffs will explain briefly below.

The only question now before the Court, therefore, is whether BOEM's "candidly acknowledged" refusal to analyze combustion impacts is lawful under NEPA. This question turns on two disputed issues: are climate change impacts of the consumption of oil and gas from the lease sale a reasonably foreseeable potential impact of the lease sale decision and did BOEM reasonably conclude no methodology exists to do the analysis of impacts. On the first point, defendants offer several legal arguments to avoid the Plaintiffs' argument that"[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). None of their arguments excuses them from the obligation and each is addressed below.

On the second point, Federal Defendants admit that BOEM never considered the methodologies for estimating the effect of this action on consumption that Plaintiffs suggested in comments. Dkt. 259 at 29. In fact, Federal Defendants fail to point to a single methodology that BOEM did consider before reaching its conclusion that no reliable methodologies exist. Rather, Federal Defendants and Conoco now offer for the first time in their briefs post-hoc arguments about the inadequacies of the methodologies that Plaintiffs brought to BOEM's attention during the administrative process. *Id.* at 31 (arguing that methodologies used by agencies throughout the federal government to model the effects of their actions on oil and gas markets are not "generally accepted" because they have been used "in the context of other programs or in different factual settings"); Dkt. 256 at 32-33. The Court should not consider these arguments because they were not the basis of the agency's decision. Instead, the Court should remand to BOEM to select a methodology or explain why methodologies widely used to model the response of oil and gas markets to changes in supply and demand cannot be used to model consumption impacts here. Even were the Court to consider these arguments, however, they fail as a factual matter. BOEM's own documents show that BOEM has modeled consumption

impacts in the past, and potentially relevant methodologies are used throughout the federal government.

    A.    <u>BOEM disavowed on remand its prior conclusion that the lease sale would have no net impact on oil consumption and associated emissions.</u>

In the 2007 EIS, BOEM stated that the lease sale "likely would not change" aggregate oil consumption or associated greenhouse gas emissions. Ex. 3 at 105. Federal Defendants summarize BOEM's 2007 conclusion in its briefing to this Court: "The 2007 EIS concluded that any [greenhouse gas] emissions avoided by not proceeding with Lease Sale 193 would be approximately offset by corresponding emissions as oil and gas is consumed from alternative sources." Dkt. 259 at 27.

Shell and Conoco agree and urge the Court to affirm BOEM's analysis of combustion impacts on this ground. But as the SEIS makes clear, and as BOEM now candidly admits in its briefing, BOEM disavowed on remand any attempt to "ascertain the incremental effect on greenhouse gas ('GHG') emissions . . . contributed by the downstream consumption of oil and gas potentially discovered and produced from future Lease Sale 193 development." Dkt. 259 at 15. Not only did BOEM adopt on remand the position that it was not required to estimate this incremental contribution, BOEM concluded that making such an estimate *was not possible*.

This is the only fair reading of the SEIS. The SEIS states that "[t]here is no reliable methodology to assess the relation between leasing in the Chukchi Sea and changes in nationwide or worldwide oil and gas consumption levels." Ex. 21 at 6a. It asserts that oil and gas markets are simply too complex. *Id.* ("Consumption of oil and gas is driven by a variety of complex interacting factors . . . ."). It states that the effect of any particular leasing decision on oil and gas conservation is not "discernable," "particularly . . . with regard to Sale 193 where the actual productive capacity is currently an unknown." *Id*. (emphasis omitted)[12] Based on this new reasoning, BOEM has "declined . . . to make an attempt to quantify . . . contributions of

---

[12] Shell argues that these are mere "organizational differences" not affecting the "substance" of BOEM's conclusions. Dkt. 260 at 28. But the "substance" of BOEM's conclusion in the SEIS is clear: the effect of the lease sale on consumption is unknown and cannot reliably be determined based on any existing methodology. This is plainly inconsistent with BOEM's conclusion in the 2007 EIS that "the level of oil consumed in the United States . . . likely would not change." Ex. 3 at 105.

greenhouse gas emissions from downstream consumption of the oil and gas that may be produced as a result of Lease Sale 193," as BOEM now admits. Dkt. 259 at 27.[13]

Agency determinations may be affirmed only on grounds actually relied on by the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983). The Court should not uphold BOEM's decision to forego analysis of greenhouse gas emissions and associated climate change on a ground offered by the intervenors that the agency itself has disavowed—namely, that the increase in consumption resulting from the lease sale will be offset by decreases elsewhere, such that net consumption "[will] not change." Ex. 3 at 105. BOEM's NEPA compliance, therefore, must stand or fall based on whether an obligation exists to analyze these impacts. In the sections that follow, Plaintiffs show that that the obligation exists here and that BOEM's refusal to examine these impacts is unjustified.

B.      Combustion of oil and gas is a reasonably foreseeable consequence of the lease sale.

The Federal Defendants and BOEM acknowledge that climate change is a reasonably foreseeable consequence of greenhouse gas emissions. Dkt. 256 at 22; Ex. 3 at 52. The question of foreseeability thus comes down to whether combustion of oil and gas is a reasonably foreseeable consequence of this oil and gas lease sale. Plaintiffs explained in the opening remand brief that both the production of oil and gas and the use of that oil and gas as energy are reasonably foreseeable consequences. Dkt. 249 at 39-41. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, holds that effects are not reasonably foreseeable only if they are "too 'remote and highly speculative' to warrant consideration" and that agencies are not free to

---

[13] Confusingly, Federal Defendants suggest that the EIS too declined to quantify the effect of the lease sale on consumption. Dkt. 259 at 27. This isolated statement in Federal Defendants' brief is difficult to square with the EIS itself, which concluded that consumption and associated emissions "likely would not change," or with Federal Defendants' statement on the very same page of the brief that "The 2007 EIS concluded that any GHG emissions avoided by not proceeding with Lease Sale 193 would be approximately offset by corresponding emissions as oil and gas is consumed from alternative sources." *Id.* All parties but the Federal Defendants agree that the EIS *did* reach a conclusion about the quantity of emissions from consumption. Dkt. 256 at 24; Dkt. 260 at 29. But even if BOEM had refused in 2007 to quantify emissions from combustion, no defendant has argued that Plaintiffs could or should have brought the present challenge to BOEM's refusal to quantify emissions from combustion prior to the remand. Any such argument is therefore waived. *See, e.g.*, *United States v. Boynton*, No. 05-V-2243-WQH RBB, 2007 WL 737725, *1 n.2 (S.D. Cal. Feb. 1, 2007) (an available argument not raised in an opposition brief to a summary judgment motion is waived).

determine that effects are unforeseeable when they in fact foresee the effects. 449 F.3d 1016, 1030-31 (9th Cir. 2006); Dkt. 249 at 41. Here, the EIS itself adopts a scenario of one billion barrels of oil as "Reasonably Foreseeable Future Development/Production (within the next 15-20 years)." Ex. 3 at 104. And the burning of oil and gas as energy is BOEM's *objective* in conducting this lease sale. Dkt. 249 at 41. Under *San Luis Obispo*, therefore, combustion of oil and gas is a reasonably foreseeable consequence of the lease sale.

As an initial matter, Federal Defendants and Conoco dispute that BOEM is required to use its forecasts of oil and gas production for purposes of analyzing greenhouse gas emissions because "even if projections of undiscovered hydrocarbon resources are accurate, there is no way of knowing how much of that volume will ever be discovered and brought to market." Dkt. 259 at 31; *see* Dkt. 256 at 26 n.16. But, as explained, Dkt. 249 at 39-41, NEPA requires that BOEM base its analysis of reasonably foreseeable future impacts on reasonable estimates of productive capacity. That is what BOEM in fact did here with respect to other environmental impacts and economic benefits. Ex. 3 at 104, 96-97; Ex. 24 at 25. It is arbitrary for BOEM to use the *development and production scenario* of one billion barrels that it has adopted as reasonably foreseeable for analysis of other environmental impacts and of economic benefits and yet refuse to use it for analysis of emissions resulting from combustion of the same oil and gas.

The Federal Defendants do not even address *San Luis Obispo*, which Conoco agrees articulates the Ninth Circuit's test for foreseeability. Dkt. 256 at 29. Instead, the Federal Defendants rely heavily on references in the case law to NEPA's "rule of reason." Dkt. 259 at 28, 29, 30, 32, 22-23 n.26 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)). However, the rule of reason adopted by *Metropolitan Edison Company v. People Against Nuclear Energy*, 460 U.S. 766 (1983), and *Public Citizen* is that courts must look to NEPA's purposes in making determinations about causation. *Metro. Edison*, 460 U.S. at 774 n.7; *Public Citizen*, 541 U.S. at 767-68. While "analogized" to the doctrine of proximate cause in tort, *Public Citizen*, 541 U.S. at 767, the rule does not mean that "any cause-effect relation too attenuated to merit damages in a tort suit would also be too attenuated to merit notice in an EIS . . . ." *Metro. Edison*, 460 U.S. at 774 n.7. It means, rather, that NEPA analysis need only be done when it would further the twin goals of NEPA—environmentally informed decision-

making and public participation.  *Public Citizen*, 541 U.S. at 767-68.[14]  Here those goals preclude BOEM from ignoring the issue of projected greenhouse gas emissions.  Analysis of the climate impacts of this major oil and gas lease sale, in the context of accelerating national and global emissions (due mainly to fossil fuel combustion) and attendant risks of environmental harm, Dkt 249 at 37, would facilitate informed agency decision-making and informed public participation in leasing decisions under OCSLA.

As explained in the opening remand brief, Dkt. 249 at 40, 46, neither NEPA's rule of reason nor its requirement of a "causal nexus," *see* Dkt. 256 at 29-30, excuses consideration of environmental impacts simply because that consideration may be complicated or difficult.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989) (quoting 40 C.F.R. § 1502.22(b)); *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549-50 (8th Cir. 2003).  Nor does it excuse consideration of impacts because private activity is part of the chain of causation. *See Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1137 (9th Cir. 2011).  And as the Ninth Circuit made clear in *San Luis Obispo*, even when impacts are remote or unlikely as a factual matter, they still must be considered if reasonably foreseeable.  449 F.3d at 1030-31 (holding that the risk of a terrorist attack was sufficiently foreseeable to require consideration).  Here there can be no fact-based assertion that greenhouse gas emissions and climate impacts are a remote or unlikely outcome of the lease sale decision.

> C.  BOEM has discretion to consider global climate change.

The Federal Defendants repeat BOEM's argument in the SEIS that it need not consider the effects of combustion because "OCSLA does not authorize BOEM to regulate emissions" from consumption.  Dkt. 259 at 29.  But as set forth in the remand opening brief, Dkt. 249 at 43, the Ninth Circuit rejects agency regulatory authority as a limit on the effects that an agency must analyze under NEPA.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005); *S. Fork Band Council*, 588 F.3d at 726.  NEPA requires BOEM to analyze the effects of the lease

---

[14] It was for this reason that analysis was not required in either *Metropolitan Edison*, where the psychological health impacts at issue had little to the with the *environment*, 460 U.S. at 773-76, or in *Public Citizen*, where the agency lacked discretion to take environmental considerations into account, 541 U.S. at 768-69.  BOEM protests that nothing in *Public Citizen* indicates that the proximate causation rule there announced depended on the fact that the agency had "no ability" to avoid the impacts in question.  Dkt. 259 at 28 n.26.  In fact, *Public Citizen* itself calls the FMCSA's total lack of discretion "a critical feature of [the] case." 541 U.S. at 766.  *Accord Ctr. for Biological Diversity*, 538 F.3d at 1213.

sale.  That BOEM does not directly regulate consumption of oil and gas does not change the fact that a reasonably foreseeable consequence of the lease sale is GHG emissions from the consumption of oil and gas produced by the lease sale.  That effect can inform the lease sale decision itself—where and whether to open areas to oil and gas activity—and NEPA therefore requires BOEM to analyze it.  *Cf. Public Citizen*, 541 U.S. at 768-69.

For its part, Shell goes much further than the Federal Defendants, arguing that consideration of greenhouse gas emissions is not required because OCSLA would prohibit taking climate change into account in making decisions.  Dkt. 260 at 32.  As described in Plaintiffs' opening remand brief, which addressed this argument, Dkt. 249 at 38 n.15, the Court should reject Shell's argument as contrary to the plain language of OCSLA.  The statute expressly authorizes BOEM to take account of the environment in making decisions, including those made at the lease-sale stage.  43 U.S.C. § 1346(d) ("The Secretary shall consider available relevant environmental information in making decisions . . . [and] in developing appropriate . . . lease conditions . . . ."); 43 U.S.C. § 1332(3) ("[T]he outer Continental Shelf . . . should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.").

The Ninth Circuit's decision in *CBD v. NHTSA*, confirms that Shell's argument is meritless.  538 F.3d at 1213-15.  *CBD v. NHTSA* considered an argument that global warming effects did not need to be analyzed under NEPA because the statute authorizing the action did not grant authority to act on the information, and rejected it even though the statute at issue, 49 U.S.C. § 32902, appears to be more restrictive of agency discretion than the provision of OCSLA governing BOEM's decisions at the lease sale stage, 43 U.S.C. § 1337(a)(1).  *CBD v. NHTSA* emphasized that statutory authority should be interpreted broadly for purposes of determining the requirements of NEPA.  538 F.3d at 1213 (quoting *Forelaws on Bd. v. Johnson,* 743 F.2d 677, 683 (9th Cir. 1985).

Shell relies on *Center for Biological Diversity v. U.S. Department of Interior*, 563 F.3d 466 (D.C. Cir. 2009), which states in dicta, *see* Dkt. 249 at 46 n.15, that BOEM would have violated OCSLA had it considered global climate change in formulating a five-year leasing program—the first step of OCSLA's four-stage process.  563 F.3d at 484-85; *id.* at 473 (describing OCSLA's four-stage process).  This case concerns a separate stage of Outer Continental Shelf development, governed by a separate section of OCSLA.  Yet Shell ignores the

distinction between the OCSLA sections governing five-year programs and lease sales, sections 1344 and 1337 respectively. 43 U.S.C. §§ 1344, 1337. *CBD v. DOI* was concerned with section 1344, which makes the development of five-year programs mandatory, *id*. § 1344 ("The Secretary, pursuant to procedures set forth in . . . this section, *shall* prepare . . . an oil and gas leasing program" (emphasis added)), just as the governing statute in *Public Citizen* made the issuance of a permit mandatory when certain (non-environmental) conditions were met. 541 U.S. at 766. Section 1377, by contrast, merely *authorizes* BOEM to grant oil and gas leases. 43 U.S.C. § 1337(a)(1). It cannot be read to contain a requirement that BOEM lease offshore lands without regard for global warming. In addition, BOEM is specifically authorized elsewhere in OCSLA to adopt lease stipulations to mitigate environmental harm. 43 U.S.C. § 1346(d). The D.C. Circuit's statement that consideration of climate change would be prohibited at the five-year-program stage is simply not relevant to deciding this lawsuit.

> D. <u>BOEM cannot avoid analysis of consumption impacts on the basis that no reliable methodologies exist without giving some consideration to existing methodologies.</u>

BOEM's remaining justification for its refusal to analyze consumption impacts is that there are no reliable methodologies for doing so. Ex. 24 at 23; Dkt. 149 at 42. However, Defendants can point to no evidence in the record that demonstrates any consideration of methodologies, let alone any consideration of the methodologies Plaintiffs brought to the agency's attention during the comment period.[15] Instead, Federal Defendants and Conoco offer in their briefs for the first time several arguments about why the methodologies referred to by Plaintiffs are not reliable. The Court should not address these arguments. "'The short-and sufficient-answer' to the [agency]'s argument . . . 'is that the courts may not accept . . . counsel's *post hoc* rationalizations for agency action.'" *Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (quoting *State Farm*, 463 U.S. at 50).

The only timely reason BOEM gave for its decision not to employ any methodology is that all existing methodologies were not "reliable." Dkt. 249, Ex. 21 at 6a. But, as Plaintiffs demonstrate in their opening remand brief, this conclusion is nowhere substantiated in the

---

[15] With respect to one of the documents in Plaintiffs' comments, an internal BOEM economic analysis called *Energy Alternatives and the Environment*, Ex. 35, Federal Defendants state that BOEM considered the document "indirectly." Dkt. 259 at 13. However, they do not and cannot point to any evidence in the record that BOEM addressed and rejected the document's methodology.

*Native Village of Point Hope, et al., v. Salazar, et al.,* 19
Case No. 1:08-cv-00004-RRB

record.  In light of the evidence that many agencies of the federal government, including BOEM itself, have estimated the response of oil and gas markets to changes in supply and demand, including the resulting greenhouse gas emissions, BOEM's conclusion is arbitrary.[16]  Under the APA, this Court must examine based on the administrative record, whether the agency "'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,'"  *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).  Here, BOEM's consideration of the issue is deficient under this standard.  Accordingly, the Court's inquiry need go no further—it should remand the decision to the agency.  Defendants' new, post-hoc arguments improperly ask the Court to determine factual questions that the agency should have addressed in its decision.

If, however, the Court were to address defendants' new explanations advanced in their briefs for the first time, it would have to reject them.  The Federal Defendants' complaint about *Energy Alternatives and the Environment* is that it does not indicate how much oil will actually be produced from Lease Sale 193.  Dkt. 259 at 31.[17]  But this is a red herring, because BOEM cannot, consistent with NEPA or the APA, use a production scenario to evaluate effects and economic benefits of the lease sale and simultaneously plead ignorance to avoid analysis of climate change.  Dkt. 249 at 39-41.  With respect to the Keystone XL SDEIS and the CAFE

---

[16] Plaintiffs provided three different examples of methodologies to determine the impact of an action on oil and gas consumption and resulting GHG emissions.  Ex. 30 at 12-13.  Federal Defendants do not argue that that BOEM's own internal document, *Energy Alternatives and the Environment*, should be excluded from the administrative record.  Dkt. No. 259 at 13.  Plaintiffs have filed a motion to supplement the administrative record with this document.  Federal Defendants dispute that the record should contain the other documents Plaintiffs cited and discussed in their comments, including documents describing methodologies employed by the State Department and the National Highway Traffic and Safety Administration.  Dkt. No. 259 at 13-15.  Plaintiffs have filed a motion arguing that the administrative record should properly be supplemented to also include these documents or, in the alternative, that these documents should be considered under the well-established exception permitting courts to consider extra-record documents.

[17] The analysis uses economic modeling to estimate the impact of Outer Continental Shelf oil production on conservation, fuel switching, and imports.  Ex. 35 at 10-12.  Plaintiffs cannot endorse this model in all respects because the record does not indicate the assumptions on which it is based.  But it falls to BOEM in the first instance to adopt a satisfactory methodology or adequately explain why none exists.  In light of  *Energy Alternatives*, BOEM cannot simply assert that all existing methodologies are unreliable.  Ex. 21 at 6a.

---

*Native Village of Point Hope, et al., v. Salazar, et al.,*                                                              20
Case No. 1:08-cv-00004-RRB

rulemaking analysis, Federal Defendants protest that these analyses are not generally accepted, Dkt. 259 at 31, but the information Plaintiffs provided to the agency indicates the contrary.[18] Conoco argues that the analyses are "inapposite" because they addressed factually distinguishable situations. Dkt. 256 at 32-33. But the Keystone XL[19] and CAFE rulemaking[20] methodologies have been employed in situations that are highly similar.[21]

III.     THE COURT SHOULD VACATE THE AGENCY DECISION OR, IN THE ALTERNATIVE, ENJOIN ACTIVITIES UNDER THE LEASES AND REMAND FOR COMPLIANCE WITH NEPA

As Plaintiffs describe in their opening remand brief, the appropriate relief in this case is for the Court to vacate the Lease Sale 193 decision and remand to the agency to comply with NEPA. Dkt. 249. at 47-49. None of the defendants disputes that the normal remedy under the APA, 5 U.S.C. §§ 701-706, for an unlawful agency action is to set aside the action and remand to the agency. Dkt. 249 at 47. The Federal Defendants do not address vacatur, focusing solely on injunctive relief. *See* Dkt. 259 at 33-36. The intervenors address vacatur, but their arguments are unavailing.

---

[18] For example, the Keystone XL SDEIS incorporates the report of a private contractor, EnSys, that employs the "WORLD model" to estimate the project's impact on oil consumption and net greenhouse gas emissions. Ex. 38 at 2; Ex. 41 at 3. "WORLD has been used for DOE's Office of Strategic Petroleum Reserve since 1987, and has been applied in analyses for . . . EIA, EPA, the American Petroleum Institute, the World Bank, the OPEC Secretariat, the International Maritime Organization, Bloomberg, and major and specialty oil and chemical companies." Ex. 41 at 3.

[19] For the Keystone EIS, for example, the State Department enlisted EnSys to "evaluate[] potential influences of the proposed [new supply corridor] on global, U.S., and regional oil demand" and associated greenhouse gas emissions. Ex. 38 at 2; *see also* Ex. 41 at 8 ("[The] WORLD model [c]aptures the interactions between crude supply, refining, product demand, and pricing."). That is what BOEM insists it cannot do here.

[20] The joint EPA and NHTSA climate change analysis for the CAFE rulemaking likewise estimates the response of oil markets to changes in supply and demand. Ex. 37 at 15, 18; *id.* at 12 (considering "the responsiveness of oil demand and supply to a change in the world oil price").

[21] Contrary to Conoco's assertion, there is nothing "duplicitous" about Plaintiffs position on these models. Dkt. 256 at 31. Plaintiffs need not endorse the State Department, EPA or NHTSA's complicated methodologies and conclusions in all respects to demonstrate that BOEM's unsupported assertion that "no reliable methodologies exist" is arbitrary.

Statoil's complaint is that vacatur is not an automatic remedy, s*ee* Dkt. 257 at 3 (stating that there is no "automatic rule" of vacatur for a violation of the APA or NEPA),[22] but Plaintiffs never argued vacatur was automatic. Dkt. 249 at 48 n.16. The Court always retains discretion to remand without vacatur in unusual circumstances—where vacatur, for example, would threaten harm to the environment, Dkt. 249 at 48 n.16, or thwart the objective of the statute at issue, *W. Oil & Gas Ass'n v. U.S. Envtl. Prot. Agency,* 633 F.2d 803, 813 (9th Cir. 1980).[23]

Conoco and Shell argue that the Court should exercise its discretion here not to vacate the lease sale. Dkt. 260 at 34-35; Dkt. 256 at 34-36.[24] But neither Conoco nor Shell cites any countervailing consideration that would warrant a departure from the normal vacatur remedy Plaintiffs request. As Plaintiffs describe in their opening brief, vacatur here advances the mandates of NEPA and OCSLA by "preserv[ing] the decision makers' opportunity to choose among policy alternatives," *Natural Res. Defense Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) (quotation marks omitted), and ensuring "orderly" offshore development "subject to environmental safeguards," 43 U.S.C. § 1332(3). Dkt. 249 at 47-49. Vacatur in this case avoids harm to the environment, including harm to endangered bowhead whales, threatened eiders and walrus, and to Plaintiffs' and their members' use of the Chukchi Sea for subsistence, scientific, recreational, and spiritual purposes. *See* Dkt. 134 at 34 (citing evidence). Indeed, in closely related circumstances, the D.C. Circuit Court of Appeals issued an opinion vacating the 2007-

---

[22] Conoco also suggests Plaintiffs' argument is that vacatur is automatic, noting that "there is no absolute rule of law that dictates what remedy the Court may fashion should it conclude that any of Plaintiffs' supplemental claims have merit." Dkt. 256 at 34.

[23] To the extent defendants suggest that the Supreme Court's decision in *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010) somehow changes the principle that vacatur is the normally appropriate remedy for agency actions that violate the APA, Dkt. 260 at 35; Dkt. 257 at 3; Dkt. 256 at 35, they are mistaken. In *Monsanto* the Supreme Court "assumed that a remand and vacatur of the agency's decision was lawful." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D. D.C. 2010). In *Monsanto*, the district court had vacated the agency action at issue, an agency decision to deregulate Monsanto's genetically modified alfalfa seed pending the agency's compliance with NEPA. *Monsanto*, 130 S. Ct. at 2756. The Supreme Court struck down the district court's additional remedy of enjoining the agency from taking a new independently justified action during remand, because the vacatur prevented the harm of which plaintiffs complained, namely contamination of their crops by Monsanto's unregulated genetically modified alfalfa seeds. *Id.* at 2760-61.

[24] Shell cites *California v. Watt*, but the court there remanded the agency's decision without vacating because petitioners in that case "d[id] not request that [the court] vacate the leasing program." 668 F.2d 1290, 1326 (D.C. Cir. 1981).

2012 Five Year Oil and Gas Leasing Program, under which BOEM conducted the lease sale at issue in this case, because of BOEM's failure to do an adequate environmental review under OCSLA. *See CBD v. DOI*, 563 F.3d at 489 ("we vacate the Leasing Program and remand the Program to the Secretary for reconsideration in accordance with this opinion").[25] Vacatur is particularly appropriate here for the additional reason that Federal Defendants have demonstrated already in this case that absent vacatur, the existence of outstanding leases factor significantly into the Federal Defendants' remand reconsideration of the lease sale decision. Dkt. 249 at 48.[26] In sum, Federal Defendants have based their decision to reaffirm the lease sale on an inadequate NEPA analysis and, as a result, the Court should vacate the lease sale decision and remand to the agency to satisfy its obligations under NEPA.

In the alternative, Plaintiffs request and are entitled to an injunction precluding drilling on leases pending the agency's compliance with NEPA. *See* Dkt. 249 at 48-49. Defendants' arguments to the contrary fail. Federal Defendants do not directly dispute the factual sufficiency of Plaintiffs' arguments regarding harm, but instead suggest Plaintiffs have asked the Court to presume irreparable injury in this case. *See* Dkt. 259 at 34-36. Federal Defendants made the same argument—almost verbatim—in the original round of summary judgment briefing, Dkt. 122 at 64-65. As Plaintiffs' original summary judgment reply brief explained, the Federal Defendants' assertion is not correct. Dkt. 134 at 35. Plaintiffs demonstrated that harm from these activities is "sufficiently likely," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), based largely on BOEM's own EIS and evidence of injury to Plaintiffs' use of the Chukchi Sea. Dkt. 134 at 35. Indeed this Court previously—and correctly—granted an injunction of drilling based on Plaintiffs' demonstration of harm. Dkt. 164 at 20-21.

Federal Defendants also repeat their argument from the original summary judgment briefing that, based on OCSLA's policy statement, an injunction would not strike the proper

---

[25] The vacatur mandate was stayed, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 07-1433, Order (July 28, 2009), after BOEM assured the court it would "delay new lease sales … and suspend activities under exploration plans for Sale #193 leases" pending the Secretary's reconsideration decision on the remanded program. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, Nos. 07-1247, 07-1433, Petition for Rehearing and/or Clarification (May 11, 2009), at 14.

[26] Federal Defendants in their response brief continue to assert that the existence of Lease Sale 193 leases is an appropriate consideration during the remand analysis. *See* Dkt. 259 at 19 (justifying analysis of alternatives on the basis of outstanding leases issued pursuant to Lease Sale 193). But this is improper. *See* Dkt. 249 at 47-48.

Case 1:08-cv-00004-RRB    Document 262    Filed 12/21/11    Page 28 of 32

balance between the public interest and harm to the environment and Plaintiffs. *Compare* Dkt. 259 at 35 *with* Dkt. 122 at 65-66; *see also* Dkt. 257 at 9-11 (same); Dkt. 256 at 35-36 (same); Dkt. 260 at 35-36 (same). The Court already rejected this argument by enjoining drilling on leases pending the original remand. Dkt. 164 at 20-21. As Plaintiffs explained in their original summary judgment reply brief, Dkt. 134 at 36, OCLSA does not articulate a policy against an injunction here—it requires BOEM to balance "environmental safeguards" in its decision-making, Dkt. 259 at 35 (citing 43 U.S.C. § 1332(3)), and specifically requires BOEM to comply with NEPA at the lease sale stage. *Sec'y of the Interior v. Cal.*, 464 U.S. 312, 338 (1984); 43 U.S.C. § 1346(a)(1).

Federal Defendants' and Statoil's final argument is that no injunction should issue because preliminary exploration activities are the only activities that can occur absent additional NEPA review. Dkt. 259 at 35-36; Dkt. 257 at 6-8, 9. The argument is another repeat of an argument Federal Defendants advanced in their original summary judgment response, *see* Dkt. 122 at 66, and the Court has already rejected it. Dkt. 164 at 20-21; *see also* Dkt. 134 at 36-37 (Plaintiffs' original summary judgment reply to this argument).[27]

For the foregoing reasons, Plaintiffs are entitled to injunctive relief in this case given BOEM's failure to comply with NEPA at the lease sale stage. In light of the substantial risk of irreparable harm, neither the government nor the intervenors bore their burden of proving the kind of "unusual circumstances" that justify continued action under unlawfully issued leases. *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995).

\*\*\*

For all the reasons stated above and in their opening remand brief, Plaintiffs respectfully request that the Court vacate the lease sale, or in the alternative enjoin activities on leases, and remand to the agency to comply with NEPA.

---

[27] As was the case for the original summary judgment motion, the argument should additionally be rejected because BOEM has now already approved a drilling plan on Chukchi Sea Lease Sale 193 leases, in this case for up to six wells starting in 2012. *See* Ex. 43; Dkt. No. 134 at 36-38.

Dated: December 21, 2011.

Respectfully submitted,

_s/ Erik Grafe_

ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

ERIC P. JORGENSEN (AK Bar # 8904010)
NEIL E. GORMLEY (AK Bar # 1105020)
Earthjustice
325 Fourth Street
Juneau, AK 99801-1145
T: 907-586-2751
F: 907-463-5891
E: ejorgensen@earthjustice.org
E: ngormley@earthjustice.org

_Attorneys for Plaintiffs Native Village of Point Hope, et al._

Case 1:08-cv-00004-RRB   Document 262   Filed 12/21/11   Page 30 of 32

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2011, a copy of foregoing PLAINTIFFS'

REMAND REPLY BRIEF, with attachments, was served electronically on David B. Glazer,

Kristen L. Gustafson, Kyle W. Parker, Jeffrey W. Leppo, Ryan P. Steen, Martin T. Schultz,

Steven E. Mulder, Rebecca Kruse, and James N. Leik.

*s/ Erik Grafe*

ERIK GRAFE (AK Bar # 0804010)
Earthjustice
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907-277-2500
F: 907-277-1390
E: egrafe@earthjustice.org

**TABLE OF EXHIBITS**
**TO PLAINTIFFS' REMAND REPLY BRIEF**

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 41 | | U.S. Department of State, Keystone XL Project Supplemental Draft Environmental Impact Statement (Apr. 22, 2011) (additional excerpts) |
| 42 | Remand Supplemental AR 1009 - 1010 | Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Final Supplemental Environmental Impact Statement, OCS EIS/EA BOEMRE 2011-041 (Aug. 2011) (additional excerpts) |
| 43 | | BOEMRE, Shell 2012 Exploration Plan – Chukchi Sea Webpage Documents |